# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
May 4, 2021 Session

## CORINIO PRUITT v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 06-00460      Chris Craft, Judge**

_____

### No. W2019-00973-CCA-R3-PD

_____

Petitioner, Corinio Pruitt, was convicted in 2008 of first degree felony murder and was sentenced to death. After Petitioner's conviction and sentence were affirmed by the Tennessee Supreme Court on direct appeal, Petitioner filed a post-conviction petition. After an extensive evidentiary hearing, the post-conviction court denied relief. In this appeal, Petitioner raises the following claims for relief: 1) the post-conviction judge erred by failing to recuse himself; 2) Petitioner is ineligible for the death penalty due to his intellectual disability, and trial counsel were ineffective in their handling of Petitioner's intellectual disability claim at trial[1]; 3) trial counsel were ineffective for failing to investigate and present additional mitigating evidence regarding Petitioner's traumatic social history, mental health, and cognitive impairments; 4) the prosecutors abused their discretion by seeking the death penalty in this case, operated under a conflict of interest, and committed misconduct by exercising peremptory strikes against African-American jurors and making inappropriate statements and arguments, and trial counsel were ineffective for failing to raise appropriate objections to these issues; 5) trial counsel rendered ineffective assistance during the course of voir dire, trial, closing argument, and jury instructions during the guilt phase; 6) the death penalty is unconstitutional and is a disproportionate sentence in this case; and 7) the cumulative effect of these errors rendered Petitioner's trial fundamentally unfair. After a thorough examination of the briefs of the parties and amici curiae, the records of the post-conviction hearing and direct appeal, and the applicable law, this court affirms the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

---

[1] Petitioner's trial predated the 2010 amendment of Tennessee Code Annotated section 39-13-203, which replaced the term "mental retardation" with "intellectual disability." This opinion will use the term "mental retardation" only when referring to the testimony of witnesses or pieces of evidence that used that term. No disrespect is intended thereby.

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J., joined.

Kelly A. Gleason (on appeal and at hearing); Lucie T. Butner (on appeal); and Jonathan King and Barbara Sidelnik (at hearing), Assistant Post-Conviction Defenders, Nashville, Tennessee, for the appellant, Corinio Pruitt.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Benjamin A. Ball, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Steve Jones, Assistant District Attorney General, for the appellee, State of Tennessee.

J. David Wicker and Elizabeth Bowden, Nashville, Tennessee; Collin P. Wedel and Andrew B. Talai, Los Angeles, California; and Alex E. Sirio, Washington, D.C., for the amicus curiae, the Tennessee Conference of the NAACP.

David R. Esquivel, Sarah B. Miller, and Elizabeth Harwood, Nashville, Tennessee, for the amicus curiae, Just City.

Ross M. Johnson and Zachary Lawson, Nashville, Tennessee, for the amicus curiae, Tennessee Conservatives Concerned About the Death Penalty.

John S. Hicks, Nashville, Tennessee, for the amici curiae, the Arc of Tennessee, Professor Daniel Kiel, and Professor Steven J. Mulroy.

## OPINION

### Factual and Procedural Background

### I. Trial and Direct Appeal

Petitioner, Corinio Pruitt, was indicted for first degree felony murder and first degree premeditated murder for the death of the victim, Lawrence Guidroz. Both at trial and on direct appeal, Petitioner was represented by attorneys from the Shelby County Public Defender's Office. After a six-day trial in 2008, the jury found Petitioner guilty of felony murder and the lesser-included offense of second-degree murder, which was merged into his conviction for felony murder. The jury then imposed the death penalty after determining that the following aggravating factors outweighed any mitigating circumstances beyond a reasonable doubt: (1) Petitioner was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed, solicited, directed, or

aided by Petitioner, while Petitioner had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit a robbery; and (3) the victim was 70 years of age or older at the time of the murder. *See* T.C.A. § 39-13-204(i)(2), (7), (14). Petitioner's conviction and sentence were affirmed on direct appeal by both this court and the Tennessee Supreme Court, with two Justices dissenting as to the proportionality of the death penalty. *See State v. Pruitt*, 415 S.W.3d 180 (Tenn. 2013), *cert. denied sub nom Pruitt v. Tennessee*, 134 S. Ct. 2874 (2014).

The Tennessee Supreme Court summarized the facts presented in the trial court as follows:

### A. Evidence at Guilt Phase

On the morning of August 2, 2005, Courtney Johnson encountered [Petitioner] by chance as he walked to the Apple Market on Winchester Road in Memphis, Tennessee. [Petitioner] talked about stealing a car and asked Mr. Johnson if he would get in the car with him if [Petitioner] took one. Although Mr. Johnson told [Petitioner] "no," he remained with [Petitioner] outside the market and spoke to people who came to the market, including [Petitioner]'s cousin, Michael Rockett. Later, Mr. Johnson's friend, "Sed," came to the market. [Petitioner] remained outside the market as Mr. Johnson and Sed walked to the Family Dollar store at the other end of the shopping center. Mr. Johnson testified that he went with Sed to the Family Dollar store because he did not want to be involved in whatever [Petitioner] was going to do.

Taka Pruitt[, who is unrelated to Petitioner,] arrived at the Apple Market with her neighbor. They parked directly outside the front door of the market. Ms. Pruitt stayed in the car while her neighbor went inside. As she waited in the car, she observed a "younger gentleman," later identified as [Petitioner], standing to the left of the door. Ms. Pruitt recognized him as someone who lived in her apartment complex. After five or six minutes, Ms. Pruitt saw an older man walk out of the market with groceries in his arms and walk to his car. As he reached the driver's side door, [Petitioner] ran up behind the older man and pushed him into the car. Although she could not see clearly into the car, it appeared to Ms. Pruitt that the two men were "tussling." She saw [Petitioner] on top of the older man, and she could see the older man's feet dangling out of the car. After about fifteen seconds, she saw [Petitioner] throw the older man to the ground, slam the car door, and drive away. When Ms. Pruitt checked on the victim, he was shaking and having trouble breathing and he was bleeding from his nose and both ears.

Ms. Pruitt ran inside the market, told employees that someone had just been carjacked, and asked them to call 911. She then ran back to the victim and called 911 on her cell phone. Ms. Pruitt went to the police station after the carjacking. She identified [Petitioner] from a photo lineup as the person who beat the victim and took the victim's car. At trial, Ms. Pruitt was shown a still photo created from the market's security camera video. She circled an image of [Petitioner], identifying him as the younger man she saw push the victim into his car. Ms. Pruitt also confirmed that [Petitioner] was alone when he attacked the victim.

Courtney Johnson testified that he saw the victim arrive at the Apple Market in a brown Chevrolet and walk into the market just before he and Sed went to the Family Dollar store. Mr. Johnson said that the victim appeared to be fine when he went into the Apple Market. Mr. Johnson and Sed were in the Family Dollar store for "three to four minutes." When they walked back in the direction of the Apple Market, Mr. Johnson saw "an old man laying down with blood coming out of his head, and his car was gone." [Petitioner] was also gone. Mr. Johnson said he ran inside the market and asked someone to call 911. He left the scene before the police arrived because he did not want to be involved and did not want to "snitch" on [Petitioner].

Memphis Police Officer Charmell Smith was the first officer on the scene and arrived before emergency medical personnel. She found the victim lying on his back on the ground and bleeding from his ears and mouth. She testified that the victim was "semi-conscious" and that she helped load the victim into an ambulance when it arrived. Based on her prior medical training as a certified nursing assistant, she opined that the bleeding from the ears indicated some kind of head trauma.

Thomas J. Leech III identified the victim, Mr. Lawrence Guidroz, from a still photo created from the Apple Market's security camera video. Mr. Leech testified that he had known Mr. Guidroz for more than twenty-five years and that he was very close to Mr. Guidroz. Mr. Leech went to the hospital to see Mr. Guidroz when he heard that Mr. Guidroz had been attacked. Mr. Leech remained in Mr. Guidroz's hospital room throughout the night. At no point was Mr. Guidroz able to communicate with Mr. Leech. Mr. Guidroz died the next day. Mr. Leech testified that Mr. Guidroz was seventy-nine years old at the time of his death. Mr. Guidroz was buried in Louisiana after a service in Memphis. Mr. Leech identified photographs of Mr. Guidroz's car, bearing the license plate number CUX 845.

Following the carjacking, Memphis Police began looking for the victim's car. Officer Jonas Holguin found the car parked at the Somerset Apartments near Tullahoma and Winchester and was instructed to watch it from a distance. At trial, Officer Holguin was shown the photograph of Mr. Guidroz's car, which had been identified by Mr. Leech, and confirmed that the license plate was the same as the car he was instructed to watch. At some point, the car was moved from the apartment complex without the knowledge of the police, and the police began to search the area in an attempt to locate the car. The car was later observed pulling into a residence at 3180 Beauchamp, and a team of police officers converged on that location.

The driver of the car, who was wearing a red shirt, went inside the house. The police made the decision to apprehend the driver. Mr. Johnson came out of the house and the police took him into custody. According to Sergeant Robin Hulley, Mr. Johnson yelled, "the guy you want is in the back yard." Officers went to the back yard and saw a man wearing a red shirt jump over a fence and run. Although dogs were called in to track the man, police had no success in finding him.

Mr. Johnson testified that after the incident at the Apple Market, he did not see [Petitioner] again until three days later, when [Petitioner] telephoned and asked to come to Mr. Johnson's house to take some liquor from Mr. Johnson's grandmother's bar. Because he knew [Petitioner] had stolen the victim's car, Mr. Johnson told [Petitioner] not to come to his house.

Nevertheless, [Petitioner] drove to Mr. Johnson's house and parked the car in the garage. Shortly thereafter, three to four unmarked police cars arrived on the scene. Mr. Johnson knew that the police were there for [Petitioner]. Although Mr. Johnson was not aware that Mr. Guidroz had died, [Petitioner] informed Mr. Johnson that he had "body-slammed" the victim before taking his car. At trial, Mr. Johnson identified a photograph of himself with [Petitioner] at the Apple Market on the day of the carjacking and identified the victim's car as the one [Petitioner] parked in his garage. Mr. Johnson was never charged in the case.

The car was taken to the crime scene investigation office, where Officer Francis Donald Carpenter processed the car for fingerprints. Officer Carpenter testified that he found several latent prints on the car. Two prints were lifted from the outside windshield on the front passenger side. Officer Nathan Gathright, a latent fingerprint examiner for the Memphis Police Department, testified that these prints belonged to Mbenda McCracken. A print found on the left rear fender outside the car belonged to Kendricks Scott. Another print

found on the right rear fender above the wheel belonged to [Petitioner]. Both Mr. McCracken and Mr. Scott testified at trial.

Mr. McCracken identified [Petitioner] in the courtroom. In August 2005, Mr. McCracken had known [Petitioner] for approximately eight months. Mr. McCracken identified a photo of the victim's car and stated that he saw [Petitioner] driving the car in August 2005. When Mr. McCracken asked [Petitioner] where the car came from, [Petitioner] told him it was his girlfriend's car. Mr. McCracken got into the car and went with [Petitioner] to buy beer and marijuana. [Petitioner], Mr. McCracken, and a friend named "Fred" drove around in the car for three to four hours and got high. Mr. McCracken later saw on the news that the car [Petitioner] was driving had been taken in a carjacking. Mr. McCracken denied any involvement in the carjacking.

Before Mr. McCracken testified, he and [Petitioner] were accidentally placed in the same holding cell for about forty-five minutes. Mr. McCracken was in custody on an aggravated burglary charge unrelated to the present case. Mr. McCracken testified that while he and [Petitioner] were in the holding cell, [Petitioner] told Mr. McCracken that there were two persons involved in the carjacking and that the other person had not been charged. [Petitioner] said that he and the other person were trying to get into the victim's car. When the victim approached the car, they jumped on him. [Petitioner] told Mr. McCracken that he grabbed the victim and threw him down. [Petitioner] tried to persuade Mr. McCracken to testify that he did not know [Petitioner] and that another man came into the neighborhood to attempt to sell Mr. McCracken parts from the car.

Kendricks Scott, whose fingerprints were found on the left rear fender, testified that he saw [Petitioner] driving the victim's car in August 2005. [Petitioner] offered Mr. Scott a ride to work and told Mr. Scott that it was "his auntie's car." Mr. Scott opened the rear door of the car and briefly sat in the back seat with the door open, but did not ride in the car. Another person, whom Mr. Scott did not know, was in the car at the time. The following day, when the police came looking for [Petitioner] at the house next door to Mr. Scott's residence, Mr. Scott learned that the car had been taken in a carjacking. Mr. Scott did not volunteer any information to the police at that time.

Alma Rockett is [Petitioner]'s aunt. [Petitioner] was living with Ms. Rockett in the Somerset Apartments in August 2005. On August 2, 2005, Ms. Rockett recognized [Petitioner] in video footage shown on a television news broadcast. She also recognized another man in the video who previously had

been in her home with [Petitioner].  At trial, she was shown still photographs from the Apple Market security video.  Ms. Rockett identified [Petitioner] as the man wearing the dark-colored shirt, a larger man as her son, Michael, and a smaller man as the man who previously came home with [Petitioner].  She also identified Michael's car in the photograph with the three men.  After seeing the video footage on the news, Ms. Rockett and her son went downtown "to straighten it out, to let them know that [Michael] was not involved."  After that night, [Petitioner] never came back to her house.  When [Petitioner] later called Ms. Rockett, she told him to turn himself in to police.

[Petitioner] testified in his own defense.  He acknowledged his prior convictions for aggravated burglary, robbery, criminal attempt to commit robbery, and theft over $500.  He stated that on the morning of August 2, 2005, he left for work around 6:00 a.m.  When he arrived at work, however, he discovered he had left his identification badge at home.  Although he called his aunt to confirm the badge was there, he never went home to get it.  Instead, [Petitioner] went to Courtney Johnson's house and arrived between 8:00 and 8:30 a.m.

[Petitioner] stated that he and Mr. Johnson talked for awhile and went to the Apple Market for the express purpose of stealing a car.  While they were standing by the drink machine attempting to decide which car to steal, [Petitioner]'s cousin, Michael, arrived and went into the market.  When Michael came out of the market, Michael, Mr. Johnson, and [Petitioner] walked to the Family Dollar store.  [Petitioner] stated that Michael bought something, and the three of them returned to the front of the Apple Market by the drink machine until Michael left.  [Petitioner] acknowledged seeing Taka Pruitt arrive at the market.  He claimed that he and Mr. Johnson knew her because "[they] smoke[d] weed with her."

Mr. Johnson spoke to Mr. Guidroz when he arrived at the market.  After Mr. Guidroz went inside, Mr. Johnson walked toward the Family Dollar store because he did not want to be seen on the surveillance camera.  According to [Petitioner], Mr. Johnson "popped up on the other side" from where [Petitioner] was and "scoped out" Mr. Guidroz's car.  [Petitioner] testified that he was the lookout while Mr. Johnson got inside the car.

According to [Petitioner], when Mr. Guidroz came out of the store, he saw Mr. Johnson in Mr. Guidroz's car.  Mr. Guidroz began struggling with Mr. Johnson.  [Petitioner] ran up to Mr. Guidroz, grabbed him, and "slung him" into the car.  He believed that Mr. Guidroz fell to the ground after he hit the car.  [Petitioner] admitted pushing Mr. Guidroz hard.  [Petitioner] testified that

he was scared and that he got into the car and drove it to Mr. Johnson's house on Beauchamp. Mr. Johnson did not get into the car with him. When Mr. Johnson came home, [Petitioner] left. [Petitioner] testified that he did not have a gun at the time he took the victim's car and that his intent was to steal the car and sell its parts.

The next day, Mr. Johnson called [Petitioner] and met him at the Somerset Apartments, where [Petitioner] was staying. The car was parked at an apartment complex across the street from the Somerset Apartments. [Petitioner] believed that Mr. Johnson was the person who moved the car to that location. [Petitioner] stated that on August 3, 2005, he and Mr. Johnson went back to Mr. Johnson's house in the victim's car and drove it into the garage. When the police arrived, [Petitioner] ran because he was scared. He claimed he did not know at the time that the victim had died. The following day, [Petitioner] turned himself in and gave a statement to the police.

When cross-examined about his statement to the police, [Petitioner] admitted that he told police he left Mr. Johnson standing outside the Family Dollar store when he took the victim's car. He admitted telling police that he did not leave the victim's car at Mr. Johnson's house. He also admitted telling police that he drove a number of friends around and that he let his friend, Reggie, use the car. [Petitioner] stated that he initially lied about Mr. Johnson's involvement because he did not want to "snitch" on him. [Petitioner] admitted that his version of the events did not match the security video, which shows Mr. Johnson walking to the Family Dollar store before the carjacking and walking back after the carjacking. He said that most of his statement to police was true. As to any inconsistencies between his version of events and the testimony from Taka Pruitt and Mr. McCracken, he claimed both were lying. He maintained that he did not intend to hurt the victim.

The State presented medical evidence regarding Mr. Guidroz's injuries. Dr. Karen Chancellor, the Chief Medical Examiner in 2005 for Memphis and Shelby County, Tennessee, performed Mr. Guidroz's autopsy. As a result of her internal and external examinations of Mr. Guidroz, Dr. Chancellor concluded that the cause of Mr. Guidroz's death was multiple blunt force injuries sustained to the head and chest and that the manner of Mr. Guidroz's death was homicide.

Dr. Chancellor found an abrasion on the front of Mr. Guidroz's face and a laceration on the left side of his forehead. She also noted that "there [was] ecchymosis or hemorrhag[ing] around both eyes, and that was caused by skull fractures . . . found inside the body." The injuries to Mr. Guidroz's body

included bruising on the ear, the right and left side of the chest, the upper left arm, the neck and shoulder, the right ankle, the backs of both hands, both forearms, and the lips. Dr. Chancellor opined that all the victim's bruises were caused at the same time and at the time of the incident at the Apple Market.

As to her internal examination of Mr. Guidroz, Dr. Chancellor noted that "there was quite a bit of hemorrhage overlying the ribs on the left side" and a complete fracture of the clavicle. Eleven ribs on Mr. Guidroz's left side were fractured, with resulting bruises on the surrounding lung tissue. Dr. Chancellor remarked that Mr. Guidroz had extensive blunt force injuries to his head, which included skull fractures, bruises to brain tissue, and hemorrhaging around the brain. In addition, Mr. Guidroz suffered a subdural hematoma, which required surgery to avoid severe brain injury. She opined that the skull fractures were caused by at least three separate blows or impacts to the left side of the head. Mr. Guidroz also suffered fractures to the orbital plates directly above the eyes, which resulted in blood collecting around his eyes.

Dr. Chancellor was unaware that Mr. Guidroz had coagulopathy, a condition making him prone to bleed, but she was aware that Mr. Guidroz had severe coronary atherosclerosis, a blockage of the blood vessels of the heart. No evidence of surgical intervention for these blockages was present. Dr. Chancellor did not collect any of Mr. Guidroz's fractured bones during the autopsy. Dr. Chancellor stated that, although the practice of removing bones during autopsy was once "in vogue," the practice is no longer common. She also did not conduct a bone density test on Mr. Guidroz because a bone density test is not a routine part of an autopsy. Although she opined that Mr. Guidroz's injuries were consistent with being beaten, she was not able to determine the order of his injuries or whether his injuries resulted from being struck by a hard object, being forcibly thrust against a hard object, or a combination of these two actions. She did not believe, however, that a fall alone would have caused all of his injuries.

The defense introduced testimony from Dr. O.C. Smith, former Chief Medical Examiner for Shelby County, Tennessee. Dr. Smith reviewed the medical examiner's files and Mr. Guidroz's medical records in July 2007. Dr. Smith noted several deficiencies in the autopsy record. He commented on the absence of X-rays taken as part of the autopsy procedure and the absence of bones for review. Dr. Smith testified that bones can be excised, cleaned, and retained in inventory, or can be preserved with photographs or X-rays. Dr. Smith testified that when he was the medical examiner, the lab was able to test for bone density either by X-ray or by excising the bone and examining it. He opined that loss of bone density due to age or osteoporosis could have made

Mr. Guidroz's bones more vulnerable to trauma. Dr. Smith's routine practice when he was medical examiner was to excise every fractured bone in a homicide or suspected homicide. He also commented that he was unable to examine Mr. Guidroz's brain specimen because the preserving fluid had been allowed to dry out.

Dr. Smith testified that Mr. Guidroz's medical records indicated he suffered from coagulopathy, which made him prone to bleed. Mr. Guidroz lost 1.5 liters of blood during his brain surgery, which required a transfusion of blood, fresh frozen plasma, and platelets. Dr. Smith opined that the coagulopathy, together with the blockages in Mr. Guidroz's heart, made him particularly vulnerable to injury. The coagulopathy also would have caused "seepage" of blood during surgical procedures, which would have made Mr. Guidroz's injuries look worse than they actually were. The ecchymosis, or hemorrhaging or bleeding under the skin, on various parts of Mr. Guidroz's body also could have been exacerbated by the coagulopathy. Dr. Smith discussed a condition known as "senile ecchymosis" that occurs as part of the aging process and opined that some of Mr. Guidroz's ecchymosis might be attributable to his age. He explained that with such a condition, even minor trauma can cause bruising with superficial bleeding on the skin's surface. He conceded that the ecchymosis could be from the original injuries but thought that it was probably a combination of surgery and original injury. Dr. Smith agreed that blood beneath the skin on the left side of Mr. Guidroz's neck likely resulted from the fracture and dislocation of the clavicle and fractures of the adjacent ribs, not from surgery.

Dr. Smith found evidence of a "contre-coup" or "decelerating" brain injury and distinguished between accelerative trauma and contre-coup trauma. Accelerative trauma occurs when a moving object strikes a fixed head and leaves a bruise on the skin and causes damage in the area of the brain immediately beneath the blow. A contre-coup injury, however, is decelerative trauma caused when a moving head hits a fixed object. Injury to the skin occurs at the point of impact, but the injury to the brain occurs on the opposite side of the head. Dr. Smith testified that, although the fractures of Mr. Guidroz's skull were on the left side of his head, he suffered a contre-coup injury to the right side of his brain, indicating that his injuries occurred in a fall.

Dr. Smith noted that the fractures to the clavicle, ribs, and head were all on Mr. Guidroz's left side and opined that the cause of death was "a fall to a flat surface or some contact where the body is in motion, and then it's been arrested by a hard, unyielding surface." Dr. Smith opined that the fall could

have been from a standing height, from running and falling, from falling from a height, or from being propelled, depending on the strength of Mr. Guidroz's bones and the force that caused the fall. He ruled out the possibility that blows or strikes to Mr. Guidroz's body were the sole cause of his injuries.

Dr. Smith agreed with Dr. Chancellor that the manner of Mr. Guidroz's death was homicide and the cause of Mr. Guidroz's death was blunt force injury to his head and chest. He also agreed that Mr. Guidroz's injuries were consistent with a scenario of

> being pushed in on the left-hand side of his car—something was going [on] in that front seat of the car to the point that an eye witness saw Mr. Guidroz's feet dangling . . . out of the driver's side door with the [d]efendant on top of him, and then the next thing that an eye witness sees is this [d]efendant pick up the body of Mr. Guidroz and sling him out of [the] car onto the concrete.

Dr. Bruce Levy, then Chief Medical Examiner for the State of Tennessee and the Medical Examiner for Davidson County, testified for the State in rebuttal. Although Dr. Smith's routine practice during his tenure was to remove bones from the body and store them, Dr. Levy testified that this practice was unique to Memphis and uncommon. In Dr. Levy's opinion, Dr. Chancellor, who actually performed the autopsy, was in the best position to render opinions as to what she saw and to interpret her observations. In his view, she followed the standard practice of documenting the autopsy by photographs, diagrams, and narratives describing what she saw.

Dr. Levy stated that Mr. Guidroz suffered blunt force trauma injuries. He opined that the victim's skull fractures, which were indicative of at least two separate blows, combined with the fractures to the ribs and clavicle, led to a "differential diagnosis." In other words, there could be different causes for the injuries: either a fall from some height, a car collision, or an accelerated fall in which the victim was thrown to the ground with some force. Dr. Levy opined that breaking eight or nine ribs was not consistent with a simple fall to the ground, but might be consistent with an accelerated fall. Likewise, the multiple injuries to the chest, arms, face, and head were inconsistent with a simple fall.

He testified that when faced with a differential diagnosis, a medical examiner will rely on the history of the case. In this case, the anecdotal reports that Mr. Guidroz was assaulted in a carjacking and thrown to the ground were factors in determining the cause of his injuries. Dr. Levy testified that "body-

- 11 -

slamming" can cause multiple fractures like the ones observed in Mr. Guidroz. The presence of complex skull fractures was indicative of a significant amount of force, "much greater than you could possibly get from simply falling to the ground and striking your head on a flat surface."

Based on the evidence, the jury convicted [Petitioner] of first degree felony murder in the perpetration of a robbery. The jury also convicted [Petitioner] of second degree murder as a lesser-included offense of the charged first degree premeditated murder. The trial court merged the two convictions and proceeded to the penalty phase.

## B. Evidence at Penalty Phase

Marie Leech[, wife of Thomas Leech,] was a close family friend of Mr. Guidroz. She testified that she met Mr. Guidroz at St. Paul the Apostle Catholic Church and had known him for more than twenty-five years. On Sundays after church, Mr. Guidroz usually had dinner at Ms. Leech's home. Mr. Guidroz was the godfather of Ms. Leech's middle child and particularly close to that child. Ms. Leech explained that Mr. Guidroz had a very active life. He attended Mass daily at different churches throughout Memphis and went to St. Peter Villa, an assisted living facility, three days a week to visit and care for residents there. Ms. Leech testified that Mr. Guidroz was fondly regarded in the Oakhaven neighborhood where he had lived for more than forty years.

The State introduced [Petitioner]'s indictments and judgments of conviction from five prior offenses through Shelby County Criminal Court Deputy Clerk, Alice Robinson. Those offenses were robbery and an attempted robbery committed on November 26, 2002, and three aggravated robberies committed on November 4, 1996.

In mitigation, [Petitioner] presented the testimony of Dr. Rebecca Rutledge, a clinical psychologist, who assessed him in November 1996 at the request of the Memphis and Shelby County Juvenile Court. [Petitioner] was sixteen years old at that time. As part of her assessment, Dr. Rutledge administered to [Petitioner] the Slosson Intelligence Test, a Bender Visual Motor Gestalt Test, and a Rorschach Psycho-diagnostic Technique Test. [Petitioner]'s score on the Slosson test was sixty-six, which is in the upper mildly mentally retarded range. Dr. Rutledge stated that someone who is mildly mentally retarded would tend to be impulsive and would not likely consider the consequences of his actions. She noted that at the time of the assessment, which lasted about forty-five minutes to one hour, [Petitioner] did

not appear to be taking the process seriously. She stated that [Petitioner]'s test results may have been slightly lower than his actual level of cognitive functioning. She opined, however, that had he put forth more effort he would have continued to test in the mildly mentally retarded range. She did not have access to [Petitioner]'s academic records at the time of the evaluation and knew only that he had repeated the first grade. She also commented that mild mental retardation is difficult to recognize because the person may appear "normal" until he is engaged in conversation. The level of functioning of a person who is mildly mentally retarded can improve with training, family support, job support, and various community resources.

Prior to her testimony, Dr. Rutledge reviewed a report from the Middle Tennessee Mental Health Institute ("MTMHI") resulting from a September 2006 evaluation of [Petitioner]. She noted that the MTMHI staff's diagnosis of [Petitioner] as mildly mentally retarded was consistent with her 1996 diagnosis.

On cross-examination, Dr. Rutledge conceded that she did not have any particular memory of [Petitioner]. At the time of the 1996 screening, she did not find that he suffered from any mental illness that would have prevented his transfer to adult court, nor did she find any disorders when she administered the Rorschach and the Bender Gestalt tests. Dr. Rutledge testified that the juvenile court asked her to administer the Slosson test. She explained that the Slosson test was designed to provide an estimate of general verbal cognitive ability in a short time frame. She acknowledged that the Slosson test, unlike other tests, did not have built-in standards for determining malingering. Dr. Rutledge testified that the Wechsler Adult Intelligence Screening ("WAIS") test is the "gold standard" for functional intelligence quotient ("I.Q.") testing and is better at discerning specific areas of impairment. She opined, however, that [Petitioner] "would have fallen pretty close to [his score on the Slosson test]" if he had been given the WAIS test in 1996.

Dr. Rutledge was aware of the staff observations in the MTMHI evaluation that [Petitioner] was exaggerating his mental illness symptoms. MTMHI had also noted [Petitioner]'s self-reported paranoid schizophrenia, although there was no record of his having received treatment for the disorder. Dr. Rutledge conceded that [Petitioner] could have deliberately underperformed on the 1996 Slosson test to avoid being transferred to adult court. She also conceded that [Petitioner] had many reasons to underperform during his 2006 assessment at MTMHI because of his pending capital murder charges.

- 13 -

[Petitioner]'s mother, Vivian Pruitt, testified that if [Petitioner] were to receive a death sentence, it "would just kill [her] too." She recounted that [Petitioner] was the youngest of five children she had by three different men. [Petitioner]'s father was about sixteen years younger than Ms. Pruitt, and [Petitioner] never had a relationship with him. When she was pregnant with [Petitioner], Ms. Pruitt smoked, but she did not recall drinking. When [Petitioner] was born, she was married to Walter Lee Pruitt. Although the two have since divorced, [Petitioner] thought of Walter Lee Pruitt as his father and was close to him.

Vivian Pruitt detailed a family history of mental health issues. She had previously been hospitalized at Memphis Mental Health Institute three times due to addiction problems, but had been sober for fifteen to twenty-five years at the time of trial. During her period of addiction, she was arrested numerous times, usually for minor offenses like public intoxication, and was frequently in and out of prison. On one occasion she was arrested for aggravated assault when she shot [Petitioner]'s father. When Ms. Pruitt was in prison, [Petitioner] stayed with his grandmother, Frankie Timberlake.

According to Ms. Pruitt, Ms. Timberlake, who helped raise [Petitioner], spent time in and out of mental institutions. Several of Ms. Timberlake's siblings (Vivian Pruitt's aunts and uncles) had mental health problems as well. One of Ms. Timberlake's siblings died from a drug overdose and another committed suicide. One of [Petitioner]'s sisters, Tapika Pruitt, had attempted suicide several times. Vivian Pruitt considered [Petitioner] a normal child with good test scores, and she never sought any type of treatment for him. He did not seem "slow" to her, but she believed he was in resource class in fifth and sixth grade.

Vivian Pruitt testified that [Petitioner]'s first arrest was at age thirteen or fourteen and that he had experienced "problems" since that time. After [Petitioner] was released from juvenile court, he was arrested for several other offenses, including stealing shoes and writing graffiti on the school walls. He was in and out of juvenile court and was sent at various times to different juvenile facilities. He escaped from the Memphis Boys Group Home after he was charged with the three aggravated robbery offenses in 1996. Ms. Pruitt testified that [Petitioner] eventually quit school "because they had him in juvenile."

Ms. Pruitt said that [Petitioner] was living with his aunt, Alma Rockett, on the day of the carjacking and was scheduled to work at Patterson Warehouse. She indicated that [Petitioner] had moved in with Ms. Rockett

- 14 -

after he and his sister, Quiana Pruitt, with whom he had been living, had a dispute about [Petitioner]'s discipline of Quiana's son. Vivian Pruitt believed [Petitioner] was experiencing stress over the fight with his sister and his housing situation at the time of the offense.

Quiana Pruitt testified that if her brother were sentenced to death and executed it would "really hurt [her]." She and [Petitioner] have the same father, who was not involved in their lives, and she considered Walter Pruitt her father. She recounted that she and [Petitioner] had a difficult upbringing. Their grandmother, Ms. Timberlake, was their primary caretaker because their mother was frequently in prison. Their aunt, Alma Rockett, told them their mother was "on drugs, didn't want [them], [and] neglected [them]." Quiana Pruitt also recounted the family history of mental health problems. Her mother and extended family on her mother's side – including an uncle and two aunts – suffered from paranoid schizophrenia. Their sister, Tapika, had mental health and drug problems. Ms. Timberlake had Alzheimer's disease and was hospitalized in a mental institution in 2000.

Quiana Pruitt did not consider her brother "slow" when he was growing up. She recalled that [Petitioner] began getting into trouble at the age of thirteen or fourteen and was in and out of "juvenile." He eventually dropped out of school in the seventh grade. [Petitioner] moved in with Quiana Pruitt and their mother following his release from prison after serving his sentence for the 1996 aggravated robbery convictions. [Petitioner] left their home after attempting to discipline Quiana Pruitt's son and went to live with his aunt, Alma Rockett.

In rebuttal, the State presented Sandra Atkinson, the records supervisor for Memphis City Schools. Ms. Atkinson reported that [Petitioner] was enrolled in the first grade at Carnes Elementary School in September 1987. Although his grades and conduct were average in the first grade, he was retained and repeated the first grade. During April of his second year in the first grade, he transferred to Larose Elementary School, where he remained for the rest of his elementary school years. [Petitioner] received mostly As and Bs for grades, and Es and Ss for conduct. His Tennessee Comprehensive Assessment Program ("TCAP") scores varied somewhat from year to year but at times were exceptional. He scored in the ninety-eighth percentile overall during his fifth-grade year and in the ninety-fifth percentile overall during his sixth-grade year.

[Petitioner]'s academic performance declined dramatically during his seventh-grade year. He enrolled at Vance Middle School in the Fall of 1994

- 15 -

and attended until December, when he transferred to Colonial Middle School for one week, then returned to Vance Middle School until May 5, 1995, after which he withdrew. Ms. Atkinson testified that [Petitioner] was frequently absent in the seventh grade. No grades were available because he did not complete his seventh-grade year. Although [Petitioner] took some of the TCAP tests, he apparently missed some of the testing days because he had no scores for reading or spelling. [Petitioner]'s remaining scores were poor, ranging from a low in the eighth percentile for science to a high in the forty-second percentile for study skills.

Although [Petitioner] did not complete the seventh grade, he was nevertheless promoted to the eighth grade. During his eighth-grade year in 1995, however, he did not attend school until November 2, 1995, and he stopped attending after January 30, 1996. His grades were dramatically lower his eighth-grade year, reflecting all Fs for the semester. His records were transferred to an alternative school on April 26, 1996. Ms. Atkinson testified that the transfer to an alternative school could have been for non-attendance or behavior issues, but the records did not reflect the reason. Nothing in [Petitioner]'s records indicates that he was ever in a resource class.

In surrebuttal, the defense recalled Vivian Pruitt to explain the dramatic decline in [Petitioner]'s academic performance following elementary school. She testified that [Petitioner] fell in the fifth grade and struck his head. She stated that he had persistent headaches following that injury, but that she "didn't think it was that serious." When he was in the seventh grade, four of [Petitioner]'s friends were killed in a particularly gruesome car wreck. [Petitioner] went to the scene and observed their injuries. [Petitioner]'s behavior declined after witnessing the accident. [Petitioner] also had a brother who died from AIDS during this period. Ms. Pruitt testified that she did not believe [Petitioner] knew right from wrong or that he meant to kill Mr. Guidroz.

Prior to the jury charge in the penalty phase and before closing arguments, [Petitioner] made an oral motion challenging the appropriateness of the death penalty in his case pursuant to Tennessee Code Annotated section 39-13-203 because he had a functional I.Q. "below seventy" and deficits in adaptive behavior. The trial court denied the motion, noting that neither the court nor the State had been provided notice that a motion pursuant to Tennessee Code Annotated section 39-13-203 would be made. The trial court commented that the motion should have been filed prior to trial and stated that the timing of the motion was improper.

The jury found that the State had proven beyond a reasonable doubt the aggravating circumstances that: (1) [Petitioner] was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (2) the murder was knowingly committed, solicited, directed, or aided by the [Petitioner], while [Petitioner] had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit a robbery; and (3) the victim was seventy years of age or older at the time of the murder. See Tenn. Code Ann. § 39-13-204(i)(2), (7), (14) (2010). The jury further found that the State had proven beyond a reasonable doubt that the statutory aggravating circumstances outweighed any mitigating circumstances and sentenced [Petitioner] to death.

*C. Evidence at the Hearing on the Motion for New Trial*

After the jury returned a sentence of death, [Petitioner] filed a motion for new trial, in which he challenged, among other things, the trial court's refusal to consider his oral motion to disallow the consideration of the death penalty due to intellectual disability. At a hearing, trial counsel testified that he had given the State a "Notice of Intent to Present Expert Testimony Regarding Mental Condition" on February 5, 2008, but failed to formally file this motion with the trial court clerk until March 10, 2008, after the trial had ended. He argued that this motion, together with the proof at trial of [Petitioner]'s diagnosis of "mild mental retardation" gave the State sufficient notice that he was challenging the applicability of the death penalty.

The trial court held a hearing on December 12, 2008, and January 16, 2009, on the issue of [Petitioner]'s eligibility for the death penalty. The defense initially rested on the proof presented at trial by Dr. Rutledge. The State introduced testimony from Dr. Sam Craddock, a clinical psychologist at MTMHI, who testified that he evaluated [Petitioner] from August 31 to September 27, 2006, at MTMHI. During this evaluation, MTMHI staff observed [Petitioner] "around the clock." Dr. Craddock administered I.Q. tests, aptitude tests, and a personality test. In addition to interviewing [Petitioner]'s mother, Dr. Craddock also examined law enforcement files in the case, certain court documents filed in the case, and a forensic evaluation conducted by the Midtown Mental Health Center.

Dr. Craddock identified a staff conference report from MTMHI dated September 22, 2006. Noted on the report was an Axis I diagnosis of "schizophrenia, differentiated type," and an Axis II diagnosis of "mild mental retardation." Dr. Craddock testified that the latter diagnosis was recorded in

error and should have read "borderline intellectual functioning." Other notes throughout the file, including the discharge summary, recorded the Axis II diagnosis as borderline intellectual functioning, not mental retardation. Dr. Craddock could not explain why he had made the transcription error. After reviewing [Petitioner]'s records, Dr. Craddock prepared an addendum to the report stating that the "mild mental retardation" note was made in error.

Dr. Craddock testified that there are three requirements for a diagnosis of mental retardation: subaverage intellectual functioning demonstrated by an I.Q. below seventy, impairments in the subject's adaptive functioning, and a diagnosis before the age of eighteen. [Petitioner]'s I.Q. score was sixty-eight on the test Dr. Craddock administered at MTMHI. Dr. Craddock acknowledged that his report indicated [Petitioner] appeared to be making a good effort on the test "[w]ith the exception of him occasionally giving quick responses with accompanying little thought." Dr. Craddock therefore believed that [Petitioner]'s I.Q. was actually higher than his scores reflected.

Other factors led Dr. Craddock to conclude that [Petitioner]'s score was not indicative of mental retardation. For instance, at the age of eighteen, [Petitioner] had received a score of eighty-one on a Beta test administered through the Department of Correction. At that time, [Petitioner] indicated an interest in earning his Graduate Equivalency Degree and learning about small engine repair. The Beta test score indicated that [Petitioner] was reading at an eighth-grade level, spelling at a high school level, and understanding math at a fifth-grade level. Furthermore, [Petitioner]'s school records indicated he had performed well both academically and on his TCAP tests until the sixth grade. School records did not indicate that [Petitioner] was ever in special education classes, which Dr. Craddock would have expected if [Petitioner] was mentally retarded.

Dr. Craddock also did not see any deficits in [Petitioner]'s adaptive behavior. [Petitioner] had stated to Dr. Craddock that one of his interests was playing chess, which Dr. Craddock noted is inconsistent with someone who is mentally retarded. Also, Dr. Craddock "question[ed] the scores because mentally retarded individuals . . . typically score high on performance and low on verbal." [Petitioner]'s scores revealed just the opposite. Dr. Craddock stated that

> [w]hen you score low on performance, there is an implication there that you may not be making your best effort. So, if you look in the textbooks, time after time, mentally retarded people, they have poor[er] verbal, math skills, and so forth than they do

- 18 -

manipulation skills, visual skills, but that was not the case with [Petitioner].

In rebuttal, [Petitioner] presented the testimony of Dr. Rutledge. She had compared the results of the test that she administered to [Petitioner] with the results of the test administered by Dr. Craddock. She stated that both tests indicated [Petitioner] had an I.Q. of approximately sixty-eight. Dr. Rutledge's memory of [Petitioner]'s adaptive skills was that he had fifth-grade reading skills, third-grade math skills, was unable to live independently, and was unable to remain gainfully employed. She admitted that she last saw [Petitioner] twelve years earlier, when he was sixteen years old and spent, at most, an hour with him. She also admitted that at the time she thought his scores might not accurately reflect his actual ability. She did not have his school records and was unaware that at one point he scored in the ninety-eighth percentile on his TCAP tests.

On May 22, 2009, the trial court entered an order denying [Petitioner]'s motion for new trial and found that [Petitioner] had failed to prove by a preponderance of the evidence that he was intellectually disabled and thus ineligible for the death penalty under Tennessee Code Annotated section 39-13-203. The trial court found that [Petitioner] had failed to prove by a preponderance of the evidence that he had significantly subaverage intellectual functioning as evidenced by an I.Q. of seventy or below. The court found that neither the test score in 1996 nor the test score in 2006 was the product of [Petitioner]'s best efforts and that his grades in school and TCAP scores indicated that the 1996 and 2006 test scores were unreliable. The trial court also determined that [Petitioner] failed to prove by a preponderance of the evidence that he suffered deficits in his adaptive behavior. The trial court based this finding on [Petitioner]'s excellent performance in school through the sixth grade and testimony from his mother that he seemed like a "normal" child. The trial court also noted Dr. Craddock's testimony that he did not see any deficits in [Petitioner]'s adaptive behavior. The trial court found that the drop in [Petitioner]'s grades and test scores after the sixth grade appeared to result from traumatic events in his life, drug use, incarceration, and absence from school.

*Id*. at 187-200 (footnotes omitted).

On the issue of intellectual disability, the Tennessee Supreme Court noted that the "review of [Petitioner]'s intellectual disability claim has been made more difficult by [Petitioner]'s timing in raising the issue at trial" and that the "best practice" would have been "to raise the issue in a pretrial setting to ensure that both the State and the defendant

- 19 -

are provided a full and fair opportunity to collect, exchange, and present the requisite proof." *Id.* at 201. However, the supreme court reviewed the evidence in the record "to determine if [Petitioner] has an intellectual disability that precludes imposition of the death penalty." *Id.*; *see* T.C.A. § 39-13-203(b) (2010). The supreme court held that the evidence preponderated against the trial court's finding that Petitioner's I.Q. scores were "unreliable" because "neither expert opined that [Petitioner]'s I.Q. was greater than 70, whether through lack of effort or on some other basis for adjustment of the raw score." *Pruitt*, 415 S.W.3d at 203. Therefore, the supreme court concluded that Petitioner had met his burden of proving by a preponderance of the evidence that he had significantly subaverage general intellectual functioning as evidenced by a functional I.Q. of 70 or below. *Id.*; *see* T.C.A. § 39-13-203(a)(1) (2010).[2] However, the supreme court noted that "little evidence was presented" regarding whether Petitioner had any deficits in adaptive behavior and whether his intellectual disability manifested before the age of eighteen. *Pruitt*, 415 S.W.3d at 204; *see* T.C.A. §§ 39-13-203(a)(2), (3) (2010). Accordingly, the supreme court affirmed the trial court's finding that Petitioner failed to establish that he had an intellectual disability that rendered him ineligible for the death penalty. *Pruitt*, 415 S.W.3d at 204.

The Tennessee Supreme Court was split on the issue of the comparative proportionality of the death penalty in this case. *See* T.C.A. 39-13-206(c)(1)(D). The majority opinion reaffirmed the analysis set out in *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), which compared the case at bar to other first degree murder cases in which a capital sentencing hearing had been conducted. *Pruitt*, 415 S.W.3d at 213-17. Upon conducting a comparative proportionality review with such cases, the majority determined that Petitioner's death sentence was not disproportionate. *Id.* at 217-223. Two Justices concurred with the majority's decision to affirm Petitioner's conviction but dissented with respect to both the appropriate pool of comparison cases as well as to the proportionality of the death penalty in this case. *Id.* at 223 (Koch and Lee, JJ. concurring in part and dissenting in part). The dissenting Justices staunchly disagreed with the *Bland* analysis and argued that the pool of comparison cases should include all cases that resulted in a conviction for first degree murder. *Id.* at 225-232. The dissenting Justices, comparing Petitioner's case both to cases in which the death penalty was sought and cases in which it was not, concluded that Petitioner's offense was "much more similar to crimes that did not result in the death penalty than to crimes that did." *Id.* at 232-237.

## II. Post-Conviction Proceedings

---

[2] Tennessee Code Annotated section 39-13-203(a)(1) was amended effective May 11, 2021, removing the language "as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." *See* 2021 Tenn. Pub. Acts, ch. 399, § 1. The amendment of this subsection, and the addition of subsection (g), does not affect our opinion in this case.

Petitioner subsequently filed a timely petition for post-conviction relief. Post-conviction counsel was appointed, and an amended petition was filed raising numerous claims related to ineffective assistance of counsel, prosecutorial misconduct, intellectual disability, and the constitutionality of the death penalty. Petitioner filed a motion seeking the recusal of the post-conviction judge, the denial of which was affirmed by this court in an accelerated interlocutory appeal pursuant to Tennessee Supreme Court Rule 10B, § 2. *See Corinio Allen Pruitt v. State*, No. W2017-00960-CCA-T10B-CO (Tenn. Crim. App., at Jackson, July 31, 2017) (order), *perm. app. denied* (Tenn. Oct. 17, 2017). The evidentiary hearing in this case was conducted over multiple days between April and August 2018, during which the following testimony was presented.

### A. The Prosecutors and General Weirich's Family

Assistant District Attorney Carolyn Alanda Dwyer testified that she was the lead prosecutor in the Special Prosecution Unit. Ms. Dwyer explained that Petitioner's case qualified for the Special Prosecution Unit because of his prior record. Ms. Dwyer testified that she was involved in Petitioner's case since it was indicted, although she did not recall handling Petitioner's preliminary hearing. She testified that the usual practice in Shelby County was for the prosecutor handling the case to determine the charges to be presented to the grand jury, so it would have been her decision to charge Petitioner with both felony murder and premeditated murder. Before filing a notice of intent to seek the death penalty, Ms. Dwyer reviewed the facts of the case and the applicable aggravating factors with then-District Attorney General William L. Gibbons and received his approval to file the notice. Ms. Dwyer testified that there was no formal process for the defense to present mitigating evidence at the time the charging decision or the decision to seek the death penalty is made and that she had no information regarding Petitioner's mental health or I.Q. at that time.

Ms. Dwyer did not recall signing an agreed order to have Petitioner evaluated at MTMHI because the doctor at Midtown Mental Health Center had concerns about his competency, but she explained that such an order was a "form order that we enter on most homicide cases." Ms. Dwyer acknowledged that she received notice of the defense team's intent to present expert testimony regarding Petitioner's mental condition through Dr. Rutledge, but she did not recall when she received such notice. She agreed that there was a note in her file to obtain Petitioner's mental health records in order to rebut such testimony and that she subpoenaed records from TDOC in February of 2008. Ms. Dwyer agreed that her file contained "form responses" to defense motions requesting individual voir dire and jury questionnaires that she printed but never filed because the defense never filed such motions in this case. She explained that individual voir dire was not a common practice in Shelby County at the time, though it was more common at the time of the post-conviction hearing.

Ms. Dwyer testified that then-Assistant District Attorney Amy Weirich[3] became involved in the case just a week or two before trial. Ms. Dwyer testified that another prosecutor had recently left the office so she asked Gen. Weirch to help her pick the jury. Ms. Dwyer testified that "it had been awhile since I had done a death penalty case" and that she relied on Gen. Weirich's experience. Ms. Dwyer denied that she had ever seen a "Voir Dire Manual" that was supposedly used by the District Attorney's Office as a training tool. She disagreed with some of the manual's suggestions that the goal of voir dire is to establish the credibility of the prosecutor and "to get [the jury] on the side of the State," explaining that "the most important thing is the jury understand their duty and they're to follow the law."

Katherine[4] Alfonso Weirich, the mother-in-law of Gen. Weirich, testified that she was employed at St. Paul Catholic Church as an administrative assistant and choir director. Mrs. Weirich knew the victim in this case because he sang in the choir that usually performed at funerals. She testified that the victim was a "very private person. He was in my choir, but I can't say that I knew him other than he was always there to come and sing." She testified that she did not socialize with the victim, though she was friends with Marie and Thomas Leech, who both testified for the State at trial. Because of her employment at the church, Mrs. Weirich received a call that the victim had been "carjacked and beat up," so she went to the hospital. After the victim passed away, Mrs. Weirich assisted with his funeral arrangements, "pretty much [taking] care of . . . the planning, the reading, the songs and all that." She also directed the choir that sang at the victim's funeral, which was not unusual given her role at the church. Mrs. Weirich attended Petitioner's trial as a representative of the church, and she knew that her daughter-in-law was one of the prosecutors. Mrs. Weirich did not have any discussions with the prosecution regarding the potential outcome of the sentencing phase. Mrs. Weirich had attended other trials as an observer, including at least two murder trials prosecuted by Gen. Weirich.

Charles Weirich, Gen. Weirich's husband, testified that he is an attorney in the Memphis area. Mr. Weirich and his family attended St. Paul Catholic Church until they moved to East Memphis. At that point, Mr. Weirich continued to attend St. Paul as a lector while his family attended a different church. Mr. Weirich would advertise his services as an attorney at St. Paul. In 2002, Mr. Weirich was contacted by the victim, whom he recognized from the church, about drafting a will. At the time, the law required an executor to live in Tennessee, so Mr. Weirich agreed to be co-executor of the victim's will with Thomas Leech, who lived out of state. After the victim's death, Mr. Weirich filed a petition

---

[3] In January of 2011, after Petitioner's trial but before the post-conviction hearing, Amy Weirich became the District Attorney General of Shelby County. Accordingly, we will refer to her throughout the opinion as Gen. Weirich, particularly as it distinguishes her from other witnesses who share her last name.

[4] Petitioner's brief indicates that this witness's name may actually be spelled "Catherine." This opinion will utilize the spelling used in the transcript and the post-conviction court's order. No disrespect is intended if this is an incorrect spelling.

to probate the estate in his role as an attorney. He attempted to renounce his role as a co-executor, but the probate judge wanted either an in-state executor who was subject to the contempt power of the court or for Mr. Leech to post a bond. Mr. Weirich agreed to stay on as co-executor, and he was eventually paid $5,000 "for fees and expenses related to the administration of the estate." The estate was closed in September of 2007, several months before Petitioner's trial. Mr. Weirich testified that the outcome of the criminal prosecution in this case had no bearing on the probate proceedings.

District Attorney General Amy P. Weirich testified that in 2008, she was the head of the Gang and Narcotics Prosecution Unit for the Shelby County District Attorney's Office. She became involved in Petitioner's trial when Ms. Dwyer asked her to assist with the case the week before trial. Because of other cases she was trying, Gen. Weirich did not read through the file until the weekend prior to the start of trial. Gen. Weirich testified that she was aware that the defense team would present evidence that Petitioner was intellectually disabled but that she was not involved in any pretrial discussions of the matter. Gen. Weirich did not specifically recall that she was the "primary attorney handling voir dire" or that voir dire was completed in a single day. Gen. Weirich testified that she had seen the "Voir Dire Manual" as a reference available in the District Attorney's Office but that she had never been instructed by previous supervisors to study it or relied on it in preparing for voir dire. Gen. Weirich testified that she had participated in capital cases where individual voir dire was used but that it was not a common practice.

Gen. Weirich recalled that Thomas Leech testified as a witness during the guilt phase of Petitioner's trial and that his wife, Marie Leech, testified during the sentencing phase. Gen. Weirich testified that she knew the Leeches prior to trial because they were "good friends of my in-laws" as well as through attending St. Paul Catholic Church. Gen. Weirich testified that she was not aware of the probate of the victim's estate at the time of trial. Gen. Weirich testified that she did not have an independent recollection of her mother-in-law attending the trial but that it would not surprise her that Mrs. Weirich would attend as a representative of the church and as support for the Leech family. Gen. Weirich was unaware that Mrs. Weirich was involved in the victim's funeral arrangements but explained "that was one of her main responsibilities for members of the parish who died[.]" Gen. Weirich testified that she did not attend the victim's funeral.

*B. Petitioner's Defense Team*

Lead counsel[5] testified that when he first began representing Petitioner in 2005, he was employed part-time in the Capital Case Unit of the Shelby County Public Defender's

---

[5] Petitioner was initially represented by two attorneys from the Shelby County Public Defender's Office. When one attorney left the Capital Case Unit, a new attorney joined the defense team. All three attorneys testified at the post-conviction evidentiary hearing. For the sake of clarity, we will refer to the trial attorneys together as "trial counsel" and individually as "former lead counsel," "lead counsel," and

Office while also maintaining a private practice consisting of both criminal and civil cases. Throughout the three years leading up to Petitioner's trial, lead counsel was also assigned to approximately 38 other cases with the Capital Case Unit for varying lengths of time, although not every case resulted in a capital trial. Lead counsel was originally assigned to Petitioner's case as co-counsel with another attorney in the Public Defender's Office. Former lead counsel was primarily in charge of case development while lead counsel assisted "mostly under her direction." When former lead counsel left the capital case unit prior to Petitioner's trial, lead counsel took over and new co-counsel joined the team. At that point, the primary responsibility for case development shifted to lead counsel because he had more experience handling capital cases. Petitioner's defense team also consisted of Ralph Nally as a fact investigator and Jeanette Stanback as a social investigator.

Lead counsel testified that he attended an initial intake interview of Petitioner on August 26, 2005, along with other members of the defense team. Lead counsel testified that he attended monthly case reviews with the entire Capital Case Unit where pending cases "were discussed and strategized." Lead counsel identified some formal, written requests for Mr. Nally to investigate certain issues, and he testified that he also made casual, verbal requests for investigation. The defense team was able to put together an arrest history for Petitioner's mother, Vivian Pruitt, going back to Petitioner's birth, but lead counsel acknowledged that he did not obtain records for any arrests during Vivian's pregnancy with Petitioner. One of the defense's mitigation theories was "bad family situation," which lead counsel explained included "Vivian Pruitt's history with respect to arrests before and other behavior." However, lead counsel agreed on cross-examination that he made strategic choices based on how the jury may view the evidence and that he did not think that Vivian's arrests would be viewed as mitigating.

Lead counsel recalled that the trial court signed an agreed order in June 2006 for Petitioner to be evaluated at Midtown Mental Health Institute to determine his competency to stand trial and mental status at the time of the offense. In August 2006, clinical psychologist Dr. John Whirley sent a letter to the trial court expressing concerns about Petitioner's competency to stand trial and recommending that Petitioner be transferred to MTMHI for further evaluation. During the evaluation at MTMHI, Dr. Craddock administered the Wechsler Adult Intelligence Scale 3 (WAIS-3) and determined that Petitioner had a full-scale I.Q. score of 68. Lead counsel acknowledged that Dr. Craddock did not administer any tests of adaptive functioning or have any adaptive rating scales from family members. Lead counsel did not recall providing any information to MTMHI to assist with an adaptive behavior assessment. However, Dr. Craddock's psychological evaluation report indicated that Petitioner was diagnosed with mild mental retardation in addition to schizophrenia and substance abuse.

"co-counsel." Petitioner was represented by a different attorney from the Public Defender's Office on direct appeal, but appellate counsel did not testify at the post-conviction hearing.

Lead counsel recalled that prior to the time he became lead counsel, the defense team retained the services of clinical psychologist Dr. Fred Steinberg to evaluate Petitioner. Case review memos from July and September 2007 listed Dr. Steinberg as a potential defense expert and cited the discharge summary from MTMHI diagnosing Petitioner with schizophrenia and "borderline" mental retardation as one of the working mitigation theories. Lead counsel testified that he spoke to Dr. Steinberg many times, although he did not recall meeting with him in person. Lead counsel testified, "my recollection was that [Dr. Steinberg] was not - - his opinion would not help us in this case."

In January 2008, lead counsel retained the services of Dr. Rutledge to testify during the sentencing phase regarding her evaluation of Petitioner for Juvenile Court in 1996 and her diagnosis of mild mental retardation. In preparing for the case, Dr. Rutledge primarily reviewed her report and the records from MTMHI. After the trial court granted the *ex parte* motion for expert services, lead counsel provided the State with a notice of intent to present expert testimony regarding Petitioner's mental condition at trial. Although the copy of the notice in the Public Defender's file had a handwritten notation that it was filed on February 5, 2008, a copy could not be found in the trial court clerk's file. Lead counsel testified that he intended the notice to be an attempt to communicate the defense's position that Petitioner was exempt from the death penalty due to intellectual disability. Lead counsel did not have an independent recollection of the prosecutor indicating that the State might seek an evaluation from its own expert. Lead counsel recalled moving for a directed verdict on the death penalty on the basis that the State had not presented any evidence to contradict Dr. Rutledge's testimony during the sentencing phase. Lead counsel testified that one of the reasons for this decision was the fact that the defense team could not afford to pay Dr. Rutledge twice for her testimony. Additionally, the statute indicated that the issue could be raised at trial and did not mandate that it be raised pretrial.[6]

Ultimately, the trial court denied the motion for a directed verdict because of the lack of a pretrial motion. However, when ruling on the motion for new trial, the trial court concluded that the timing of the motion was an issue of first impression and reserved ruling on the intellectual disability issue. Lead counsel filed a formal written motion for a hearing on July 17, 2008, and attached the reports from MTMHI and Dr. Rutledge, which were consistent in diagnosing Petitioner with mild mental retardation. However, prior to the hearing, lead counsel learned that Dr. Craddock had sent a letter to the prosecution stating that he had erred in diagnosing Petitioner with mild mental retardation and changing his diagnosis to borderline intellectual functioning. Lead counsel contacted Dr. Rutledge again in August 2008 and requested the raw data from MTMHI for her to review. Dr. Rutledge told lead counsel that she "did not see any reason to justify change of diagnosis."

---

[6] *See* T.C.A. § 39-13-203(e) (2003).

In an email from November 2008 discussing scheduling Dr. Rutledge's rebuttal testimony in this case, lead counsel asked if Dr. Rutledge would also be willing to be involved in another case. In that email, lead counsel stated that he wanted to "consider some measure of adaptive behavior" for the other defendant because that was "classically the area in which we lose on [the intellectual disability] issue" and asked Dr. Rutledge if there was "any test or scale which might facilitate our proof of such deficits." Lead counsel testified that adaptive functioning was an important area to explore in any case and that he was aware of the Adaptive Behavior Assessment System ("ABAS") test for adaptive deficits. Additionally, Dr. Rutledge's response to his email referred to the Vineland Adaptive Behavior Scales when she offered to evaluate the other defendant. However, lead counsel never asked Dr. Rutledge to perform any adaptive behavior assessments of Petitioner, nor did she interview Petitioner or any of his family members. However, on cross-examination, lead counsel agreed that a diagnosis of mild mental retardation required a finding of adaptive deficits. Lead counsel agreed that he relied on the opinions of the experts and did not tell them what tests they needed to do.

Lead counsel testified that he did not consider filing a motion challenging the State's dual charging of felony murder and premeditated murder. He testified that Ms. Dwyer was the lead prosecutor throughout the case and that he did not recall the circumstances of Gen. Weirich becoming involved in this case. Lead counsel stated that he "never heard anything to th[e] effect" that Gen. Weirich knew the victim, and he did not recall Gen. Weirich disclosing that her family was close to the victim's family at any point during the trial. Lead counsel testified that if he had known that Mr. Weirich was co-executor of the victim's estate, he would have addressed that issue during his cross-examination of Mr. Leech. Lead counsel was not aware that Mrs. Weirich attended the trial or that she was Gen. Weirich's mother-in-law.

Lead counsel estimated that he met with Petitioner in person approximately 20 to 30 times prior to trial to discuss the facts of the case and Petitioner's social history. Lead counsel's notes from a meeting on February 8, 2008, indicated that Petitioner was depressed and had been prescribed Cogentin and Risperdal, which lead counsel believed were both psychotropic drugs. Lead counsel could not recall what dosages Petitioner was taking but testified that he had the jail medical records available. On cross-examination, lead counsel agreed that the upcoming trial could have been a cause of Petitioner's depression. Lead counsel testified that he did not notice anything about Petitioner's demeanor, behavior, or ability to communicate that would have indicated that Petitioner was impaired by the medication and that he would have addressed the matter with the court if he had. On redirect examination, Lead counsel agreed that he did not consult with a medical doctor regarding Petitioner's medication.

Lead counsel testified that he participated in the ongoing process of investigating mitigation evidence. He believed that he met with Petitioner's family members in their

homes, though he admitted he could be confusing this case with another. Lead counsel did not recall meeting with any of Petitioner's teachers or any of his friends and former neighbors from the Fowler Homes neighborhood. When presented with a photograph from the Public Defender's file labeled "Corinio Pruitt family," lead counsel testified that he did not recognize any of the children in the photo but that he had "no reason to doubt that that is his family." Lead counsel conceded that he requested a mitigation instruction regarding Petitioner's prenatal exposure to drugs and alcohol even though Vivian Pruitt denied drinking while she was pregnant, and no other witnesses testified on the issue. Lead counsel also requested a mitigation instruction that Petitioner experienced "significant ad[a]ptive deficits," even though including the term "significant" when it was not in the statute "was probably a mistake." Lead counsel also testified that he would generally agree with the Tennessee Supreme Court's opinion that "little evidence" of Petitioner's deficits in adaptive behavior was presented.[7] Lead counsel agreed that in investigating adaptive deficits and mitigating circumstances, "all the records that are available should be obtained." Lead counsel also agreed that it was important "to attempt to interview anyone that would know anything about that issue," including family, friends and neighbors "if we were aware of [them]." On cross-examination, lead counsel agreed that it was possible for the jury to determine that Vivian Pruitt was not being truthful when she denied drinking while she was pregnant with Petitioner.

Lead counsel did not recall if there was a strategic decision not to file a motion requesting individual voir dire but testified that such a motion was in the "standard motion packet" created by a former supervisor of the Capital Case Unit, although "it was commonly overruled." Lead counsel testified that he was familiar with juror questionnaires and had used them previously with this particular trial judge and in other capital cases, so he "probably" made "a conscious strategic decision" not to use them in this case. Lead counsel recalled that voir dire was conducted as a group in the courtroom and that more than one juror responded that they had heard of the defense expert, Dr. Smith, and would not credit his testimony. Lead counsel was aware that Dr. Smith had stepped down from his position as Shelby County Medical Examiner after he was charged with possession of explosives and lying to investigators, a case that ultimately ended in a mistrial. Lead counsel had not seen an episode of the television show, *48 Hours*, featuring Dr. Smith's story and discussing his "history of lying." On cross-examination, lead counsel agreed that Dr. Smith had been employed by defense attorneys on numerous occasions and that as a former medical examiner, he was in a unique position to review and critique autopsy procedures. Dr. Smith also testified about his practice of preserving bones during an autopsy. On redirect-examination, lead counsel testified that he was not aware of the case of *State v. Jerry Ray Davidson* where a pathologist from Arkansas provided similar

---

[7] *See Pruitt*, 415 S.W.3d at 204.

testimony for the defense.[8]  Lead counsel testified that he would not be surprised if there were other experts but that he had known Dr. Smith for several years, had seen him testify before in other cases, and had a certain rapport with him despite his legal issues.

Lead counsel did not have an independent recollection of delivering the closing argument in this case but recognized a document he created containing notes of topics that he wanted to discuss.  He acknowledged that the notes contained the statement, "What happened here to Lawrence Guidroz?  No one cared about him."  Lead counsel did not recall reading an article in a local newspaper just after the murder describing the high regard in which the victim's neighbors held him.  Lead counsel did not speak to anyone from St. Paul Catholic Church before the trial, although he did meet Mr. Leech and other parishioners outside of the courtroom during the trial.  Lead counsel recalled that Mr. Leech told him that "they were not out for blood."

Lead counsel testified that he did not recall a plea offer but that the State would usually approve a plea agreement if the victim's family did not object.  Lead counsel testified that he discussed settling the case with Petitioner many times, but Petitioner "would have no part of it."  Lead counsel explained to Petitioner the possible defenses and the likelihood of conviction at trial.  With regard to whether Petitioner understood the charges against him, lead counsel testified, "I think he understood it but I don't think he accepted it" because "his position all along . . . was that at most he was guilty of carjacking."  Lead counsel explained that Petitioner did not believe he was guilty of murder because he did not intend to kill the victim, even though he had several lengthy conversations with the defense team about the elements of felony murder.  During one interview with Petitioner in September 2005, which lead counsel recorded and transcribed, Petitioner recited from memory the legal concept of criminal responsibility for felony murder and asked why his "trial partner" was "out on the street."  During this interview, Petitioner admitted that he knew Courtney Johnson intended to rob somebody, and Petitioner also admitted that he grabbed the victim and threw him to the ground, causing the victim to hit his head on the concrete.  Lead counsel explained that even though Petitioner could recite the elements of felony murder, "I don't believe he ever accepted felony murder" because he "had made his mind up that he wasn't guilty of felony murder and that's what he wanted."  Lead counsel testified that his advice to Petitioner was not to testify during the guilt phase but only during the sentencing phase.  However, after a *Momon* hearing,[9] Petitioner decided that he wanted to testify during the guilt phase of the trial, which lead counsel recalled was "definitely unhelpful."

---

[8] *See State v. Jerry Ray Davidson*, No. M1998-00105-CCA-R3-CD, 2002 WL 15381 (Tenn. Crim. App., at Nashville, Jan. 7, 2002), *aff'd*, 121 S.W.3d 600 (Tenn. 2003).

[9] *See Momon v. State*, 18 S.W.3d 152 (Tenn. 2000).

- 28 -

On cross-examination, lead counsel testified that the Public Defender's file contained copies of letters that Petitioner had sent to his mother, which included instructions to call certain people along with phone numbers and directions on how to access messages on an answering machine. Lead counsel agreed that the records from MTMHI indicated that Petitioner began using marijuana at age fourteen, cocaine at age sixteen, and methamphetamine and various pills at age twenty-two. Lead counsel agreed that the Public Defender's file also contained a psychological evaluation of Petitioner from 1998 in which he reported that he began selling drugs at the age of fourteen and that he typically made a $350 weekly profit. A September 2006 discharge summary from MTMHI indicated that Petitioner was diagnosed with schizophrenia, undifferentiated type; history of cocaine and cannabis abuse; and borderline intellectual functioning. On redirect examination, lead counsel read from a staff conference report from MTMHI that indicated Petitioner's "below average cognitive abilities" would limit his ability to assist in his defense, though he did have "sufficient ability" to work with his attorneys, understand the evidence, and weigh the merits of a plea offer.

Lead counsel identified a "social chronology" for Petitioner listing his juvenile and adult arrests, psychological evaluations, periods of incarceration, and suicide attempts prior to his arrest in this case. Lead counsel obtained the presentence reports from Petitioner's prior convictions, which indicated that Petitioner was in a gang. Lead counsel obtained records from Petitioner's employer at the time of the offense as well as Petitioner's school records. Lead counsel testified that he and former lead counsel presented Petitioner's case at a seminar put on by the National Association of Criminal Defense Lawyers where the participants were able to consult with experienced attorneys and mitigation experts in order to brainstorm ways to defend their cases. On redirect examination, lead counsel testified that the seminar probably included presentations on *Atkins v. Virginia* and that he purchased the AAMR manual around that time.

Co-counsel testified that he worked for the Public Defender's Office and that he joined the Capital Case Unit in 2007. He was assigned to Petitioner's case as second chair after former lead counsel left the Capital Case Unit and lead counsel became first chair. Co-counsel agreed that his role was to assist lead counsel, who had the primary responsibility to manage the defense team. Co-counsel testified that he participated in the monthly case reviews with the rest of the capital defense team. On cross-examination, co-counsel testified that this was his first capital trial. Co-counsel acknowledged that capital defense is "constantly evolving" and that attorneys must "do the best we can at the time."

Co-counsel first met with Petitioner in February 2007, and his notes from that meeting indicated that Petitioner was taking Risperdal and Cogentin. Co-counsel believed that Risperdal was "an anti-psychotic or something they prescribe for people with schizophrenia" and that "Cogentin deals with the side effects of Risperdal." Co-counsel was not aware of the dosages Petitioner was receiving or why those drugs had been

prescribed. Co-counsel testified that the defense obtained Petitioner's jail medical records and that they discussed it with their experts. Co-counsel testified that he and lead counsel discussed whether to inform the jury regarding Petitioner's medication, but they considered it to be "a double edge sword" because the jury might be more fearful of a defendant who is psychotic. Co-counsel testified that Petitioner "didn't appear crazy to me but I'm not a doctor." Co-counsel did not recall any discussion of retaining a psychiatrist or neuropharmacologist. On cross-examination, co-counsel testified that he never had an indication that Petitioner's medication was interfering with his ability to communicate and that he would have brought it to the attention of the trial court if he had.

When presented with a report from MTMHI that indicated that Petitioner's "below average cognitive abilities will limit the quality of what he contributes to his defense," co-counsel agreed that he experienced communication issues with Petitioner. Specifically, co-counsel explained that he did not "know that we ever got through to him" that felony murder was first degree murder and was death penalty eligible. On cross-examination, co-counsel testified that Petitioner had the opportunity to plead guilty and receive a sentence of either life or life without parole. Co-counsel agreed that he advised Petitioner with regard to that offer and discussed possible defenses and the likelihood of conviction at trial, but Petitioner chose not to plead guilty. Co-counsel testified he discussed the concept of felony murder and the fact that it was death eligible with Petitioner "[m]any times."

Co-counsel testified that he did not have any contact with Dr. Steinberg, whose work on the case had been conducted prior to co-counsel's joining the team. Co-counsel's notes from a conversation with former lead counsel in January 2007 reflected that Petitioner had been diagnosed as schizophrenic and "borderline" intellectually disabled by MTMHI but that former lead counsel agreed with Dr. Steinberg's opinion that there was "nothing wrong" with Petitioner. The notes also indicated that there was "lots of mitigation," that Petitioner had a bad family situation and a long juvenile record, and that the biggest problem would be the facts of the case. Co-counsel testified that it would not "surprise" him if Dr. Steinberg's report was not located in the Public Defender's Office's files for this case "because if we have a conversation with our doctors and it's not going to be helpful, we'll often tell them to not bother writing a report." Co-counsel did not know whether Dr. Steinberg's testing resulted in an I.Q. score of less than 70, stating, "All I know is I was told that he was not helpful to us." On cross-examination, co-counsel testified that he did not recall if Dr. Steinberg had indicated that Petitioner was malingering.

Co-counsel testified that lead counsel was primarily responsible for contacting and preparing Dr. Rutledge. Co-counsel did not specifically recall discussing with lead counsel the reason for not having a pretrial hearing on the intellectual disability issue but testified that "some of it had to do with Doctor Rutledge's schedule." Co-counsel also explained that "part of it also was we had the report from [] MTMHI that was helpful and that we were not going to press the issue because we were afraid that the State was going to fix it

if we did." Co-counsel explained that by "fix it," he meant having an expert testify that the report was inaccurate, which is ultimately what happened during the post-trial hearing. Co-counsel's notes from that hearing indicated that the trial court agreed to consider evidence of intellectual disability and deficits in adaptive behavior presented during the mitigation phase. The defense waived the presence of Dr. Rutledge during the initial hearing because of her illness, and the trial court agreed to bifurcate the hearing to allow Dr. Rutledge to testify in rebuttal on a later date. Co-counsel's notes taken during Dr. Craddock's testimony for the State indicated "no work done" with regard to "measures of adaptive behavior," which co-counsel believed meant "there's no scale for adaptive behavior." Co-counsel testified that his understanding of the "clinical standard" for adaptive deficits was "you either have deficits or you don't" and that adaptive strengths did not matter. With regard to whether the defense team made a strategic decision not to investigate Petitioner's adaptive deficits, co-counsel testified that "we did endeavor to develop those things." On cross-examination, co-counsel testified that only an expert could diagnose intellectual disability and that such a diagnosis required a finding of adaptive deficits and manifestation before the age of eighteen. On redirect examination, co-counsel testified that the "legal standard" for intellectual disability under Tennessee's statute "includes not just I.Q. score but also deficits," which was based on the "current level of medical standards."

With regard to the mitigation investigation, co-counsel testified that he was involved in some of the family meetings but that lead counsel had primary responsibility for mitigation since that had been his job when he was second chair. Co-counsel testified that he did not accompany Ms. Stanback when she met with Petitioner's family members in their homes but that he met with them in the office. Co-counsel did not meet with any of Petitioner's teachers, friends, or former neighbors. Co-counsel's notes from a team meeting two months before trial indicated that "no family members will help" with mitigation, and co-counsel explained that they were relying on Ms. Stanback "to marshal the family" to Petitioner's defense. Co-counsel testified that one of the possible mitigation themes was Petitioner's "horrendous childhood." Co-counsel denied that there was a strategic decision not to seek out or develop mitigating evidence. On cross-examination, co-counsel acknowledged that some of the mitigation evidence could "cut the other way."

Co-counsel's notes also reflected that the defense team was considering the possibility of having someone form the victim's church testify that the Catholic Church is against the death penalty. However, co-counsel explained that he did not know whether such testimony would be admissible and that they were simply "brainstorming" possible mitigation theories. Co-counsel acknowledged that a news report after the trial indicated that Mr. and Mrs. Leech did not necessarily agree with Petitioner's death sentence. On cross-examination, co-counsel testified that he presumed from the outset that the Leeches were against the death penalty because of their religion. Co-counsel testified that he did not recall "how far we got" with calling a Catholic priest to testify about the Church's

position but that he would not dispute the record showing that the State's objection to such testimony was sustained.

Co-counsel reviewed his notes from a meeting with Petitioner's family on the Saturday before the start of trial that included Shirley Pruitt, the widow of Petitioner's stepfather, Walter Pruitt. The notes reflected that Petitioner's grades dropped in the sixth grade after his parents split up. Both of Petitioner's parents, as well as his grandmother, were drinking a lot, and "everything was very dysfunctional." Petitioner grew up moving from place to place, and his mother was not always around. Co-counsel's notes reflected that there was always "some fighting going on," including one incident in which Petitioner's mother shot or stabbed her boyfriend, and he ended up in the hospital; Petitioner was twenty-four years old at the time. According to Shirley Pruitt, Petitioner never had a job long enough to get his own apartment or be self-sufficient, and he never had a steady girlfriend.

Co-counsel's notes reflected that there was a second family meeting that same day with Vivian and Antonio Pruitt. At the time of the post-conviction hearing, co-counsel did not recall that Vivian Pruitt was Petitioner's mother. The notes from that meeting reflected that there was some discussion as to whether Alma Rockett or Quiana Pruitt would act as the "family historian" during the mitigation phase. According to the notes, Petitioner's mother agreed that an I.Q. test of Petitioner at sixteen years old indicated that he was "mildly mentally retarded." Petitioner's mother indicated that Petitioner never did anything wrong around her, denied "early drinking," but stated that "all boys smoked marijuana." The notes indicated that whenever Petitioner's mother was arrested, he would stay with his grandmother, who was mentally ill, and that mental illness ran in the family. On cross-examination, co-counsel testified that "probably a lot of kids did smoke marijuana" in the neighborhood where Petitioner grew up. With regard to whether Petitioner's lack of a job and lack of a stable living situation were unusual compared to his other clients, co-counsel testified that "[p]eople who are defendants often have trouble because of their situations, their traumatized childhoods, their adolescent development or lack thereof I think it's typical for the clients that I deal with."

Co-counsel testified that most of the pretrial motions had been filed before he became involved in the case. He did not recall if there was a specific strategic decision for not filing motions requesting individual voir dire or the use of juror questionnaires. Co-counsel testified that lead counsel primarily handled voir dire while co-counsel took notes. During the State's voir dire, co-counsel noted that the prosecutor stated that mitigating circumstances are "something that makes it not so bad," which co-counsel circled because he thought it was a misstatement of the law. Co-counsel denied making a conscious strategic decision not to object to the prosecutor's statement. Co-counsel did not dispute that more than one juror stated that they had heard about Dr. Smith and would not credit his testimony. Dr. Smith had been retained as an expert witness before co-counsel became

involved in the case. Co-counsel was aware that Dr. Smith had resigned as the county medical examiner after he was charged with possessing explosives and lying to investigators, though co-counsel was not aware of the specific allegations. Co-counsel denied seeing an episode of *48 Hours* discussing Dr. Smith's story, though he was aware that "there was some media exposure there." On cross-examination, co-counsel testified that he had never heard of using juror questionnaires or individual voir dire until he started working on capital cases.

Co-counsel testified that during the trial, lead counsel was able to lean back to confer with Petitioner, who was seated behind counsel table. Co-counsel testified that even though the attorneys had advised Petitioner not to testify during the guilt phase but only during the sentencing phase, "he did exactly the opposite." On cross-examination, co-counsel testified that the defense planned to use remorse as a mitigating circumstance but that "kind of required Mr. Pruitt to take the stand during the Sentencing Phase and he decided not to." With regard to whether Petitioner expressed remorse during his guilt phase testimony, co-counsel recalled that Petitioner was not "the best witness for himself."

Co-counsel did not recall when Gen. Weirich became involved in this case. Co-counsel testified that Gen. Weirich did not inform the defense that her husband handled the victim's estate and that co-counsel did not learn that information until "much later." Co-counsel testified that he was aware that Gen. Weirich knew the victim through "her church community" but that he did not know if "she had much personal interaction" with the victim. Co-counsel testified that he did not think that Mr. Weirich's prior representation of the victim would have been important to the defense. Co-counsel testified that he was not sure if he would have filed a motion to disqualify Gen. Weirich on that basis but that he "would have considered anything to get either Ms. Dwyer or [Gen.] Weirich off the case because they're both good trial lawyers." Co-counsel testified that he may have addressed the issue during the cross-examination of Mr. Leech but that he did not know "what inference that might have raised for the jury."

During the State's rebuttal closing argument in the guilt phase, co-counsel objected to Gen. Weirich's statement that she "t[ook] offense" to lead counsel's argument that "nobody care[d]" about the victim because he thought it was inflammatory and improperly "put[] her opinion in front of the jury." Co-counsel testified that he was not aware that lead counsel was going to argue that the victim had no family and was "a little surprised that he mentioned that at all." Co-counsel testified that he continued to object during Gen. Weirich's rebuttal closing argument because he was "trying to slow her down." In co-counsel's notes, he circled the term "predators" because he "thought maybe it was an improper argument, improper way of describing my client." However, co-counsel testified that he "probably" made a strategic decision not to object to that argument "because I objected a bunch and I think that at a certain point the jury holds it against you when you interfere, and she was about to close, be done anyway so I didn't want to stop her and have

- 33 -

her restart and get her going again." Co-counsel explained that whenever Gen. Weirich gave a closing argument, he would "read this chapter on prosecutorial misconduct because she played it very close to the line." Co-counsel testified that he did not consider filing a motion in limine regarding improper argument, explaining that Gen. Weirich "was really good at what she did, you know. We just had to be on our toes to catch her where we could."

On cross-examination, co-counsel testified that the defense team had copies of Petitioner's report cards from elementary school. Co-counsel testified that Petitioner had "done really well" on some tests in the fourth and fifth grades but that "his academic performance had dropped off precipitously around the sixth grade, maybe had a head injury at that point." The report cards reflected that Petitioner made the honor roll and principal's list in second, third, and fourth grade. Some of the handwritten comments from Petitioner's teachers indicated that Petitioner was "smart," "a good learner," "an excellent student," and had "great potential," though some cautioned about his behavior and excessive absences. On redirect examination, co-counsel testified that he had not been to Larose Elementary and did not recall that Petitioner grew up in the adjacent Fowler Homes neighborhood. With regard to the safety and security of the children living in that area and whether the teachers cared for the children by providing food and clothes, co-counsel testified that he "relied on Ms. Stanback for a lot of that information" since "[s]he knew about the area and the culture a lot better than I ever will."

On cross-examination, co-counsel recalled seeing Petitioner being interviewed on a show called *Gangland* that aired shortly after the trial. Co-counsel was "a little taken back" when he saw the episode so close after trial because "[i]t appeared that [Petitioner] had done meetings with these people during my representation of him" and not told his attorneys about it. With regard to Petitioner's demeanor, co-counsel testified that "[h]e seemed very well spoken and articulate on this episode." Co-counsel testified that during the interview, Petitioner "went into some detail" about the Lemoyne Gardens gang, or LMG, including "how it was organized and who some of the players were." Co-counsel testified that defendant "knew [Petitioner] had some affiliation" with a gang, so he "wasn't surprised by that." On redirect examination, co-counsel testified that he did not know when or where the interview was filmed and that he did not know how much of the interview was edited out of the episode that eventually aired. Co-counsel agreed that because he saw the episode after Petitioner's trial, it did not affect his trial strategy but that he probably would have advised Petitioner not to participate.

Former lead counsel testified that she had worked for the Public Defender's Office for twenty-three years and was the lead attorney on Petitioner's case until she left the Capital Case Unit in December 2006. She recalled handling Petitioner's preliminary hearing in September 2005. In July 2006, Petitioner was evaluated by Midtown Mental Health, who subsequently referred Petitioner to MTMHI for further evaluation because his

competency was "questionable." Former lead counsel testified that in her experience, it was "rare" that Midtown would refer someone to MTMHI. She had Petitioner sign a release so that the defense could have access to the records from MTMHI, including copies of social histories and staff reports. Former lead counsel recalled filing an *ex parte* motion requesting funds to hire Dr. Fred Steinberg to conduct an independent psychological evaluation of Petitioner. In December 2006, she signed a certification of the time that Dr. Steinberg spent on the case, including the time he spent drafting a forensic report. Former lead counsel testified that even after leaving the Capital Case Unit, she was willing to assist in Petitioner's case and that lead counsel even asked the supervisor if she could be "third chair" at trial, but Petitioner "said no."

On cross-examination, former lead counsel testified that she still worked in the Public Defender's Office after leaving the Capital Case Unit and was available to consult with Petitioner's defense team. She recognized a copy of Dr. Steinberg's report and testified that she did not know why a copy could not be located in the Public Defender's Office's file for Petitioner. She testified that she "wouldn't have signed the certification if the work hadn't been done, so I would have had to have received it at least at some point in time." Dr. Steinberg's report indicated that Petitioner "was noticeably medicated and somewhat slowed in psychomotor response in the initial sessions" but that "he was more spontaneous and normal in psychomotor response" during a later session. The report stated that Petitioner's I.Q. test "indicates that he is functioning within the Borderline range of intelligence." The report indicated that Petitioner had a "tendency to exaggerate and feign mental illness" and that there was "corroborating data suggestive of symptom exaggeration and malingering of psychiatric symptoms." The report stated that further neuropsychological testing was not necessary in light of these results. Former lead counsel testified that she did not recall following up with Dr. Steinberg about his report but that she would have shared the substance of her conversation with the other members of the defense team.

Former lead counsel recognized her notes from a meeting with Petitioner in September 2005 in which Petitioner relayed his version of the incident, including detailed directions of how he and Courtney Johnson walked to the store. Former lead counsel also recognized a letter she sent to Petitioner in January 2006, which stated that she was providing Petitioner with copies of his discovery and pretrial motions that she had filed on his behalf. Former lead counsel's notes from April 2006 indicated that "Aunt Alma doesn't want us calling or coming to see her anymore." At some point, Petitioner indicated to her that he was not willing to accept any plea offers. Former lead counsel's notes from a meeting with Petitioner in December 2006 indicated that Petitioner wanted the charges reduced to manslaughter and that she explained to him that there was no chance of that happening and that the best offer the State was willing to make was life. The notes also indicated that Petitioner did not want to take the stand. Former lead counsel testified that she attended a conference with Ms. Stanback and lead counsel during which they

developed mitigation themes for this case. Former lead counsel acknowledged that Petitioner filed a complaint about her with the Board of Professional Responsibility and that she wrote a response detailing the work she had done on the case.

On redirect examination, former lead counsel testified that she could not recall an occasion where she did not get a report from an expert who had worked on one of her cases. She testified that she would have concerns about discoverability if the report was unhelpful to her client but denied that she would fail to put it in her file or shred it for that reason. She testified that while she would not plan on calling such a witness to testify, she would put the report in the file if for no other reason than to be able to show on post-conviction that the evaluation was performed. Former lead counsel noted that she signed the certification for Dr. Steinberg on December 22, 2006, not long before she left the case, so she "can't say" if the report was received after she left and "somebody else did something with it." However, she testified that she would have put the report in the file had she received it so that "the people who came behind me would be able to look at it and see what's there." She also testified that she was not aware of anyone in the Public Defender's Office removing reports from files and that doing so would be an ethical issue. She testified that the copy of the report that was entered into evidence had underlining and handwritten notes, but she did not recognize the handwriting. On recross-examination, former lead counsel testified that she recalled being "a little surprised" by the results of Dr. Steinberg's evaluation "because it came back very different from what I had heard from Middle Tennessee, and I was disappointed that it didn't say the same thing."

Jeannette Stanback testified that she worked on Petitioner's case as a mitigation investigator. She was present with former lead counsel and lead counsel during Petitioner's intake interview and took notes. Ms. Stanback gave a lay opinion that Petitioner's behavior was consistent with other defendants she had worked with who were assessed as having a low I.Q. score. Ms. Stanback testified that she regularly met with Petitioner in preparation for trial, meeting with him at the jail at least once a month if not more frequently. Ms. Stanback testified that her initial impression of Petitioner was that he was "stoic" and "unpenetrable" and that it took some time to get through to him. Ms. Stanback agreed that Petitioner was prone to child-like outbursts and was easily influenced by jailhouse lawyers. She could not recall if Petitioner was taking anti-psychotic medication.

Ms. Stanback testified that she gathered records from the jail, MTMHI, and other places. Ms. Stanback also interviewed various witnesses and compiled a report of Petitioner's social history. She testified that everyone on the defense team had access to a shared file and that they would share theories and notes during meetings. Ms. Stanback recalled the defense team meeting with Dr. Steinberg, though she admitted that she may have confused him with someone else.

Ms. Stanback testified that Petitioner grew up in South Memphis. Petitioner lived with his mother and sister in the Clementine Apartments, a poor, high-crime neighborhood. Petitioner sometimes lived with his aunt, Alma Rockett, where the conditions were better. However, at the time of his arrest, Petitioner was "couch surfing" among different residences. Ms. Stanback testified that she was familiar with the Fowler Homes neighborhood, which in the 1980s and 1990s had a reputation as being a very volatile community with high crime and low income and education.

## C. Lay Witnesses

Gaynell Talley, a retired teacher, testified that she taught in the Memphis City School system for thirty-five years. Much of that time, she taught third and fifth grade at Larose Elementary School. Ms. Talley also taught a special reading program under Title I, which she explained was a government program for students who had low test scores and were living below the poverty line. Ms. Talley testified that 99% of the students at Larose were on the free lunch program, and a majority lived the nearby Fowler Homes housing project. Ms. Talley testified that the school provided a clothes closet, free school supplies, and basic hygiene products for the children. The teachers encouraged attendance by calling and visiting the children's homes. The school provided a safe and nurturing environment for the children. Ms. Talley recalled Petitioner's name, but she did not recognize him, and he was never assigned to one of her classes.

Sirderrick Payne testified that he grew up in the Fowler Homes housing project and that he had been best friends with Petitioner since they were about eight or nine years old. Mr. Payne described the neighborhood as being "rough" with a lot of violence, crime, and drug use. On one occasion, when they were about nine or ten years old, Mr. Payne and Petitioner were outside playing curb ball when "Marco the Beast" shot at Petitioner's house while Petitioner's mother and sisters were inside. The boys hit the ground during the shooting, then afterwards ran to the house and saw big holes in the walls and door. Petitioner could not stop crying and "was crazy." Mr. Payne testified that, to his knowledge, the holes in the walls were never fixed.

Mr. Payne also described Petitioner's home life as "rough." Petitioner lived with his mother, his grandmother, his two older sisters, and his two older brothers, as well as one of his sisters' children. Although the house had five bedrooms, Petitioner did not have his own bedroom and often slept on the couch. Mr. Payne testified that Petitioner's mother and siblings were all using drugs, selling drugs, and/or engaging in prostitution. Mr. Payne testified that Petitioner's house was always loud and there was a lot of traffic in and out of the house at all hours. Petitioner's house was considered the place to "hang out, smoke, shoot dice, [and] have sex . . . [I]t was like they don't sleep."

Mr. Payne testified that Petitioner's mother could not control her drug addiction. On one occasion when he was eleven years old, Petitioner's mother offered to have sex with Mr. Payne in exchange for drugs. Petitioner's mother also used her welfare checks and food stamps to buy drugs, so by the end of the month Petitioner would either come over to Mr. Payne's house for food or would have to steal to get food. Mr. Payne testified that although his own mother was also a drug addict, she always made sure to feed and clothe her children, unlike Petitioner's mother who "ran the street to make sure she got high." Additionally, unlike Petitioner's older siblings, Mr. Payne's older siblings looked out for him and helped to provide for him.

Mr. Payne testified that the interactions between Petitioner and his mother were often violent. Petitioner's mother would yell and curse at Petitioner, call him names, and beat him with an extension cord or a belt. On one occasion, Petitioner's mother smacked Petitioner so hard that Mr. Payne thought she had broken his neck. Petitioner's mother was also violent with her boyfriends. She and her boyfriend "Buck" would get drunk or high and start fighting most days of the week. Mr. Payne testified that it happened so often that the Memphis Police Department stopped responding to the domestic disturbance calls.

Both Petitioner and Mr. Payne attended Larose Elementary School, which Mr. Payne described as "fun" and a place "where you can go, really, to feel most safe at" and where "[y]ou can eat and have food." The situation was much different at Vance Middle School, which was located near a different housing project. Mr. Payne testified that if they walked through the other housing project to get to school, they risked getting "jumped." However, if they walked the long way around, they would not get to school on time and either the doors would be locked or they would be written up for tardiness. Petitioner and Mr. Payne stopped attending school, and Mr. Payne eventually transferred to a different school because of the violence.

Mr. Payne described Petitioner as a "follower . . . [m]eaning he can't think for himself." Petitioner was constantly asking Mr. Payne what to do. Petitioner was bullied as a child because he tried to stand up for his older brother who was gay. The other children picked on Petitioner, hit him, and stole his shoes, and Petitioner was afraid to go to school. Mr. Payne testified that he started selling drugs around age nine or ten because he saw the older boys doing it and buying nice things. However, Petitioner did not sell drugs because "he didn't know how" and did not have the "mind set" to do it. Mr. Payne gave an example where someone switched real drugs for "fake" drugs without Petitioner noticing, and Petitioner ended up having to refund money to the people to whom he inadvertently sold the fake drugs. Petitioner would often lose money when trying to sell drugs, and Mr. Payne would have to help him pay for it. Mr. Payne testified that to his knowledge, Petitioner did not use drugs and denied that Petitioner was in a gang. Mr. Payne admitted that he was a member of the Vice Lords and that he was incarcerated on a second-degree murder conviction at the time of Petitioner's trial.

Myron Stewart testified that he grew up in the Fowler Homes housing project about a block away from Petitioner. Mr. Stewart testified that many of the kids who lived in Fowler Homes stopped attending school because of the difficulty involved in walking to Vance Middle School. Mr. Stewart testified that there were frequent gang fights and that "[a] lot of kids was getting jumped on and chased from school, back in the day." However, because he played sports, Mr. Stewart "had like a pass to go through different projects." Mr. Stewart also had the opportunity to spend time with family in Chicago and nicer neighborhoods in Memphis, which motivated him to do better. Mr. Stewart eventually graduated high school and attended community college. In his career, Mr. Stewart worked for the local jail, prison, and police department before leaving the criminal justice field because of too many encounters with people he knew from the old neighborhood.

Mr. Stewart explained that growing up, his house was better than most in terms of cleanliness and discipline. His mother also provided food for many of the kids, including Petitioner. Mr. Stewart testified that Petitioner's family was "dysfunctional" in comparison. Petitioner's mother had a reputation for her drinking and drug use, and there was no one to be a father figure to Petitioner. Mr. Stewart also described the violence in the neighborhood, including shootings and gang fights. Many of the young men who had stopped attending Vance Middle School were selling marijuana for a man named "Jab-Blue" because he let them smoke as much of the marijuana as they wanted.

Mr. Stewart testified that he worked in the Shelby County Jail at the time Petitioner was incarcerated there before trial. Mr. Stewart testified that Petitioner did not seem like the same person he knew, and he was not sure that Petitioner recognized him. Mr. Stewart testified that Petitioner did not want to get up to eat or shower and that he seemed "[s]low . . . like he was out of it." Mr. Stewart testified that he had worked on the medical floor of the jail where inmates were prescribed psychiatric drugs and that Petitioner exhibited behavior like someone who had been prescribed a high dose of such drugs.

Talon Williams testified that he grew up in the Fowler Homes housing project and that he met Petitioner when they played basketball as kids. Mr. Williams testified that his mother, Doris Barker, tried to make sure that the kids in the neighborhood had clean clothes to wear, enough food to eat, and organized social activities and outings to keep them engaged. Petitioner participated in one of her programs and played on the neighborhood basketball team. Although Petitioner was a good player, he would get frustrated that he could not read the defenses and would quit a lot. Even though Petitioner wanted to be included in things, he was not good in group settings and generally did not fit in.

Petitioner spent a lot of time at Mr. Williams's house because his own house "wasn't the best place to be." Mr. Williams testified that even among others in the housing project, Petitioner's family stood out for their poverty, violence, and drug use. Petitioner's entire

family used or sold drugs. Petitioner's mother was always high or drunk. Petitioner's mother and her boyfriends would fight in the front yard "pretty regular[ly]," and "it was kind of like a spectacle where people were drawn to watch them and laugh." Petitioner's house was "dark, smelly, garbage everywhere, a lot of people in and out." Mr. Williams testified that you could not sit on the minimal furniture there was because it was all infested with bed bugs. Petitioner's house was always hot in the summer because the only air conditioning unit was located in one of his brothers' bedroom behind a locked door. On one occasion, the family got evicted for failing to pay rent, and all of their belongings were put out on the curb. The community had to come together to pay their rent so that they could go back inside.

Mr. Williams testified that Petitioner did not have a lot of family support growing up. Petitioner's grandmother would stare at the television all day and mumble to herself, or she would wander off and knock on other people's doors. Mr. Williams testified that he later learned that she was mentally ill. Petitioner's brother, Tony, sold drugs and usually kept to himself and his "crew" without paying attention to Petitioner. Petitioner's sister, Tapika, was "strung out on drugs" and would often leave her children for days at a time. Petitioner's brother, Rico, was gay and was frequently assaulted due to the homophobia in the community. Mr. Williams often provided Petitioner with clothes off of his own back, made sure that he ate, and would give him a haircut when he had not had one in a while.

Mr. Williams testified that he observed Petitioner using marijuana and cocaine as a teenager. On one occasion, Petitioner was "hanging out with a group of wrong characters" and had been using cocaine for three or four days. When Mr. Williams tried to get Petitioner out of there, Petitioner was "just spaced out, out of his mind on drugs." Mr. Williams testified that Petitioner obtained money to buy drugs by robbing people and gambling. Mr. Williams testified that Petitioner would "try to hustle crap games" but that he was usually not successful at making money because he did not understand the game.

Mr. Williams testified that he spent time in the Shelby County Jail with Petitioner prior to trial in this case. He noticed that Petitioner was "lethargic and incoherent and seemed spaced out." Mr. Williams testified that Petitioner would sit very still and that Petitioner spoke slowly and could not complete a sentence.

Doris Barker, Mr. Williams's mother, testified that she lived in the Fowler Homes housing project in the 1980s and 1990s and that she knew Petitioner as "one of the children that [she] helped to raise in our development." She first met Petitioner when he was eight or nine years old. She described Petitioner as "[a] real nice boy" who came to many of the programs that she organized. Ms. Barker explained that she planned social activities for the children in the neighborhood and tried to make sure that they did not go hungry and that they knew they were loved. Ms. Barker received a grant called Esteem Fifty for three years, which allowed her to provide tutors and organize excursions outside of the housing

project. Petitioner successfully completed that program despite lacking the required parental involvement.

Ms. Barker testified that she was familiar with Petitioner's family because they lived just around the corner. Ms. Barker testified that Vivian Pruitt "wasn't one of the best mothers in the world" and that she tended to prioritize her own needs while the rest of her family "just struggle[d] along." Ms. Barker testified that Vivian "wanted to be high. She wanted to drink, or smoke crack and have a good time. She just didn't care." Ms. Barker never saw Vivian go to the grocery store or hug her children. Ms. Barker testified that Vivian only ever called on Petitioner when she needed something. For example, whenever Vivian found out that Petitioner had some money from dancing, she would take it from him.

Although Petitioner "had a roof over his head," Ms. Barker described the house as "an open door, no locks or nothing, people just walking in and there was always some confusion at that house." Ms. Barker testified that there was "[a] lot of fighting and cutting and cussing" and that Petitioner was "a child with nobody to teach him anything." Ms. Barker testified that she worked as a housing inspector for the Memphis Housing Authority. On one occasion, Vivian failed her inspection because "[t]he whole house was just torn up and in chaos. In the kitchen, dishes piled all up and people running in and out of the house, whatever time of night, it just was bad." A second failed inspection would have meant eviction, but Vivian was able to pass the second inspection.

Ms. Barker testified that although everyone in the neighborhood was "poverty stricken" and "financial prisoners," most families "held together" while Petitioner's family had "no unity" and lacked any sense of caring, nurturing, or love. Petitioner's family also had trouble making the rent, which was usually around $30 or $35 per month. With regard to the violence in the home, Ms. Barker testified that Vivian, her live-in boyfriend "Buck," and Petitioner's siblings would fight all the time both inside and outside of the house. There were frequent occasions where someone would get stabbed or end up with a black eye. Ms. Barker testified that the neighbors eventually got used to the fighting and tried to ignore it, while the children did their best to try to escape it.

Ms. Barker testified that she met Petitioner's grandmother, Frankie Hamilton, one day when she knocked on Ms. Barker's door and asked for "a sandwich and some snuff." Ms. Hamilton told Ms. Barker that she did not have any money because her daughter, Vivian, was taking her monthly checks. Ms. Barker continued to periodically help Ms. Hamilton by feeding her and sending someone to the store to buy her snuff. Ms. Barker testified that Ms. Hamilton was a "sweet person" who "really loved" Petitioner and tried to do what she could for him. Ms. Hamilton often babysat Petitioner and his siblings' children. However, Ms. Hamilton was in bad health and had dementia. She could not go to the grocery store because of the concern that she might wander off.

Ms. Barker was also familiar with Petitioner's oldest sister, Tapika, who lived next door. Ms. Barker testified that Tapika had four children, and Ms. Barker found out that they had never been to school, had never received their immunizations, and did not know how to eat with utensils. Tapika fed the children only "powder eggs and Ramen noodles," while she gave her money and food stamps to "a couple of gigolo guys." Tapika was frequently partying and doing whatever she wanted, and she would leave the children for days at a time. Tapika also smoked crack cocaine and engaged in prostitution. Ms. Barker testified that Tapika failed to provide for her children because she was simply "repeating what she saw" from her own mother.

Ms. Barker testified that she received a letter from Petitioner about a year before the hearing in this case, thanking her for always being there for him. Ms. Barker testified that Petitioner's writing in the letter made sense and was not rambling, but it was very simple, "kind of like a kid wrote it."

Davey Floyd testified that he knew Petitioner since they were around ten or eleven years old and considered him to be his best friend growing up. Although Mr. Floyd lived elsewhere, he spent time in the Fowler Homes housing project with his father, who was known as "Jab-Blue" and was the major distributor of marijuana and cocaine in the neighborhood. Like many of the kids in the neighborhood, Petitioner started selling drugs for Mr. Floyd's father when he was twelve or thirteen years old. This gave Petitioner unlimited access to marijuana, and he smoked "a hell of a lot" it, "way more" than the other kids. Petitioner also played dice to try to increase the money he made from selling drugs.

Mr. Floyd testified that Petitioner grew up in "a very harsh, violent, uncaring, gruesome environment." Mr. Floyd described Petitioner's house as "[n]asty, un-kept, roaches, rats, trash everywhere, smells, bullet holes in the walls." Petitioner's family was "[c]razy, violent, abusive." Mr. Floyd testified that while other families in the neighborhood were able to "handle their responsibilities" and "provide," he knew of no other family "to be so abusive and so dysfunctional" as Petitioner's family. Mr. Floyd explained that Petitioner's mother caused much of the dysfunction with her extreme drug addiction, alcoholism, violence, and prostitution. Petitioner's mother had no self-control and neglected all of her responsibilities, including her own personal hygiene. She would engage in fights in the courtyard, and people would laugh or look at her with disgust.

Mr. Floyd testified that Petitioner's mother was physically and verbally abusive toward Petitioner and did not provide for him, feed him, care for him, or tell him that she loved him. On one occasion when Petitioner was fourteen years old, he asked her for money to buy something to eat, and she cursed him out, shoved him against the wall by his throat, and then made him leave. Mr. Floyd testified that Petitioner's brother, Rico, was a

child molester and that he sexually abused Petitioner and other teenaged boys. Rico also engaged in prostitution in exchange for drugs and eventually died from AIDS.

Mr. Floyd testified that Petitioner was bullied as a child. Petitioner was picked on and pushed around more than other kids because he was "a quiet, inward type person" rather than "outgoing or witty." In contrast, Petitioner's brother, Tony, "had personality and character" and was the "life of the party." People wanted to be around Tony and often provided him with food and money; however, Tony did not look out for Petitioner or feed him when he was hungry. Petitioner's sister, Quiana, also had "everything she needed" because she dated older guys who had money. Often the only food in the house was her personal food that she kept in her room, but she would only give Petitioner "something small" when he was "absolutely hungry" because he had not eaten in a couple of days. Mr. Floyd testified that he would give Petitioner food and money whenever he had any to spare.

Mr. Floyd testified that he was housed in the same pod of the Shelby County Jail as Petitioner before trial. Every time he saw Petitioner, Mr. Floyd noticed that Petitioner was "doped up on so much psych meds that he was out of it." Mr. Floyd described Petitioner as follows: "eyes rolling up in the back of his head, drooling, slobbering, coming out of his mouth . . . slow talking, can't think straight, not . . . responding properly . . . no mind function."

Shirley Jean Pruitt testified that she married Walter Pruitt in 1994. Walter was previously married to Petitioner's mother, Vivian Pruitt. Shirley testified that Vivian was much younger than Walter and "they just didn't get along." When Walter was with Vivian, he drank heavily and "was in and out of trouble and jail." After Walter met Shirley, he eventually stopped drinking and started attending church. Even though Walter was not Petitioner's biological father, he considered Petitioner to be his son, and Walter introduced Petitioner and his siblings to Shirley as his children. Shirley testified that Walter tried to maintain contact with the children after he and Vivian split up. Vivian would not interfere with these visits if Walter brought her some money or something to drink. However, if Walter told her that he did not have anything, Vivian would start cursing and complaining about his relationship with Shirley, asking "why was he bringing this 'B' to her house." Vivian would even grab at Shirley through the window of Walter's truck. Eventually, Shirley stopped accompanying Walter on these visits because "it was just too much of a problem." Shirley testified that Walter only saw Petitioner "off and on." Shirley testified that Walter "loved [Petitioner] and cared about him, but Walter was kind of guilty, he felt guilty about not staying there with them."

Shirley testified that she met with Petitioner's attorneys when they asked her to provide some clothes for him to wear at trial. However, they did not ask her any questions about Petitioner's life and simply told her that they were going to raise an insanity plea because paranoid schizophrenia ran in Petitioner's family. Shirley identified a photograph

from trial counsel's file that was marked "Corinio Pruitt's family." Shirley testified that the picture did not depict Petitioner and his siblings but was instead a picture of Walter's daughter from a prior relationship with her half-siblings, who lived in St. Louis and who Petitioner had never met.

Marsha McMillan testified that she knew Petitioner because she was married to Walter Pruitt's brother. Additionally, both Ms. McMillan and Petitioner worked at Patterson Warehouse through a temporary agency called LSI. Ms. McMillan was a supervisor at Patterson Warehouse, and Petitioner worked there for three or four months before his arrest in this case. Ms. McMillan testified that Petitioner would take the bus to get to work and sometimes would arrive late. Ms. McMillan testified that Petitioner had trouble reading instructions on paperwork for loading specific items on a pallet and often had to work with Ms. McMillan to get it right. When putting together a display, most employees were able to correctly follow the model, but Petitioner struggled such that Ms. McMillan had to step in and show him how to do it. Petitioner had an accident with a hand-jack loader where a pallet turned over, and Ms. McMillan testified that other employees did not have similar accidents on a regular basis. Petitioner also had problems putting items into the compactor the correct way so that it would not get jammed. Ms. McMillan testified that to her knowledge, Petitioner was not high while he was at work, but she only found out about Petitioner's drug use after the fact.

### D. Petitioner's Expert Witnesses

Dr. Jonathan Joseph Lipman testified as an expert in the field of neuropharmacology, which he explained is the science of how drugs act on the brain and affect behavior. Dr. Lipman testified that in this case, he was asked to "opine on the possible forensic relevance of [Petitioner's] early adolescent cannabis use." Dr. Lipman reviewed records from court files, the reports of psychological evaluations of Petitioner conducted by other experts, medical records, and collateral witness interviews provided by post-conviction counsel. Dr. Lipman did not personally interview Petitioner but relied on interviews conducted by other experts in this case. Dr. Lipman testified that these sources indicated that Petitioner started smoking marijuana at age fourteen, or possibly as early as age twelve, and that Petitioner smoked "frankly an outrageous amount" of 2 to 2.5 ounces of marijuana per day. Dr. Lipman opined that Petitioner's early and heavy marijuana use "likely added to the pre-existing intellectual impairments and the cognitive dysfunction" and that "drug abuse more likely than not interfered detrimentally in his brain's development during this critical period of brain maturation in his teenage years."

Dr. Lipman testified that brain development during childhood "is an extremely dynamic process" and that "[t]here are so many opportunities to interrupt that," including pre-natal development, social and environmental factors, and drug use, which can "produce profound chemical changes in the brain" and "synergize with each other to produce a more

than addictive impairment." Dr. Lipman testified that Petitioner likely had pre-existing impairments due to his pre-natal exposure to drugs and alcohol and his "chaotic" upbringing. Petitioner's mother had a "profound arrest history for drug and other offenses during pregnancy," including being arrested for shooting Petitioner's biological father three days before Petitioner's birth. Petitioner's birth records indicated that "he was not normal at birth." Specifically, Petitioner's birth weight was at the "low end of normal," his head circumference was in the third percentile, the sagittal suture in his skull was "gaping open," and his left eye "bugging out and swollen." Petitioner was then "brought up in frankly deprived circumstances" where his "main caregiver was a paranoid schizophrenic lady" and his mother "exchanged drugs for sex and . . . was constantly being arrested." Dr. Lipman explained that the "synergistic impacts" of Petitioner's gestational impairments and social deprivation meant that "[h]e was not a normal child when he started to abuse marijuana at age [twelve] to [fourteen]."

Dr. Lipman described a large epidemiological study that found that early marijuana use "produces measurable intellectual and cognitive deficits later on in life." The study found that certain participants "had neuropsychological impairments that could not be attributed to anything other than early marijuana use" and that were distinct from those who started using marijuana after their brains were more fully developed. Dr. Lipman explained that marijuana's impact on I.Q. scores and neuropsychological testing was "an indication of neurotoxicity." Dr. Lipman explained that the frontal lobe, which controls executive functions such as planning and judgment, is the last part of the brain to develop and is the most sensitive to damage. Dr. Lipman testified that some people might be able to "resist some of the damage that marijuana can do at that age" if they had a "well nourished brain that had been properly stimulated from birth with nurturing learning experiences," but that Petitioner's "was not such a brain." Dr. Lipman testified that Petitioner's various I.Q. scores were "consistent with a degenerative process as occurring at or after age fourteen," when he achieved his highest score on an intelligence test. Dr. Lipman testified that Petitioner's arrest record was consistent with someone with a damaged frontal lobe, since such "individuals are impulsive and they get into a lot of trouble."

Dr. Lipman testified that a person with frontal lobe damage might be more likely to develop a drug abuse habit because they "cannot apply judgement [as] clearly as a normal person and cannot resist as easily as a normal person." Dr. Lipman testified that one's social environment can also contribute to drug abuse "because modeling is where children get their ideas of what normality is. When everyone is buying, selling and using drugs that may seem normal to a child, not the thing to be resisted." Dr. Lipman testified that post-traumatic stress disorder can also "predispose someone to an appetite for tranquilizing drugs particularly" and that they "might self-medicate with marijuana."

On cross-examination, Dr. Lipman agreed that certain drugs may be associated with violent crime and that neurotoxicity can cause violent behavior as well as other neurological diseases. Dr. Lipman agreed that marijuana can be addictive, can be a gateway drug, and can increase rates of juvenile crime. Dr. Lipman testified that marijuana use can lead to mental health issues "[i]n vulnerable people" and "can provoke psychosis" in those who may be predisposed. Dr. Lipman testified that he was not aware how common Petitioner's experiences were compared to others in Memphis, including the lack of prenatal care, the stressful home environment, parental arrest records, and juvenile use of marijuana. The State presented Dr. Lipman with a longitudinal study of twins that suggested that the decline in I.Q. scores may not be attributable solely to marijuana exposure but to underlying environmental factors that are common to both marijuana use and low intellectual attainment. The State also presented Dr. Lipman with a recent meta-analysis that suggested that "the magnitude and persistence of cognitive deficits" associated with marijuana use may have been "overstated" in previous studies. The meta-analysis suggested that observed deficits may be associated with "acute use or withdrawal" and that abstinence may be associated with "restored cognitive functioning." However, Dr. Lipman testified that the meta-analysis only compared cross-sectional studies and specifically excluded longitudinal studies like the one he described on direct examination, so the results may not necessarily be contradictory.

On redirect examination, Dr. Lipman testified that the twin study suggested that there were "multiple interacting factors" causing intellectual decline; however, "environmental stress" would be consistent between the twins living in the same home. The study found that "the effects of the environment was greater than the effect of the marijuana use, although marijuana users had lower test scores relative to non-users and showed a significant decline in crystallized intelligence between pre-adolescence and later adolescence." Dr. Lipman described Petitioner's environment as follows:

> His upbringing was -- I don't want to say deprived but emotionally, socially, educationally, intellectually and in terms of adult modeling was impoverished, and stressful. People are being shot around him. He was unwashed, he was not cared for, he smelled of urine according to his school friends, his neighborhood friends. He was afraid to go home. He had a very stressful upbringing. His responsible caregiver, his grandmother who was apparently schizophrenic, his mother was a most unsuitable lady.

Dr. Lipman explained that gestational impairment, environmental stress, and neurotoxicity from substances like marijuana have a "synergistic effect," meaning that while "it might be possible to survive any one of them[,] when they are combined the damage is more than additive." Dr. Lipman testified that he relied on multiple studies showing the effect of marijuana on brain development in writing his report in this case.

Katy Spurlock with the Urban Child Institute testified as an expert in "identifying and communicating information regarding early childhood brain development and trauma." Ms. Spurlock testified that she worked with nonprofit organizations, health care providers, and policymakers to develop training programs and public awareness campaigns designed to translate the scientific research on early childhood development into terms that lay people can understand and use to change their behavior in order to improve public health outcomes.

Ms. Spurlock testified regarding the impact of adverse childhood experiences ("ACEs") on childhood development and public health outcomes. An initial study by Kaiser Permanente in the 1990s identified ten ACEs related to abuse (physical, emotional, and sexual), neglect (physical and emotional), and household dysfunction (mental illness, incarceration, substance abuse, death, and divorce). Subsequent studies have identified additional ACEs, including poverty, racism, community violence, and bullying. These studies have found that 30% of people had experienced at least one ACE, while 12-15% had experienced four or more. Ms. Spurlock testified that the studies showed a "dose response relationship," meaning that the more ACEs a person has had, the worse their health and educational outcomes are over the course of their life. Ms. Spurlock testified that the odds for certain outcomes, such as substance abuse, mental health issues, attempted suicide, and involvement in the criminal justice system, are "pretty astronomical" for people with four or more ACEs.

Ms. Spurlock explained that the brain continues to grow and develop after birth and is not fully developed until around age 25. Ms. Spurlock explained that "those early years when the brain is not fully formed, an assault to the brain that is related to these adverse childhood experiences and trauma, is particularly damaging when the brain is at its most vulnerable." Ms. Spurlock testified that if the stress and trauma associated with ACEs are not mitigated in any way, such as with the support of a caring adult, they can cause lasting damage to the developing brain. Ms. Spurlock explained the "cascade effect," where a disruption in cognitive development can lead to a "lack of success in school and relationships and health," which leads to risk taking, social and emotional issues, adverse health outcomes, and eventually an early death. Ms. Spurlock explained that a child may be able to overcome the effects of ACEs if they receive adequate family or community support, known as "building resiliency." However, it becomes more difficult to build resilience as the child gets older and experiences more ACEs. Additionally, poverty exacerbates the effects of ACEs because of the increased family stress and lack of access to resources to address psychological needs.

On cross-examination, Ms. Spurlock testified there is a correlation between ACEs and criminal behavior later in life. Ms. Spurlock testified that someone who does well in their elementary school years may have someone in their life, such as a teacher, who is "nurturing them in a way that helps them that mitigates some of those adverse childhood

experiences for some success." Ms. Spurlock testified that a 2014 study conducted in Memphis showed while the percentage of people who reported having at least one ACE was similar to the results of studies conducted nationwide, there was an increased rate of emotional abuse and neglect, domestic violence, and sexual abuse.

Dr. Richard G. Dudley, Jr., a physician with a specialty in psychiatry, testified that he was asked to conduct a psychiatric evaluation of Petitioner. Dr. Dudley conducted a clinical interview with Petitioner over the course of four days, gathering background information and evaluating Petitioner's mental status and possible symptoms. Dr. Dudley also reviewed various records related to Petitioner's trial and family history, social history interviews, and the evaluations conducted by the other experts in this case. Dr. Dudley testified that it was his opinion that Petitioner's psychiatric difficulties could have been presented as mitigation evidence and also impacted his competency to stand trial.

Dr. Dudley explained that examining any family history of mental health issues was important because of the increased genetic risk of Petitioner's developing psychiatric issues as well as the impact such issues would have on the environment in which Petitioner was raised. Dr. Dudley testified that Petitioner's family history was replete with a variety of mental health disorders, substance abuse, seizure disorders, intellectual disorders, and lengthy criminal records. Specifically, Petitioner's maternal grandmother, Frankie Hamilton – who was one of Petitioner's primary caretakers – suffered from schizophrenia, did not consistently comply with treatment, and was periodically hospitalized in psychiatric institutions. Petitioner's biological father, Terry McGirt, was assessed as having an I.Q. score of 68 when he was sixteen years old. Petitioner's mother, Vivian Pruitt, had a history of drug and alcohol abuse, drank during her pregnancy with Petitioner, was incarcerated on multiple occasions, and had a "long history of difficult relationships with considerable domestic violence."

Dr. Dudley gave his opinion that Petitioner "suffered from multiple psychiatric and neuropsychiatric difficulties" related to trauma endured during childhood and adolescence, which occurred in "the absence of the type of parenting that might have helped to mitigate its effect." Petitioner displayed "the classic symptoms of trauma, hypervigilance, over reactivity, and the like, even some dissociation." Additionally, Petitioner had "other developmental difficulties characterized by instability" affecting "important areas of functioning such as attachment, sense of self, mood regulation and decision making," as well as "intellectual and/or other cognitive difficulties." Petitioner's birth records indicated "some gestational difficulties" associated with his mother's use of alcohol during pregnancy and lack of prenatal care, which may have contributed to the development of some of Petitioner's mental health issues and cognitive deficits. Dr. Dudley attributed Petitioner's "significant history of marijuana use and abuse" to his family history of substance abuse, to the fact that it was common in the environment in which Petitioner grew up, and to Petitioner's discovery that "marijuana was helpful in calming some of the

symptoms" previously described. As Petitioner grew older, he "struggle[d] with depression often accompanied with suicidal ideations and some attempts, and also then there was the emergence of psychotic symptoms characterized primarily by paranoia delusions and periods of auditory hallucinations."

In describing Petitioner's history of trauma, Dr. Dudley explained that Petitioner experienced various traumas inside the home during his early childhood as well as traumas outside the home and in the community as a teenager. Dr. Dudley explained that Petitioner had more difficulty acknowledging and talking about the traumas he experienced in the home. As a child, Petitioner was exposed to both his mother's and grandmother's "difficulties," including his mother's being stabbed when Petitioner was nine years old. When he was five years old, Petitioner was sexually abused for a period of time by a friend of his mother. Although his grandmother may have known, the abuse was never discussed with Petitioner's family and contributed to his feelings of being unsafe and not protected. The family's money often went toward drugs rather than caring for Petitioner and his siblings, and Petitioner began performing in the streets to try to raise money to take care of some basic needs. As a teenager, Petitioner was assaulted, robbed, had a gun pointed at this head, and was in and out of juvenile detention. Petitioner's home was shot at, and there were frequent shootings in the neighborhood. When he was fifteen years old, Petitioner lost a group of friends to a violent car accident. Dr. Dudley acknowledged that there was some discrepancy as to whether Petitioner actually witnessed the accident or whether he was in juvenile detention at the time. However, Dr. Dudley testified that "clearly [Petitioner] knew about it and knew the details associated with it" such that it "contribut[ed] to the larger picture of the kind of multiple traumas that he endured during his adolescent years."

During the clinical interviews with Dr. Dudley, Petitioner talked a lot about his feelings of hypervigilance and concerns about harm. He described the nightmares and intrusive thoughts he had about the violence he witnessed. He became anxious, nervous, and depressed when describing his past traumas as well as displayed "some spacey dissociative sorts of symptoms." Dr. Dudley explained that Petitioner lacked any kind of nurturing parental support to help him build resiliency and cope with the repeated exposure to violence. Dr. Dudley testified that the situation was further complicated by Petitioner's intellectual and cognitive impairments as well as his marijuana use, explaining that "while each of them have their own individual effect on a person's ability to function, . . . they're also interactive with each other and . . . in many cases they exacerbate the effect of each other and their interaction."

Dr. Dudley testified regarding the stressors in Petitioner's life around the time of the offense in this case. Petitioner was released from prison in 2004 and was "trying to get his life on track in some sort of positive way" by having a job and being able to support himself. However, Petitioner had "difficulty sustaining employment for a variety of

- 49 -

reasons," including difficulty learning the tasks required and being able to do them efficiently. Because Petitioner was not able to financially support himself, he moved around living with different family members. For a time, Petitioner was in a relationship that was "quite supportive" and contributed a sense of stability, so it was "pretty devastating" when that relationship ended. Petitioner was struggling with depression and the emergence of psychotic symptoms.

Dr. Dudley reviewed Petitioner's jail medical records. Petitioner was prescribed Risperdal and Cogentin to treat his schizophrenia and depression. Petitioner was prescribed a dosage of 6 milligrams of Risperdal throughout the course of the trial. Dr. Dudley testified that the "normal dosage" was 2-3 milligrams and that a 6 milligram dose was "high enough that it would leave most people sedated." Dr. Dudley believed that Petitioner was taking the Risperdal in the evening, which "would leave him . . . sedated in the morning." People who observed Petitioner described him as acting "doped up, sedated." Petitioner also reported feeling sedated, unable to focus or pay attention, and not understanding what his attorneys were telling him. Petitioner also believed that his attorneys were working against him and trying to harm him. Dr. Dudley had "a serious question about [Petitioner's] competency at the trial" due to the combination of his intellectual cognitive difficulties, psychotic symptoms and paranoia, and the sedation caused by the medication, all of which interfered with his ability to trust and work with his attorneys and to understand the nuances of important decisions, such as whether to testify. Dr. Dudley testified that Petitioner was still "in a lot of physical and emotional distress at the time that I saw him" in 2015 and 2016. Petitioner complained about his health and various bizarre medical issues, such has leaking bodily fluids, and he expressed a belief that the doctors were part of a larger plot to torture him. Dr. Dudley testified that Petitioner's "underlying intellectual cognitive difficulties were evident clinically" and would have caused difficulty in trying to get Petitioner "to understand and demonstrate a capacity to make some reasonable decisions."

On cross-examination, Dr. Dudley testified that he always considers the possibility of malingering when conducting an evaluation. In his opinion, Petitioner was not malingering. Dr. Dudley acknowledged that he did not administer a standardized test for malingering and that he does not do so as part of his regular practice. Dr. Dudley explained that he instead considered "whether the symptoms . . . [are] presented in the way that we know that they present as opposed to . . . a way that a lay person might think that mental illness looks like[.]" Additionally, Dr. Dudley considered other sources of information to see whether similar symptoms were being reported before the offense. Dr. Dudley believed that "the things that [Petitioner] told me were essentially true." However, with regard to the incident in which several of Petitioner's friends died in a car crash, Dr. Dudley acknowledged that Petitioner told him that the friends had asked him to accompany them joyriding and that he witnessed the scene of the crash even though records indicated that Petitioner may have actually been in juvenile detention at the time. Dr. Dudley

acknowledged that he did not interview anyone other than Petitioner and that the all of the documents and interview summaries he reviewed were provided by the post-conviction defense team.

Dr. Dudley testified that it was unlikely that Petitioner's grandmother's schizophrenia was caused by syphilis because she had a long history of psychotic symptoms that predated her other health problems as well as a family history of schizophrenia. Dr. Dudley testified that Petitioner's biological father was a juvenile at the time he fathered Petitioner. Although Dr. Dudley testified that Petitioner's birth records were consistent with gestational difficulties and a lack of prenatal care, he did not know the medical significance of the notation that Petitioner's sagittal suture was open.

Dr. Dudley testified that when Petitioner first began to use marijuana, he discovered that it helped alleviate some of the fear and anxiety associated with his trauma, which rapidly lead to his abuse of marijuana. Additionally, Petitioner grew up in an environment in which substance abuse was common, and he may have also enjoyed the feeling of being high. Dr. Dudley testified that someone who is "psychologically pulled together" may be more successful in addressing a substance abuse problem "compared to individuals who suffer from a combination of substance abuse difficulties and other psychiatric difficulties and intellectual difficulties and a mixture of things like [Petitioner]." Dr. Dudley agreed that it was "fair to say" that a lot of people in Memphis have substance abuse problems, especially in "neighborhoods where there's been considerable violence, drugs, and poverty." Dr. Dudley agreed that Petitioner grew up in such a neighborhood. In addition to using marijuana continuously since the age of fourteen, Petitioner also used cocaine for a period of time when he was sixteen, but he eventually stopped using it because he found it made him more anxious and paranoid. As an adult, Petitioner also used various pills, like Xanax and Lortab, and also tried methamphetamine. Petitioner did not mention to Dr. Dudley that he was in a gang, but Dr. Dudley testified that it was not uncommon for someone who grew up in a violent neighborhood to join a gang.

Dr. Dudley testified that he would consider depression and suicidal ideation to be unusual, but not unheard of, in jail populations. Dr. Dudley testified that Petitioner experienced depression and suicidal ideation both while in and out of incarceration. In Dr. Dudley's opinion, Petitioner was incompetent at the time of trial due to the combination of his intellectual disability, "other psychiatric difficulties," and the high doses of anti-psychotic medication that he was taking. Dr. Dudley agreed that the Physician's Desk Reference indicated that the recommended dose of Risperdal is between 4 and 8 milligrams per day, which Dr. Dudley testified is usually given in divided doses. Dr. Dudley testified that in his opinion, a single dose of 6 milligrams per day was a high dose and was associated with more adverse effects. Dr. Dudley could not recall who had reported observing Petitioner as seeming "doped up" but stated that "there were a range of people who were observing him around the time of the trial" and that statements from people in the jail would

be relevant to whether Petitioner was competent at the time of trial. During redirect examination, Dr. Dudley testified that he did not see Petitioner having much interaction with his post-conviction attorneys from where he was sitting several feet behind counsel table.

Dr. Pamela Mary Auble testified as an expert in the field of neuropsychology, which she explained "is the understanding of brain behavior relationships" and "evaluating people to determine if they have mental or emotional deficits or impairments." Dr. Auble testified that Petitioner had never received a full neuropsychological examination before she was asked to conduct one for this post-conviction proceeding. Dr. Auble testified that she reviewed various records associated with this case, including the pretrial evaluations conducted by Dr. Craddock and Dr. Steinberg, as well as the reports generated by the other experts who testified during the post-conviction hearing. Dr. Auble tested Petitioner across several dates in August 2016. Dr. Auble explained that the testing took multiple sessions because Petitioner would complain of back pain, and she did not want him to become fatigued and not put forth his best effort. Dr. Auble also met with Petitioner in 2018 to administer two additional subtests in response to some results of the testing by the State's expert, Dr. Tucker Johnson. Dr. Auble testified that the battery of tests she administered were designed "to measure in a quantitative standard fashion aspects of human behavior," including "tension and motor skills, memory, speech, language, spatial skills, reasoning, problem solving, judgment, planning, . . . [and] dealing with changing situations." Dr. Auble explained that the tests she administered are standardized and that you can compare a person's performance to "normative data."

Dr. Auble testified that it is important to test a person's level of effort to determine whether they are "doing their best" and not malingering. Dr. Auble administered two stand-alone tests of effort as well as several measures of effort embedded within the other tests she administered to Petitioner and concluded that Petitioner was not malingering. Dr. Auble testified that both Dr. Craddock and Dr. Steinberg administered the Wechsler Intelligence Scale, which included embedded measures of effort, but neither administered a stand-alone test of effort. Dr. Craddock also administered a personality assessment inventory, the results of which indicated that Petitioner "had some trouble understanding some of the questions" because "he was either not reading it, he was responding randomly or he was confused." Dr. Auble explained that "when you get [results] like that you just can't interpret the rest of the test because he's not answering them in a reliable fashion." Dr. Steinberg also administered a test in which Petitioner gave a "striking" number of "inconsistent" responses regarding various psychological symptoms. Dr. Auble explained that Petitioner's responses on that test were not "reliable" because "maybe he's not always understanding what he's being asked or maybe he's responding without paying attention to what he's being asked." One of the embedded tests of effort on the Wechsler Intelligence Scale is the reliable digit span subtest, and Petitioner's scores on this subtest when

administered by Dr. Craddock, Dr. Steinberg, Dr. Johnson, and Dr. Auble indicated that he was "putting forth adequate effort."

Dr. Auble testified that she administered over 20 neuropsychological tests and subtests to Petitioner, which revealed significant impairments in "two main areas": executive functioning and memory. Dr. Auble defined executive functioning as "capacities that enable a person to engage successfully in independent purposes self-directed and self-serving behavior." Dr. Auble explained that impairments in executive functioning can "show up globally because they affect all aspects of behavior," including "approaching or planning or carrying out mental tasks or monitoring your performance." Dr. Auble testified that in the neuropsychological context, memory is defined as "the ability to learn new information." Based on her testing, Dr. Auble found that Petitioner "was particularly impaired on tests which required him to produce information, to engage in reasoning or organization, or to grasp new incoming material."

Dr. Auble testified that Petitioner had difficulty getting set for tasks and understanding what he was supposed to do on a certain test. Dr. Auble had to repeatedly explain the instructions to Petitioner, and she testified that Petitioner's "inability to understand" was "very striking." Another issue that Dr. Auble noticed was that Petitioner's reasoning was "very rigid, very concrete." Dr. Auble testified that Petitioner had difficulty putting together different pieces of information to come up with correct answers. Dr. Auble testified that Petitioner had difficulty shifting from one idea to another, which related to his ability to "change [his] behavior to adapt to what's happening out in the world." If Petitioner received intervening information, it negatively impacted his ability to recall the original information. Dr. Auble testified that Petitioner "had significant trouble remembering new information, and that was especially true when he had to generate that information himself." Both Dr. Craddock and Dr. Steinberg had found similar impairments during their pretrial intelligence testing of Petitioner. Dr. Auble testified that Petitioner scored in the fifth percentile or below on many of the tests she administered. Dr. Auble testified that Petitioner's memory was "worse than expected" for someone of his level of intelligence, which is generally an indicator of a brain injury. However, Petitioner did well in certain areas, such as paying attention adequately during the tests and performing well on some "speeded tests."

Dr. Auble testified that she diagnosed Petitioner as having mild intellectual disability and mild neuro-cognitive disorder under the current DSM-5. Dr. Auble testified that under the DSM-4TR in use during the pretrial evaluations in 2006, she would have diagnosed Petitioner with mild mental retardation and substance induced persisting dementia, which refers to "impairments in memory and certain other areas of functioning." Dr. Auble explained that neuro-cognitive disorder refers to "impairments in cognition that represented decline from the previous level of functioning," which was consistent with the impairments found by both Dr. Craddock and Dr. Steinberg in 2006. In explaining how

neuro-cognitive disorder impacts Petitioner's ability to function, Dr. Auble testified that Petitioner struggled to understand new things, had difficulty remembering things he was told, had "trouble going back and forth between different ideas," had difficulty planning or prioritizing, was unable to retain information needed to think through a problem, was inflexible and impulsive, and had difficulty accurately perceiving social situations. Dr. Auble testified that "these deficits would also impair him in making life decisions or doing complicated real life tasks."

Dr. Auble testified that for a diagnosis of intellectual disability, an individual must have deficits in intellectual functioning, which includes "reasoning, problem solving, planning, abstract thinking, judgement, those kinds of things." Dr. Auble testified that according to the DSM-5, "individual cognitive profiles based on neuropsychological testing . . . can help you understand intellectual abilities better than a single I.Q. score." An individual must also have adaptive deficits, which "are the failure to meet developmental and socio-cultural standards for personal independence and social responsibility." Dr. Auble explained that adaptive deficits "limit your functioning in one or more activities of daily life, and those can include communication, social participation, independent living and they also have to be present across multiple environments like home, at school, at work." Dr. Auble testified that there are three categories of adaptive behavior: the conceptual domain, which includes "academic abilities" as well as "abstract thinking, planning, strategizing, solving problems, setting priorities, mental flexibility, short term memory"; the social domain, which includes conversation and communication, understanding of risk in social situations, social judgement, and gullibility; and the practical domain, which includes personal care, complex daily living tasks, money management, recreation, health care, and vocational skills. Finally, the intellectual disability must have manifested during the developmental period. Dr. Auble testified that Petitioner met the criteria for a diagnosis of intellectual disability.

Dr. Auble testified that there are multiple risk factors for developing intellectual disability. Dr. Auble testified that intellectual disability is not always something a person is born with or caused by genetics, explaining that "someone can be born with [a] perfectly normal genetic profile but develop intellectual disability due to a lot of other factors like an early injury or child abuse." Based upon the records provided and interviews conducted in this case, Dr. Auble identified many risk factors in Petitioner's life that were either definitely present or potentially present, including the ACEs, trauma, and marijuana use previously discussed. Dr. Auble testified that Petitioner had both maternal and paternal family members with significant mental illness and that Petitioner was diagnosed with schizophrenia by MTMHI in 2006. Dr. Auble testified that mental illness is often a comorbidity with intellectual disability and may be caused by similar factors, such as brain injury, ACEs, or a genetic abnormality. Dr. Auble noted Dr. Lipman's report that heavy marijuana use is correlated with both psychosis and depression as well as deficits in cognition and memory. Dr. Auble testified that Petitioner's "intellectual disability and his

mental illness are inter-related. They serve to aggravate each other and they combine together to limit his adaptive functioning."

Dr. Auble testified that Petitioner met the statutory definition for intellectual disability and that this was true at the time of the offense and at trial. Dr. Auble agreed that she did not administer any intelligence tests to Petitioner as part of her evaluation because she was informed by post-conviction counsel that the Tennessee Supreme Court had already concluded that the first prong had been established. However, Dr. Auble reviewed the intelligence tests administered by Dr. Craddock and Dr. Steinberg in 2006 and by Dr. Johnson in 2017. Dr. Auble testified that Petitioner's mean score among the three tests was 70.3, which in her opinion placed Petitioner within the range of the statutory definition of intellectual disability. Dr. Auble also compared Petitioner's scores on the different subtests and noted that Petitioner mostly scored "within a couple of points" each time. Dr. Auble testified that "a lot of stability over time . . . is an indication of validity," explaining that someone who was malingering would have difficulty remembering "what things you did good on and what things you didn't do so good on and to repeat that so that you come up with similar subtest scores." Dr. Auble testified that the one discrepancy she noted was the Matrix Reasoning subtest, in which Petitioner received a "much higher" score on the test administered by Dr. Johnson. Dr. Auble noted that Petitioner's responses were "variable" between correct and incorrect answers. Dr. Auble explained that due to the style of the questions, it was possible to get a higher score just by guessing. Dr. Auble decided to re-administer this subtest to Petitioner along with the Digit Span test, which includes an embedded measure of effort and on which Petitioner's scores had been very stable. Petitioner scored "slightly but not significantly higher than the 2006 evaluation but lower than in 2017" on the Matrix Reasoning test, which indicated to Dr. Auble that Petitioner may have benefitted from some lucky guesses rather than that he had learned how to do the test.

Dr. Auble testified that Petitioner's impaired functioning manifested before the age of eighteen, stating her belief that "it was a gradual onset." Dr. Auble noted the risk factors present around the time of Petitioner's birth, including an incident of domestic violence between Petitioner's mother and biological father just prior to Petitioner's birth, which could have affected Petitioner and made him more vulnerable to post-traumatic stress disorder. Dr. Auble testified that Petitioner did not start school until he was seven and a half years old and that he repeated the first grade. Petitioner started doing well when he "found that school was a safe place." Dr. Auble testified that Petitioner's good grades and achievement test scores in elementary school could have been due to inflation, "[b]ut the fact that [Petitioner] did as well as he did suggest[ed] that he was working hard and he . . . liked school." However, Petitioner's "home life was beyond awful" with his mother's frequent arrests, substance abuse, and violence; his stepfather's abandonment; his grandmother's serious mental illness; and the family's extreme poverty. By middle school, Petitioner's grades began deteriorating because Petitioner had to walk through a dangerous

neighborhood to get to school and because Petitioner began to use "an incredible amount" of marijuana every day. Dr. Auble testified that when Petitioner was fourteen years old, he received a verbal I.Q. score of 81, which was "lower than you'd expect given his achievement testing." Petitioner scored lower than that on the screening test conducted by Dr. Rutledge when he was sixteen years old and lower still when he was evaluated in 2006. Dr. Auble cited a study that found that early marijuana use could contribute to a decline in mental ability and testified that Petitioner's scores on the tests she administered were consistent with that study.

Dr. Auble testified that Petitioner has deficits in adaptive behavior. Dr. Auble testified that her neuropsychological assessment primarily addresses adaptive deficits in the conceptual domain but would also have an impact on the social and practical domains as well. Dr. Auble testified that in the conceptual domain, Petitioner has impairments in "abstract thinking, planning, formulating strategies, setting priorities, mental flexibility and short term memory. He has a concrete approach to problems and solutions." In the social domain, Dr. Auble testified that Petitioner "is likely to have a limited understanding of risk in social situations because he [has] trouble processing changing situations. He is likely to have poor social judgement." In the practical domain, Dr. Auble testified that "while [Petitioner] can engage in personal care, I think complex tasks like organizing child care, managing money, . . . or making complex decisions about things like health care or working in a skilled [v]ocation, all of those would be impaired because of the deficits that I found."

Dr. Auble agreed that Petitioner had disabilities in the areas of reasoning, judgment, and impulse control, thus lessening his culpability. Dr. Auble testified that the transcript of Petitioner's trial testimony indicated that "his understanding of the issues in his case were very limited." Dr. Auble testified that in reviewing the records available at the time of trial, including the testing conducted by Dr. Craddock and Dr. Steinberg, she would have recommended a full neuropsychological assessment of Petitioner. Dr. Auble testified that she was able to review significantly more social history information than was provided to either Dr. Craddock or Dr. Steinberg.

On cross-examination, Dr. Auble testified that it is not unexpected for a person's scores to "vary a little bit" when the same test is administered multiple times. Dr. Auble explained that standardized tests are designed to compare a person to the "normal population." Dr. Auble agreed that failing to follow the manual for administering a particular test could affect the validity of the results and make them harder to interpret.

Dr. Auble explained that a diagnosis of mild neuro-cognitive disorder under the DSM-5 was the same as a diagnosis of substance induced persisting dementia under the DSM-4TR and that the name had simply changed between the two editions. Dr. Auble explained that it was common for a person with intellectual disability to have a "co-occurring diagnosis" of mild neuro-cognitive disorder when "it is caused by an event or

something that happens that makes the person's abilities decline or get worse in that developmental period." Dr. Auble testified that she did not believe that Petitioner was born with intellectual disability but that "it was a gradual progression," again noting Petitioner's childhood risk factors, heavy marijuana use, and emotional trauma. Dr. Auble testified that she believed that Petitioner's use of marijuana damaged his brain; however, Dr. Auble acknowledged that she is not an expert on neuroimaging of brains to detect such damage and that no such imaging was conducted on Petitioner.

With regard to her conclusion that Petitioner may have benefitted from some lucky guesses when he scored higher on Dr. Johnson's administration of the Matrix Reasoning subtest, Dr. Auble clarified that she was "not saying [Petitioner was] guessing through the whole test." Dr. Auble explained that "as the test goes on, his choices involve more guessing" as the questions got more difficult.

Dr. Auble testified that she did not interview anyone to evaluate Petitioner's adaptive deficits and that her conclusions were based solely on her neuropsychological testing. Dr. Auble testified that the risk factors she identified on direct examination "are associated with intellectual disability and thought to contribute to the development of intellectual disability." In Petitioner's case, those risk factors included Petitioner's drug use; his family's extreme poverty; a family history of mental illness and cognitive disability; his mother's lack of prenatal care and substance use during pregnancy; domestic violence; child abuse and neglect; a lack of appropriate caregivers and adequate stimulation to foster his development; and a lack of early intervention or special education services when his grades began to decline in middle school. Dr. Auble testified that many of those factors had been present before Petitioner began heavily using marijuana and "would have made him at least vulnerable and maybe had caused some decline already."

Dr. Caroline Everington testified as an expert in intellectual disability and adaptive behavior assessments. Dr. Everington testified that she is a fellow of the American Association on Intellectual and Developmental Disabilities ("AAIDD"), which she described as the organization that developed the official definition of intellectual disability and that works with the American Psychiatric Association to ensure "each version of the DSM has a congruent definition for intellectual disability." Dr. Everington testified that the current edition of the AAIDD's manual defined intellectual disability as "significant limitations in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills . . . [that] originates before age [eighteen]." Dr. Everington testified that this definition was similar to the definition in the prior edition of the AAIDD manual in use at the time of trial.

Dr. Everington was asked to provide an opinion regarding Petitioner's adaptive behavior. Dr. Everington testified that her "opinion is based upon assessments administered to [Petitioner,] interviews with six individuals who have had contact with

[Petitioner] in a variety of settings, and with a review of other records that were available," totaling over two thousand pages. Dr. Everington testified that in her opinion, Petitioner meets the definition of intellectual disability under the criteria established by the AAIDD, the DSM, and the Tennessee statute. All three definitions required a showing of limitations in intellectual functioning, deficits in adaptive behavior, and manifestation during the developmental period. Dr. Everington agreed that an assessment of adaptive behavior was a necessary component of an intellectual disability diagnosis at the time of Petitioner's trial in 2008.

Dr. Everington testified that the majority of people with intellectual disability fall into the mild range, and she described some of characteristics of mild intellectual disability in contrast with some of the stereotypes. "It is an invisible disability," in that most people in this category do not have obvious physical traits indicating that they have a disability. Mild intellectual disability is "multi factored," in that there may not be one specific cause that can be identified, like a genetic disorder. Mild intellectual disability is "[n]ot necessarily comprehensive," in that a person "can function quite well in some settings" and may only need "intermittent" or "less intrusive" support. However, while "the differences are much more subtle than in more severe disabilities," mild intellectual disability "actually affects many thing[s] that the person does across many roles" and "does affect functioning in adaptation through their lifetime." Intellectual disability "really affects learning," and people in the mild range have "a capacity to learn many things but they have a great deal of difficulty remembering learned information and even more difficulty applying the information to new settings." People with intellectual disability "benefit the most from structure and systematic instruction" but may have difficulty paying attention and staying focused, may miss important details, may have "a deficient knowledge base to draw from" when making decisions, and may have difficulty with certain executive functions like problem solving and "flexible thinking." Social characteristics of people with intellectual disability include impaired social judgment, suggestibility, gullibility, and naivety. Because people in the mild range "understand that they have deficits relative to other people, . . . there is a strong desire to please and to fit in." People with intellectual disability are overly trusting of others, are not attuned to social cues and nuances, and might be described by a lay person "as being more child like" in their approach to social situations. People with intellectual disability may have an "inability to perceive consequences and learn from mistakes," which leads to "repeating the same thing over and over again." However, Dr. Everington testified that limitations coexist with strengths and that a person with mild intellectual disability is not expected to be "uniformly low in all activities and human capabilities." Dr. Everington testified that people with mild intellectual disability need support, such as reminders, explanations, assistance with "complex activities of daily living," and assistance with developing "coping skills and problem solving" in stressful situations. Dr. Everington testified that "[a] benefactor is someone that does provide supportive assistance," but Petitioner did not have such a person in his life. People with intellectual disability may be able to graduate from high school or obtain a GED with

"repeated instruction assistance," though the drop-out rate is "significantly higher." People with intellectual disability may also learn vocational skills and work habits with ongoing support.[10]

Dr. Everington testified that adaptive behavior is defined as "the collection of conceptual, social, and practical skills that have been learned by people in order to function in their everyday lives" and as the "degree to which an individual meets community standards for independent functioning and social responsibility." Dr. Everington testified that it is important to assess a person's typical, rather than maximum, level of performance. Dr. Everington testified that both the DSM-5 and the AAIDD manual require significant deficits in at least one of three domains: conceptual, social, and practical. Dr. Everington testified that although people with intellectual disability may have some strengths, the focus of the assessment is on their deficits since that is part of the definition. Dr. Everington testified that while the DSM-5 requires adaptive deficits to be "directly related to intellectual impairments," the position of the AAIDD is that it is "impossible" to show a causal relationship rather than just a correlation between the two.

According to Dr. Everington, the professional consensus on adaptive assessments is that it is important to use multiple informants who have known the individual over time and in different settings, preferably from the same socio-cultural background. Dr. Everington testified that convergent validity is determined by using as many sources as possible and giving each one the appropriate weight. Dr. Everington testified that academic functioning is given less weight than the actual application of those skills. Dr. Everington explained that an assessment of adaptive behavior looks at performance rather than potential, explaining that "someone telling you that they can do something and actually doing it in a setting are very different because a setting is very complicated very frequently and requires a different level of conception and choice making and so forth." Dr. Everington testified that self-report is given very little weight and "should be avoided when possible or only used in a corroborative way" because people with intellectual disability "are notoriously poor historians on their own behavior." Dr. Everington testified that a person's adaptive deficits in a community setting are given more weight than those in a restrictive prison setting.

Dr. Everington testified that the AAIDD manual requires the use of standardized tests of adaptive behavior whenever possible "because they provide a reference for the individual skills in relation to the expectations for the culture and age groups." In this case, Dr. Everington used the Adaptive Behavior Assessment System, Third Edition ("ABAS"),

---

[10] The transcript indicates that a recording malfunction resulted in approximately 15 pages of indiscernible text. From the PowerPoint presentation that was admitted as an exhibit to Dr. Everington's testimony, it appears that the missing testimony addressed additional capabilities of people diagnosed with mild intellectual disability, dual diagnosis with psychiatric disorders, and various family and environmental risk factors.

which is usually administered to a single informant to determine a person's "current behavior in the community." However, Dr. Everington testified that *Atkins* cases require a nonstandard administration because of the need to conduct a "retrospective assessment" of a person who may have been incarcerated for a long period of time. Dr. Everington testified that "a nonstandard administration can give some important information" but should not be relied upon as the "only piece of information." Dr. Everington explained that the results of the assessment should be compared with other sources of information, such as interviews and records, in order to determine validity.

In this case, Dr. Everington administered the ABAS to three informants: Alma Rockett, Petitioner's aunt; Michael Rockett, Petitioner's cousin; and Marsha McMillan, Petitioner's family member and work supervisor. Dr. Everington testified that Michael Rockett was the primary informant and that Alma Rockett "contributed a few things." However, because they were unable to answer questions about Petitioner's behavior in a work setting, Dr. Everington conducted a follow-up interview with Ms. McMillan. Dr. Everington testified that while administering the rating scale to these informants, "a lot of the interview was general discussion of their memories and recollections of [Petitioner] at different points in his life and their memories and recollections of . . . skills that he could and couldn't do," which provided "helpful corroborative information." Dr. Everington testified that she used Petitioner's age at the time he was initially incarcerated in this case to determine his score because that was the last time he lived in the community. Petitioner scored extremely low, less than the first percentile, across all domains.

Dr. Everington also relied on a plethora of social history interviews, both those she conducted in person and summaries provided by post-conviction counsel. Dr. Everington testified that she focused on how long the person knew Petitioner and in what context rather than on the person's background and criminal record. Dr. Everington testified that she also took into account an informant's potential bias and explained that it was important to look at other sources of information besides family members. Dr. Everington testified that the in-person interviews allowed her to develop a rapport with the informant and assess their body language, which wouldn't be possible with a phone interview. Dr. Everington interviewed friends and family members who knew Petitioner as a child and as an adult. Additionally, post-conviction counsel provided summaries of "extensive interviews that had a lot of detail." Dr. Everington testified that "there was a lot of continuity" among the various interviews, which contributed to their validity. Dr. Everington acknowledged that many of the informants were Petitioner's peers from the South Memphis community, including other impoverished young black men who perhaps used drugs. Dr. Everington testified that "within that community [Petitioner] stands out as being different."

Dr. Everington testified regarding some examples of Petitioner's deficits in the conceptual domain as relayed by various informants, noting that each example "by itself would not be a problem but you're looking at a collection of deficits here." Petitioner could

follow simple directions but had difficulty following directions with two or more steps. One informant described an incident where Petitioner was told not to use a saw because he might cut himself, but Petitioner got the saw and did cut himself. Petitioner had difficulty with communication, could not answer questions that required careful thought or opinion, could not hold an intelligent conversation, and sometimes stared off into space. Petitioner did not pay bills, did not have a bank account or credit cards, and did not save or budget his money. Petitioner's former girlfriend reported that she frequently gave Petitioner money because he spent all of his on marijuana. A childhood friend reported that Petitioner was unable "to provide for himself on the street." In his job at Patterson Warehouse, Petitioner had difficulty cutting cardboard boxes to the correct measurement, matching serial numbers when unloading pallets, and putting the correct number of items in boxes. Petitioner needed assistance filling out job applications, and he got the job at Patterson Warehouse through either his mother or Ms. McMillan. Petitioner could not pass the GED. With regard to self-direction, Petitioner had difficulty concentrating, arriving places on time, and completing tasks efficiently, often quitting or becoming discouraged if a task was too hard. Petitioner had difficulty resisting pressure from others to do things that might endanger him and was susceptible to suggestion. Petitioner was often taken advantage of by others, both as a child and as an adult, even when told not to trust certain people. Petitioner did not manage his time well and spent "enormous amounts of time playing on the computer." In summary, Dr. Everington testified that Petitioner had "significant deficits in the application of functional academics, communication[,] and self-direction. He has some strengths in academics . . . , but the problem is application of those in a real life setting."

Dr. Everington testified regarding some examples of Petitioner's deficits in the social domain as relayed by various informants. Petitioner had some basic social communication skills, such as greeting others and being friendly. However, Petitioner lacked social judgment and failed to avoid friends or social settings that might be dangerous, even though it was important to be careful about who you associated with in the Fowler Homes neighborhood. Several informants stated that Petitioner had no friends other than his cousins while growing up. Petitioner could identify basic emotions like happy and sad, which a child can do, but had difficulty identifying more complicated emotions or talking about his feelings. Petitioner had difficulty understanding the perspective of other people and would not refrain from saying or doing something that might embarrass someone. Petitioner did childish and risky things in the work setting to gain attention. Petitioner was easily tricked and manipulated by other people, often falling prey to scams as both a child and an adult. Petitioner was described as more of a follower than a leader. Petitioner had difficulty following rules and obeying laws. Petitioner did have good leisure skills, such as being able to play card games like Spades, playing video games, enjoying music, and being a good dancer. However, Petitioner sometimes had trouble understanding certain games. Petitioner did not display age-appropriate skills, like organizing an activity for others or participating in team sports. Petitioner had difficulty

with social problem solving due to his limited intellectual resources and had difficulty avoiding the triggers for criminal offenses. In summary, Dr. Everington testified that Petitioner "had significant deficits in all aspects of the domain," particularly "in understanding social situations [and] appropriately conforming his behavior[.]"

Dr. Everington testified that when most people think of adaptive deficits, they think of deficits in the practical domain, such as the inability to live independently; however, most people with mild intellectual disability "do really well comparatively in this area." Dr. Everington testified regarding some examples of Petitioner's deficits in the practical domain as relayed by various informants. Petitioner did not have a driver's license, and there were no reports of Petitioner driving on a regular basis. Petitioner primarily walked or took the bus, but he had difficulty with the bus schedules and often got lost or arrived late. Petitioner did not shop for his own clothes, go for haircuts, or go to the grocery store. Petitioner could not use a map or an ATM, and he did not use community resources like the post office or library. Petitioner could use a microwave and make simple foods that did not require cooking. Petitioner did not wash his own clothing or help clean the house. Petitioner had to be specifically told to perform simple household tasks, like taking out the trash. Petitioner did not attend to his health care needs by going to the doctor or drug store and had to be reminded to take medication. Petitioner did not always dress appropriately for the weather. Several informants reported that Petitioner had poor hygiene, such as wearing urine-soaked clothes as a child even after other children made fun of him. Petitioner never sustained full-time employment for any length of time, and those jobs he did have were obtained through family members. Petitioner was able to perform menial tasks with supervision but had difficulty with more complex tasks. Petitioner rushed through tasks, did not seek help if he had difficulty, talked to himself and others rather than working quietly, needed reminders to follow the daily schedule, and did not check to see if his work needed improvement. Dr. Everington stated that it was significant that Petitioner had never lived independently or contributed to the support of others. One informant said, "I know a lot of people who have been locked up who could make it on their own but [Petitioner] wasn't like that," and another reported that Petitioner "had a hard time functioning in the world." Dr. Everington explained that "there was some of this notion among the people that [Petitioner] really had some deficits that would prevent him from totally being independent." Dr. Everington testified that Petitioner had significant deficits in the practical domain.

Dr. Everington testified that she administered some academic assessments to Petitioner for additional information about his conceptual skills. Dr. Everington explained that while such information is helpful, the practical application of those skills in a community setting was more important. Additionally, Dr. Everington explained that results of such tests should be interpreted carefully because Petitioner has "been going to school every day, been doing academic skills" while he was incarcerated, which would improve his academic skills. Moreover, the tests demonstrate Petitioner's current abilities

rather than his functioning at the time of the offense. Dr. Everington testified that Petitioner did "well," with scores in the average and below average range for reading, spelling, and math, which was more advanced than the majority of people who have an intellectual disability. However, Dr. Everington testified that these results did not preclude finding a deficit in the conceptual domain. Dr. Everington testified that Petitioner's scores on the achievement tests administered by Dr. Craddock and Dr. Steinberg were "more in line with expectations" for "somebody functioning in this I.Q. range." Petitioner also scored within the range of someone with an intellectual disability on a test of written and spoken language, which was similar to the results found by Dr. Steinberg. Dr. Everington explained that while Petitioner has learned some vocabulary through his experiences, particularly medical vocabulary, his understanding of analogies, word similarities, and opposites is "severely deficient in comparison to other adults." Dr. Everington testified that Petitioner's "real understanding of language and his ability to comprehend anything complex . . . is lacking." Dr. Everington administered the Independent Living Scales ("ILS"), which is a test designed to gather information about what someone knows about certain tasks, like managing money, maintaining a home, transportation, health, and safety. Dr. Everington testified that Petitioner scored within the range for a person with intellectual disability. Dr. Everington explained that because of the difference between knowing what to do and actually doing it, she gave the results of this test very little weight.

With regard to evidence of manifestation during the developmental period, Dr. Everington testified that several informants who knew Petitioner during childhood reported that Petitioner was "different and . . . ha[d] difficulty in learning and that there's some issue with mental capacity." Dr. Everington noted that although Petitioner repeated first grade, he subsequently made passing grades until middle school. Petitioner had variable TCAP scores, although he did achieve some high scores above the ninetieth percentile. However, in seventh grade, Petitioner's "grades fell off and other problems emerged at that point." Petitioner was socially promoted to the eighth grade despite failing grades and low TCAP scores. Dr. Everington noted that she had some concerns with the validity of the school records given that several informants reported "questionable testing administration practices" and cheating. Additionally, Dr. Everington noted that Petitioner attended a Title I school in a high poverty area, so the grade expectations may have been different. Dr. Everington testified that Petitioner "basically stopped attending" school in seventh grade, which was around the same time that Petitioner began to heavily use marijuana.

On cross-examination, Dr. Everington denied that the AAIDD was an advocacy group and stated that "[i]t is a professional organization that serves the profession of a wide variety of people that work in this area." Dr. Everington authored two chapters in the AAIDD's 2015 book regarding intellectual disability assessment in death penalty cases. As on direct, Dr. Everington testified that the AAIDD had taken issue with the statement in the DSM-5 that adaptive deficits must "directly relate" to intellectual functioning. Dr. Everington testified that both definitions state that intellectual deficits are "associated with"

or "accompanied by" adaptive deficits, but the position of the AAIDD was that "one doesn't cause the other" and that "[e]ach are assessed separately[.]" Dr. Everington denied that more people would meet the definition of intellectual disability under the AAIDD criteria than under the DSM-5 criteria, explaining that "the definitions are virtually identical. That sentence occurs at a different point in the discussion of that definition in the DSM. It is not in the definition itself."

Dr. Everington agreed that some of the quotes used in her presentation came from interview summaries provided by post-conviction counsel, which were "fairly detailed but they weren't verbatim[.]" Dr. Everington acknowledged that people can lie during interviews, but she testified that the consistency of the interviews led her to believe that they were valid and not rehearsed. Dr. Everington testified that she focused on objective examples of observed behavior over subjective opinions and that she would corroborate the information by interviewing multiple people and looking at additional sources of information. Dr. Everington testified that she always has concerns about potential bias when interviewing family members, so she determines an informant's credibility based upon whether they provide detailed information and examples and whether that information is consistent with other information she has. Dr. Everington did not know whether the people she interviewed had been told that their responses could help Petitioner avoid the death penalty, and she did not know how that might influence their responses.

Dr. Everington testified that standardized adaptive behavior assessments, such as the ABAS and others, are "imperfect in an *Atkins* kind of situation because of the retrospective nature of it." Dr. Everington testified that in many cases, standardized tests are unable to be used, so greater reliance is placed on the interviews. Dr. Everington agreed that under the protocols for the ABAS, if an informant cannot answer three or more questions in a section, then the score for that section is not valid. Dr. Everington explained that "within the *Atkins* hearings and so forth people tend to use adaptive scales more loosely because of this problem" with finding an informant who can complete the entire rating scale. Dr. Everington testified that she does not rely exclusively on the test but that it can give a piece of information regarding the person's functioning across a "wide variety" of areas even if the score is not compared to the norm. Dr. Everington testified that in this case, her report included a comparison of the Petitioner's ABAS score to the norm with "a caveat" regarding "the retrospective testing and the alternative use of it," explaining that she was "very straight-forward" with the "nonstandard administration" of the test. Dr. Everington testified that the ABAS manual states that it can be used in a "clinical format" to gather information about the various skills assessed on the test, which she testified is what she did in this case. Dr. Everington testified that interviewing informants together and recording their answers on the same score sheet was "a nonstandard use of the test." Dr. Everington testified that Michael Rockett was the primary informant and that she believed that she noted which responses came from Alma Rockett and Marsha McMillan. Dr. Everington testified that if Michael and Alma Rockett provided different responses to

the same question, she would use her judgment based on "who could give me an example" of the particular behavior in order to give "some indication that the rating that they were giving was accurate." Dr. Everington testified that Alma Rockett was "not the best" informant and only provided one comment on the ABAS score sheet, although she did provide more information during an open-ended interview.

Dr. Everington testified that she followed the standardized testing protocol when she administered the ILS to Petitioner. Dr. Everington agreed that the ILS is normed to the general population rather than to the community in which Petitioner was raised. Dr. Everington scored Petitioner's response as incorrect when he could not remember his telephone number from prior to his incarceration and, after being asked a couple of times, gave his brother's number without the area code. Dr. Everington conceded that she did not know if Petitioner had a telephone but stated that he always lived with someone who did have a telephone. Petitioner was unable to answer questions about social security benefits, filing income tax returns, or the purpose of a will, even though he may not have had any personal experience with those things. Dr. Everington scored Petitioner's response that you could get checks or money orders "from the check-cashing place" as incorrect, even though it may have been possible to do so in Petitioner's community. Dr. Everington agreed that she could not conclude whether Petitioner's incorrect responses were the result of an intellectual disability or the environment in which he was raised. Dr. Everington testified that the ILS was "just a piece of information. It doesn't really tell you . . . how [Petitioner] used that information that he had."

Dr. Everington explained that while standardized rating scales are normed based on the general population, it was important to have the rating scale completed by someone from the same community in order to get "their viewpoint in the community." Dr. Everington explained that interviews are also important to determine if "the people in environment saw this person was functioning differently than other people within the environment." Dr. Everington obtained most of her information about the community from her interviews and from the materials provided by post-conviction counsel rather than from independent research. Dr. Everington testified that Petitioner grew up in a "high poverty," "chaotic," and "somewhat violent environment." Dr. Everington testified that several of the interviews indicated that "everyone" in the Fowler Homes neighborhood smoked marijuana, but she did not know how much they consumed in comparison to Petitioner. Dr. Everington testified that she did not ask the informants about selling drugs because of the difficulty in getting information about that topic. Dr. Everington testified that she did not "know how successful [Petitioner] was" at selling drugs other than comments that he was "not a good criminal" and "put himself in situations where he was easily caught." Dr. Everington testified that although Petitioner was in a gang, he was not very "accomplished" within the gang, especially in comparison to his brother, "who apparently functioned much better." Dr. Everington testified that Petitioner's criminal record evidenced adaptive

deficits both in terms of a failure to obey rules and laws as well as "[i]n terms of problem-solving, making choices, making kind of rational solutions to his problems."

Dr. Everington denied that mental illness could underlie both Petitioner's low I.Q. scores and his adaptive deficits given the evidence of a cognitive disability "throughout his lifetime." Dr. Everington denied that Petitioner's adaptive deficits were directly related to the fact that he dropped out of school. Dr. Everington testified that while a lack of school attendance would affect academic skills, it "would not affect learning across the board in all areas" the way that intellectual disability does. Dr. Everington testified that while Petitioner's adaptive deficits were "to a certain degree" related to his being neglected as a child, "there are other people in that same environment who do not display that degree of deficits." Dr. Everington conceded that she did not interview Petitioner's surviving siblings, who were raised in the same home environment. Dr. Everington testified that she did not interview Vivian Pruitt, Petitioner's mother, because she was deceased.

Dr. Everington testified that substance abuse could be an underlying cause of Petitioner's low I.Q. scores and adaptive deficits in that "damage to the brain . . . can cause problems in thinking and cognitive issues." Dr. Everington testified that based on the information she had, Petitioner "likely had some deficits in childhood" that were "made worse . . . through the heavy ingestion of marijuana during that critical developmental time where his brain was still developing." When the State asked whether the various examples of adaptive deficits mentioned during Dr. Everington's direct testimony could have been the direct result of Petitioner's "incredibly high marijuana usage on a daily basis," Dr. Everington responded that she considered the effect of marijuana on Petitioner's overall functioning but not whether it caused any specific behavior. Dr. Everington testified that the examples she gave were consistent with somebody who had a cognitive disability, "which is likely related to the marijuana usage." With regard to certain reported deficits in communication (unable to hold an intelligent conversation, staring off, not listening, etc.) and work (difficulties with measurements and counting), Dr. Everington conceded that she did not know whether Petitioner was under the influence during those times described by the informants. Dr. Everington testified that while she was aware of studies showing the long-term effects of marijuana on the developing brain, she was not aware of any research on the short-term effects of marijuana intoxication on adaptive behavior.

Dr. Everington testified that the individual examples of behavior she discussed on direct examination were simply "indicators" of adaptive deficits. For example, Petitioner's failure to tell people where he was going was an indicator of responsibility, his failure to limit his time playing on the computer was an indicator of time management, and his failure to clean his fingernails was an indicator of hygiene. Dr. Everington testified that she was "looking at the totality of skills" rather than each one in isolation. Dr. Everington explained that while adaptive strengths may be noted, the focus of an evaluation is on whether the

person has deficits that effect their "independent living" and "successful social adaptation" because the definition of intellectual disability requires a showing of adaptive deficits.

The State presented Dr. Everington with Petitioner's letter to his mother in which he gave directions for checking his girlfriend's voice messages and asked whether that contradicted Dr. Everington's finding that Petitioner had a deficit with regard to giving directions involving multiple steps. Dr. Everington responded that she had not previously seen the letter and that she did not know the context in which the letter was written, whether someone helped Petitioner write it, or whether he was copying something.

With regard to the fact that Petitioner did not pay bills and did not have a bank account or credit cards, Dr. Everington testified that "[t]hose are skills that are typically displayed by . . . adults," even though Petitioner had spent the majority of his adulthood incarcerated. Dr. Everington also considered the use of an ATM to be "very common" for adults both in Petitioner's community and in the general population, even though Petitioner did not have a bank account. With regard to whether Petitioner's difficulties providing for himself were considered a deficit within an impoverished community, Dr. Everington noted that the person who reported lending Petitioner money "was in the same community and was able to function more successfully than [Petitioner] . . . in terms of hustling on the streets." The State asked whether it was common for inmates to spend all of their commissary money and have to borrow from others, and Dr. Everington responded that many of the inmates with whom she had worked over the years "actually are able to tell you to the penny what they've got, and they tell you how much soap costs and they tell you how much shampoo is, and they do budget . . . within the commissary setting because those little items are so important." Dr. Everington agreed that she did not know how much money Petitioner had in his commissary account when he spent it all at once.

Dr. Everington testified that Petitioner had difficulty maintaining full-time employment, which she described as "enough to support yourself independently," though she was not aware of the unemployment rate for Shelby County. Dr. Everington denied that Petitioner's difficulties in maintaining employment or obtaining a GED were due to a lack of interest. Petitioner had mentioned that his goal was to obtain his GED, and the records indicated that he had completed a food safety program and a six-week hospitality and culinary arts program while incarcerated on a prior robbery charge. Petitioner "was concerned about not having enough money and wanting to work," and he was pressured to get a job while he was living with Alma Rockett. Ms. McMillan reported that Petitioner did a good job cleaning a house while she was with him, and Dr. Everington explained that Petitioner "would probably be able to do a very menial job like that." Additionally, Petitioner worked for a period of time at Patterson Warehouse, though Dr. Everington did not recall how long Petitioner had that job. Dr. Everington agreed that Ms. McMillan was the only source of her information about Petitioner's behavior in a work setting even though Petitioner's girlfriend also worked with him at Patterson Warehouse. With regard

to the fact that Petitioner habitually arrived late to work on certain days, Dr. Everington explained that "people with intellectual disabilities have difficulty with temporal kinds of things[, w]ith being on time, with organizing their life." Ms. McMillan also "observed quite a number of things about [Petitioner's] work habits and difficulties that he had . . . in the work setting, which are consistent with somebody with an intellectual disability in terms of following directions" and other "work habits that would enable you to be successful." Dr. Everington did not know if Petitioner was using marijuana before going to work or how that would have affected his performance on the job. Although there were various explanations for why Petitioner lost his job at Patterson Warehouse – either due to a fight over a girl, abuse of break time, or an argument with a supervisor – Dr. Everington considered it an example of "difficulty in social problem-solving" in that it demonstrated "not really understanding social protocol and so forth . . . in a work setting."

Dr. Everington testified that Petitioner was described as more of a follower than a leader and explained that people with intellectual disability tend to "look to other people for cues and assistance with things and tend to be overly reliant on other people." Dr. Everington testified that there were several examples of Petitioner being taken advantage of and tricked, both as an adult and as a child, even after he was warned not to trust certain people. Dr. Everington relayed one example where Petitioner was performing on Beale Street and other children joined him with the promise to split their money, but then they cheated Petitioner out of his fair share. Dr. Everington testified that Petitioner was often "the fall partner for his peers who would hatch a plan to steal things" and then abandon Petitioner. Dr. Everington testified that this happened repeatedly, but Petitioner "never learned. He'd keep doing it. He was a pushover for them." Dr. Everington gave another example of a woman who took advantage of Petitioner while he was in prison even though a family member had warned him not to give her any money. Dr. Everington agreed that she did not know how much money Petitioner gave the woman but explained that she was "looking at [Petitioner's] being taken advantage of and not understanding the motives of other people" regardless of the amount of money risked.

Dr. Everington agreed that Petitioner suffered from severe neglect during his childhood. The State asked whether Petitioner's attending school in urine-soaked clothes could have been due to a lack of adult support at home. Dr. Everington explained that she considered it an example of an adaptive deficit because Petitioner "was made fun of by the other kids and continued to do that," whereas "someone else, likely, would have found a way to get clean clothes." Dr. Everington explained that this showed Petitioner's lack of problem-solving skills and a lack of awareness about his appearance even if he did not have access to an abundance of clothing. Dr. Everington noted that Petitioner's brother was reported as dressing in clean clothes, though he was older than Petitioner. Dr. Everington also noted that it was unusual for someone in elementary school to be urinating in their clothing. Dr. Everinton testified that Petitioner was also reported as having difficulty with making friends during this same period.

As on direct examination, Dr. Everington testified that there were no reports of Petitioner driving as a regular mode of transportation. Dr. Everington agreed that Petitioner did not own a car but testified that "[i]t is unusual for someone in his age group to not drive or to want to have a car." Dr. Everington testified that in her experience "with people from impoverished neighborhoods in these cases, almost all of them drive and almost all of them have a car," even if they did not have a driver's license. Dr. Everington acknowledged that the trial testimony indicated that Petitioner drove the victim's car away from the scene and that he had been charged with car thefts as a juvenile. Dr. Everington clarified that "driving and getting around using a car are two different things" and that Petitioner "could probably drive." Dr. Everington testified that Petitioner walked to most places in his community and that he rode the bus to work, though he had difficulty with the bus schedules and sometimes got lost after taking the wrong bus. When asked if she investigated whether using public transportation in Memphis was difficult, Dr. Everington responded that the "inference was that most people could do that and [Petitioner] could not."

With regard to the fact that Petitioner did not shop for his own clothing, Dr. Everington explained that is "an important skill" and that it was unusual, "particularly for a young man," to not want to have nice clothes or tennis shoes. Dr. Everington acknowledged that Petitioner's girlfriend reported that he spent the money he had on marijuana. Dr. Everington also testified that it was unusual for an adult to not shop for groceries, even though Petitioner was living with his sister or his aunt. With regard to the fact that Petitioner did not wash his clothes or clean the house while he was living with his aunt, Dr. Everington testified that she did not know if that was because his aunt offered or Petitioner refused to do those things for himself. Even though she did not know exactly how much of Petitioner's adult life he spent out of custody, Dr. Everington found it "notable that there's a perception that [Petitioner] would need help. That other people could function independently, but that he would need help."

## E. State's Expert Witness

The State called Dr. Tucker Johnson, a clinical psychologist,[11] who testified that in her opinion, Petitioner was not intellectually disabled. To reach that conclusion, Dr. Johnson conducted a clinical interview of Petitioner as well as intelligence testing, an adaptive screening, achievement testing, and a test of response style. Dr. Johnson ensured that Petitioner understood that she had been retained by the prosecution and that his responses would not be held in confidence. Dr. Johnson also reviewed the same records, reports, and social histories that were provided to the defense experts. Finally, Dr. Johnson

---

[11] Dr. Johnson's qualifications are discussed further below in the context of Petitioner's objection pursuant to Tennessee Rule of Evidence 702.

conducted several phone interviews of informants who knew Petitioner in different settings throughout his life.

With regard to Petitioner's medical history, Dr. Johnson reviewed Petitioner's birth records and did some research into the conclusions drawn therefrom by some of the other experts. Dr. Johnson testified that although Petitioner's head circumference was in the fifth percentile, it was not listed as an abnormal finding in his birth records. Dr. Johnson testified that the defense experts' characterizations of Petitioner's sagittal suture opening was "inaccurate" and that based on her research, Petitioner's sagittal suture opening was average rather than abnormal. Dr. Johnson testified that when Petitioner was evaluated by MTMHI, his mother spoke with a forensic social worker and reported "that there were no complications with her pregnancy or delivery and that [Petitioner] met developmental milestones within a normal time frame." Although Petitioner's mother reported to the social worker that Petitioner was dropped on his head as an infant, Dr. Johnson did not have any medical records about that incident. Dr. Johnson did have medical records of Petitioner's being admitted to the hospital when he was eleven years old and having an x-ray of his spine, which may have been related to his mother's report to the social worker that Petitioner was admitted to the hospital after being "knocked out" as a young teenager. Dr. Johnson also had medical records where Petitioner was hospitalized after he overdosed on marijuana, cocaine, and pills.

Dr. Johnson testified that although Petitioner "clearly [had] a mental health history," it was "unclear" from the records "exactly when problems started arising with his mental health." Petitioner had never received mental health treatment while in the community. Petitioner's pretrial jail records reflected that Petitioner complained of paranoia, visual and auditory hallucinations (including commands to hurt himself), intermittent suicidal ideation, depression, and sleep disturbance. Petitioner reported that he had previously attempted suicide by overdose and had threatened to hang himself. When Petitioner was evaluated by MTMHI, he was diagnosed with schizophrenia and prescribed anti-psychotic medication; however, there was a note that Petitioner "was probably exaggerating some symptoms" and "embellishing features of an existing disorder." When Petitioner was transferred to prison after his conviction, he eventually stopped taking the anti-psychotic medication. Petitioner reported that "it had been some years since he experienced hallucinations," and he continued to believe that he did not require mental health medication. However, Petitioner continued to experience periods of depression and suicidal ideation. Petitioner's prison medical records also included "several unusual complaints, including bugs crawling in his stomach, worms, sores under his skin, and fluid leaking and moving in his body," which Dr. Johnson testified was "probably an indication of a residual symptom of psychosis." Additionally, Petitioner frequently complained about pain in his back, and he "was diagnosed by a neurologist with somatoform pain disorder, which is a disorder where somebody is reporting pain . . . but they can find no medical substantiation for that." Based upon these records, Dr. Johnson concluded that Petitioner

"was displaying some symptoms of . . . a major mental illness of psychotic proportions" around the time of the offense in this case but that those symptoms had since stabilized.

With regard to Petitioner's social history, Dr. Johnson testified that it was "abundantly clear that the household in which [Petitioner] was raised was chaotic" and that Petitioner did not "have any role models who exhibited adequate adaptive functioning for him to learn it." Dr. Johnson testified that Petitioner's mother had "a number of legal problems," "a significant addiction to drugs and alcohol," and was often away from home, "so a lot of the parenting was apparently incumbent upon the grandmother, who had a major mental illness." Petitioner's childhood home was "very busy," with a lot of people coming through to buy and use drugs. Dr. Johnson also noted the "severe" domestic violence between Petitioner's mother and the different men with whom she was involved, as well as the violence in the neighborhood. Dr. Johnson testified that Petitioner sometimes had to beg for food and performed backflips on Beale Street as a means of earning money to eat. Dr. Johnson testified that as a teenager, Petitioner lost several friends in a severe car accident, which qualified as a traumatic event regardless of whether he saw it or heard about it. Dr. Johnson testified that Petitioner reported that he was a member of the Vice Lords gang. Dr. Johnson asked Petitioner about the *Gangland* episode where he discussed being in the Lemoyne Gardens Mafia, and Petitioner told her that he did not consider it to be a gang but simply the housing project where he lived at the time. Dr. Johnson noted that in the episode, Petitioner used an analogy (comparing the death of a gang leader to cutting the head off of an animal), which Dr. Johnson testified requires "a little more complicated thinking."

Dr. Johnson also reviewed Petitioner's school records. Dr. Johnson testified that Petitioner attended Title One schools where many of the students were impoverished and the teachers provided additional support, "act[ing] much as social workers; having a clothes closet, feeding these children." One of Petitioner's former teachers reported that it was common for kids to start school in the first grade being unable to read because of the lack of Kindergarten and PreK services. Petitioner repeated the first grade after receiving low grades and TCAP test scores, but both improved significantly the following year. Petitioner generally received good grades and positive comments from teachers throughout elementary school, though there were some notes about excessive absences and poor conduct. Additionally, Petitioner's scores on TCAP tests remained relatively high, including several scores over the ninetieth percentile. However, Petitioner's grades dropped significantly in middle school, and his seventh grade TCAP scores were all well below the fiftieth percentile. Dr. Johnson testified that Petitioner's low grades and TCAP scores from his first time through the first grade and in middle school did not seem consistent with the reports of widespread grade inflation and TCAP cheating, and Petitioner's former teachers with whom she spoke denied that they personally engaged in such practices. During Dr. Johnson's interview with Petitioner, he reported that he took medication for ADD while in school but that he did not receive special education services.

- 71 -

Petitioner did not know why his academic performance declined in the seventh grade, and he could not explain why he dropped out of school in the eighth grade. Dr. Johnson testified that Petitioner's memory was "pretty good" and "corresponded with the school records that we had."

Dr. Johnson testified that Petitioner's employment history as an adult was limited to his employment with a temp agency in 2005. It was through this agency that Petitioner obtained a job at Patterson Warehouse for three or four months. Petitioner indicated that his job duties included unloading boxes from trucks and that his supervisors were generally pleased with his performance. Petitioner reported that he was fired from that job because a supervisor lied about Petitioner's abuse of break time. The temp agency then sent him to another job where he was also responsible for unloading trucks, but Petitioner did not like that job and did not return after the first day. Soon thereafter, Petitioner was arrested in this case. Dr. Johnson asked Petitioner how he got money when he was not working, and Petitioner told her that his mother gave him money or that he "engaged in illegal activities that could bring him money."

Dr. Johnson spoke to Marsha McMillan about Petitioner's job performance at Patterson Warehouse. Ms. McMillan described Petitioner as "mentally slow." She reported that Petitioner "seemed to forget instructions and had to redo tasks and could not read written directions." Ms. McMillan described an incident during which Petitioner was working on a task but "was not doing it very well and a stack of boxes fell on him." Ms. McMillan reported that Petitioner was shy and asked her to tell a girl who worked with them that he was attracted to her. Dr. Johnson asked Ms. McMillan if she was aware whether Petitioner was using drugs on the job, and Ms. McMillan reported that she was not aware at the time but was later told by some associates that Petitioner had used cocaine and heroin. After her initial interview with Ms. McMillan, Dr. Johnson attempted to schedule a follow-up interview in order to administer an ABAS rating scale but was unsuccessful.

Dr. Johnson interviewed Petitioner's aunt, Alma Rockett, with whom Petitioner had lived for about 4 or 5 months prior to his incarceration in this case. Ms. Rockett had known Petitioner since his birth, but she had moved away for a period of 14 years and did not see Petitioner during much of his childhood and teenage years. Ms. Rockett reported that her sister, Vivian Pruitt, drank heavily and used illicit drugs during her pregnancy with Petitioner. Ms. Rockett described Petitioner as "real hyper as a child and then was fidgety, nervous and restless as an adult." Ms. Rockett reported that Petitioner would "sometimes burst out laughing for no discernible reason," "star[e] off into space," or talk to himself. Ms. Rockett believed that Petitioner had paranoid schizophrenia based on her experience with her mother, who displayed symptoms of a major mental illness and was periodically hospitalized.

Dr. Johnson was able to get some general information about some of Petitioner's adaptive behaviors while he lived with Ms. Rockett. Ms. Rockett reported that Petitioner took out the trash but did not cook or perform other household chores. Ms. Rockett reported that Petitioner would offer to help around the house, and she knew that Petitioner could do those chores because he had done them while living with his mother. However, Ms. Rockett did not want him to help with chores because "she wanted them done a certain way" and "she preferred to do it herself in her home." Ms. Rocket reported that Petitioner had a job for a short period of time and that he took the bus to work. Dr. Johnson testified that Dr. Everington's report had indicated that Ms. Rockett would lock Petitioner out of her house while she was away because she was afraid that he would hurt himself due to his low functioning. However, when Dr. Johnson asked Ms. Rockett about this, Ms. Rockett said that someone had told her that Petitioner said he was going to rob her and kill her and her mother, so she locked Petitioner out because she was afraid for her mother's safety. Ms. Rockett reported that she had not had any contact with Petitioner since he entered prison.

Dr. Johnson attempted to administer an ABAS rating scale to Ms. Rockett to try to replicate Dr. Everington's findings. Dr. Johnson testified that "Ms. Rockett cooperated for a little bit, but she kept saying, 'I already told this information to these other people.'" Ms. Rockett stated that she was told by the defense team that the information she provided could help Petitioner avoid the death penalty. After explaining the importance of each side doing an independent assessment, Dr. Johnson was able to get through several adaptive domains before Ms. Rockett said that she did not want to do it anymore. In each adaptive domain that was completed, there were a number of items on which Ms. Rockett responded "I don't know" even after being encouraged to guess by Dr. Johnson. This resulted in Dr. Johnson being unable to score the test; however, Dr. Johnson was still able to use the information provided in the questions that Ms. Rockett did answer in forming her opinion. Dr. Johnson noted that there were no "I don't know" answers on Dr. Everington's ABAS, so Dr. Johnson did not believe that Ms. Rockett's ratings could be considered reliable, meaning similar across administrations.

Dr. Johnson testified that while "adaptive functioning has to also be assessed kind of retrospectively," she believed that "adaptive functioning in a prison environment is relevant to a current status of intellectual disability since that's supposedly a lifelong disorder." Dr. Johnson explained that because of the structure of the prison environment, "[y]ou can't assume necessarily that the person has an ability to independently follow any sort of structure in his life, but you can look at whether or not there are any -- anything outstanding that correctional officers have noted that would be indicative of intellectual disability, such as an inmate having trouble understanding, speaking very slowly, sometimes not responding at all, needing directions repeated a number of times, having trouble following multiple step directions." Dr. Johnson noted that intellectually disabled inmates tend to be "preyed upon by more sophisticated inmates." The correctional

counselor with whom Dr. Johnson spoke considered Petitioner to be "an average inmate" who "functioned comparable to other inmates." Petitioner followed the rules, was on the highest level of privileges, and had not had a disciplinary infraction since 2013. Petitioner did well with preparing his cell for inspection and did not demonstrate problems with personal hygiene. Petitioner generally got along with the prison staff and other inmates, and there were no reports of Petitioner's "being shunned or bullied or taken advantage of or being preyed upon." Petitioner engaged in leisure activities like playing dominoes, basketball, and handball, and he was able to answer Dr. Johnson's question about how to know who wins a game of handball. The correctional counselor reported that although Petitioner sometimes spoke slowly, "he didn't demonstrate any problems with expressing himself," "what he said was very logical and understandable[,] and he seemed to understand all conversations."

Dr. Johnson testified that Petitioner was currently attending classes to obtain his GED so that he would be eligible to work in the prison. Dr. Johnson testified that Petitioner was taking adult basic education classes as a precursor to the GED classes. Dr. Johnson testified that "there was a lot of variability in [Petitioner's test] scores," which were expressed in terms of grade equivalency. The correctional teacher reported that Petitioner's effort also varied and that some of the very low scores may have been because he was not trying. The teacher reported that Petitioner put forth more effort and scored higher on his most recent testing because he was interested in a barber job that might become available. The teacher reported that Petitioner would occasionally miss problems that he knew how to do, which suggested to Dr. Johnson that Petitioner had "some persisting attention deficits." Petitioner generally scored higher in math skills and language than he did in reading. Dr. Johnson testified that although Petitioner dropped out of school in the eighth grade, there were several tests on which Petitioner scored above an eighth-grade equivalency, which "would not be expected of someone with intellectual disability." Dr. Johnson noted that one of the defense experts had said that Petitioner "appeared to be learning and obtaining more knowledge as a result of . . . his educational instruction[.]"

Dr. Johnson testified that she administered an adaptive screening to Petitioner, which she had used several times in the past but conceded was not standardized. Dr. Johnson testified that the questions primarily focused on the conceptual and practical domains, but she also gathered any information she could about the social domain. Dr. Johnson explained that the screening "looks at [Petitioner's] ability to display the behaviors that I asked about" and that a correct answer indicates that Petitioner has a skill in that area, although "[i]t doesn't necessarily indicate that he always displayed that in the community."

Dr. Johnson testified that Petitioner knew the date, was able to correctly spell the day of the week and the month, correctly wrote his Social Security Number from memory, correctly spelled his first and last name, and correctly wrote the address of the prison. Petitioner was able to accurately identify the current and previous presidents and discuss a

current event in the news. Petitioner was able to provide the name and phone number of a family member with whom he remained in contact. Petitioner was able to draw simple shapes and write a sentence with correct capitalization and punctuation. Petitioner was able to perform calculations in his head to determine the correct amount of change. Petitioner was able to indicate the correct time on an analogue clock face.

Petitioner indicated to Dr. Johnson that he had never washed his clothes in a washing machine because his aunt performed this task for him. Additionally, Petitioner stated that he never cooked using a stove or oven or followed a recipe because he "didn't have to" when all of his meals were prepared by his mother, grandmother, or aunt. Petitioner indicated that he knew how to use a microwave, that he swept and mopped as part of keeping a house clean, and that he showered to keep himself clean. Dr. Johnson believed that Petitioner's response about going to a hospital in order to see a doctor was "pretty consistent with his sociocultural environment." Petitioner knew to call 911 in an emergency, indicating that he had done so in the past after an incident where his mother was stabbed. Petitioner stated that he sometimes drove a car, although he never obtained his driver's license, which Dr. Johnson stated was not unusual based on her experience with people from impoverished areas of Memphis. Petitioner stated that his brother taught him how to drive, and he was able to explain what different traffic signs meant. Petitioner testified that his mother showed him how to catch a bus, and he explained that he would get off when he recognized the area; however, Petitioner "gave some conflicting information" about what he would do if he went somewhere unfamiliar.

Petitioner indicated that he had experience using a computer to search the internet and a cellphone for texting. He was able to answer questions about ordering food at a restaurant, shopping, using public restrooms, and what to do in various emergency situations. Petitioner knew how much money was in his inmate account and how much he was paid per hour for attending school. When Petitioner was employed in the community, he would cash his paycheck at a check-cashing place and keep the money on his person. Petitioner never had a bank account or filed tax returns, which Dr. Johnson did not believe was unusual in more the impoverished areas of Memphis.

Dr. Johnson testified that Petitioner "did a pretty good job of relating his history" with regard to his medical history, childhood, and schooling, which involved the use of long-term memory. Dr. Johnson noted that "a fair amount of the time intellectually disabled people will have some problems with recalling their history comprehensively and putting together timeframes." However, Dr. Johnson did not notice any "striking abnormalities in [Petitioner's] ability to recall and provide information that was relative to events in his life."

Dr. Johnson contrasted some of her observations of Petitioner with some of the ratings on the ABAS conducted by Dr. Everington. Dr. Johnson testified that Petitioner

displayed good social skills during the interview, such as pouring water for Dr. Johnson and asking her if she wanted some food when he received his lunch, although he had been rated as "never or almost never" offering food or beverage to guests. Dr. Johnson testified that although Petitioner was rated as "sometimes" speaking clearly and distinctly and "never or almost never" listening closely for more than five minutes, she did not experience any difficulties with him in these areas. With regard to the question of "[p]articipat[ing] in conversations without talking too much or too little," Petitioner was rated as "never or almost never." Dr. Johnson testified that she found "some of [Petitioner's] answers were abbreviated, but when I asked him to elaborate, he had no trouble with elaborating, giving me an adequate amount of information." Dr. Johnson noted that "there's such a thing as a skill deficit and a performance deficit, but in these areas I definitely didn't see a skill deficit." Dr. Johnson testified that she believed it was important to take into account the context of whether there was an opportunity or a need to perform a skill, such as Petitioner's not washing his clothes or cooking his meals because others did those things for him.

Dr. Johnson administered a comprehensive standardized I.Q. test to Petitioner, as well as an achievement test and tests of response style and effort. Dr. Johnson testified that Petitioner had a full-scale I.Q. score of 75, with a 95 percent confidence interval of 71 to 80, which "puts him in the borderline range." Dr. Johnson testified that Petitioner's "verbal comprehension was also in the borderline range at 72, which was not unexpected given that he has the difficulty with reading." Petitioner's other composite scores for perceptual reasoning, working memory, and processing speed were all in the low average range. Dr. Johnson testified that Petitioner "didn't get any scores in the low range that are consistent with intellectual disability." Petitioner's scores on the achievement test administered by Dr. Johnson were similar to those on the test administered by Dr. Everington and were "above what you would expect from someone with an intellectual disability." Dr. Johnson also administered the Validity Indicator Profile, a test of response style and effort that can also give an estimate of cognitive ability because the questions get progressively more difficult. Petitioner's response style was rated as "compliant," which "indicated that he was both intending to do well on the test and exhibiting the adequate effort," and his adjusted score was "significantly above" the average score of adults with known intellectual disability.

Dr. Johnson testified that she disagreed with Dr. Auble's testimony that Petitioner may have scored higher on the Matrix Reasoning subtest by guessing, noting that the probability of Petitioner answering three of the more difficult items correctly in a row by just guessing was "extremely low." Dr. Johnson believed that Petitioner's incorrectly answering some of the easier items on the test was "probably consistent with the attention deficits" that the correctional teacher had noticed. Additionally, Dr. Johnson observed Petitioner's behavior while he was taking the test, and he appeared to be "behaving exactly as I would expect" of someone considering each answer rather than guessing. Dr. Johnson

testified that Petitioner got a perfect score on the Test of Memory Malingering, which meant that he was "exhibiting adequate effort." Based on Dr. Johnson's observations, Petitioner appeared to be giving adequate effort on all of the tests in that he would not answer too quickly and would change responses if he realized one was incorrect. Dr. Johnson testified that she was not concerned about the validity of any of the scores she obtained on the cognitive testing.

Dr. Johnson believed that there were "some problems with interpreting the prior I.Q. test[s] . . . and the prior diagnoses [of mild mental retardation] because of various ancillary issues." Dr. Johnson believed it was "odd" that even though Dr. Rutledge issued a report for juvenile court saying that Petitioner had mild mental retardation, she did not assess Petitioner's adaptive functioning and only testified at trial to adaptive deficits that occurred after her evaluation. Dr. Johnson also noted that both Dr. Craddock and Dr. Steinberg concluded that Petitioner's "general intellectual functioning was within the borderline range, rather than extremely low," despite I.Q. scores below 70, because "there was no evidence to suggest that [Petitioner] demonstrated significant deficits [in] adaptive functioning." Dr. Johnson testified that both marijuana use and mental illness can affect a person's performance on an I.Q. test. Dr. Johnson noted that Petitioner was reported as "using marijuana all day, every day" and was experiencing symptoms of a psychotic disorder at the time he was arrested and initially evaluated in this case. Because Petitioner's mental illness had stabilized and he was no longer using marijuana by the time she tested him, Dr. Johnson believed that she obtained a more accurate I.Q. score.

Dr. Johnson testified that the DSM-5 requires adaptive deficits to "arise from the intellectual deficits," which she explained "provides a little more conservative estimate" because "if it doesn't matter where those arise from – the diagnosis is going to be given to more people." Dr. Johnson testified that in Petitioner's case, it was unclear if "what's reported as deficits actually were due to a problem with intellectual functioning" as opposed to drug use or mental illness. As an example, Dr. Johnson explained that "if someone's high on marijuana, they are going to have problems with all of those things on the job" that were described by Ms. McMillan, such as working slowly and not understanding directions. Additionally, Dr. Johnson noted that Petitioner was fired from his job at Patterson Warehouse for abusing break time, not because of poor job performance, and speculated that Petitioner may have been using marijuana on his breaks. Dr. Johnson testified that it was "not clear from the record that [Petitioner] required support rather than choosing it." As an example, Dr. Johnson testified that Petitioner "was content to have his relatives launder[] his clothes and didn't attempt to learn this skill, although his intelligence that I measured in the borderline range suggests he could learn that skill if given the opportunity."

Dr. Johnson agreed with Dr. Everington that the ABAS could be used to conduct a retrospective assessment of adaptive functioning even though that is not a standard

administration. However, Dr. Johnson was concerned that Dr. Everington's report listed only a single set of scores for all three respondents. Dr. Johnson explained that multiple informants should be given separate rating forms, otherwise it is not clear who provided what information. Dr. Johnson testified that while a nonstandard administration of the ABAS is permissible, the report should clearly explain "the nature and purpose of the nonstandard administration" and "provide appropriate cautions regarding use or nonuse of the scores." Dr. Johnson testified that Dr. Everington's report did not contain such a notation, and Dr. Johnson was not aware of the nonstandard administration until she looked at the raw data. Dr. Johnson testified that "when you start making exceptions to standardized procedures, the more you make, the more potentially unlikely that your scores actually reflect the functioning of the individual."

Dr. Johnson agreed with Dr. Auble's opinion that Petitioner did not appear to have been intellectually disabled early in life. However, Dr. Johnson disagreed with Dr. Auble's opinion that Petitioner developed marijuana induced persisting dementia, now known as neurocognitive disorder under the DSM-5. Dr. Johnson testified that while being intoxicated or experiencing withdrawal from marijuana use can affect a person's performance on an I.Q. test, recent studies suggested that the cognitive decline associated with marijuana use "pretty much disappears after 72 hours." Dr. Johnson noted that the diagnostic criteria for dementia required an impairment in memory and the ability to learn new information, but Petitioner was able to recall his social history and "demonstrated that he is able to improve his academic functioning with instruction." Dr. Johnson testified that if the "influence [on Petitioner's memory] has been less over time, I think that calls into question whether or not there's an intellectual disability that was precipitated by a . . . cannabis induced neurocognitive disorder, major or mild." Additionally, Dr. Johnson could not find any academic literature or "research study that marijuana use was associated with dementia."

On cross-examination, Dr. Johnson testified that as part of her role with the Shelby County Juvenile Court, she was familiar with the ACEs study and had attended many trainings related to trauma. Dr. Johnson agreed that the more ACEs a person had, the more likely they were to have negative mental and physical health outcomes. Reviewing the same records and social history interviews as Petitioner's expert witnesses, Dr. Johnson agreed that Petitioner lived in a home with severe domestic violence, prevalent drug use, frequent arrests, mental health issues, and various forms of abuse and neglect, all of which are ACEs. Additionally, Petitioner grew up in an impoverished neighborhood where violence and crime were prevalent. Dr. Johnson testified that as a young child, Petitioner might not have been fully aware of everything that was going on but that he eventually became more aware as he got older. Dr. Johnson testified that unresolved trauma in children can lead to behavioral disturbances, problems with learning, a heightened threat response, substance abuse, and anxiety and mood disorders. Dr. Johnson agreed that Petitioner did not have nurturing people in his life to help him build resilience.

Dr. Johnson reviewed several portions of the AAIDD's manual and user guide with post-conviction counsel. Dr. Johnson agreed with the AAIDD's manual where it cautioned against relying exclusively on an individual's self-report of adaptive deficits. While Dr. Johnson agreed that many people with intellectual disability may attempt to appear more competent than they are, she did not know if that was necessarily true for defendants in the criminal justice system. Dr. Johnson agreed that "practice effects," which can increase I.Q. scores when a person has been tested multiple times, should be taken into consideration if a person is retested within one to two years of a previous test administration. Dr. Johnson testified that she "partially agreed" with the AAIDD manual's recommendation that "past criminal behavior" should not be used to "infer level of adaptive behavior." Dr. Johnson testified that while she does not "look at sophistication of criminal behavior," certain crimes, like aggravated assaults, may be related to communication deficits and displays of aggression seen in "the lower ranges of intellectual disability." Dr. Johnson disagreed with the AAIDD manual's recommendation to not take into account a person's "street smarts," explaining that the DSM-5 states that adaptive skills, or the "ability to adapt to your surroundings," should be assessed in relation to "socioculturally matched individuals." Dr. Johnson testified that "in some of the more dangerous neighborhoods, it takes some adaptive skill that would not be on the ABAS, but it still is relevant." Dr. Johnson agreed that a person's behavior while in jail or prison "needs to be considered within the context of a structured environment." Dr. Johnson acknowledged that Petitioner possessed many of the prenatal, perinatal, and post-natal risk factors for intellectual disability listed in the AAIDD's manual.

Dr. Johnson testified that the DSM-5 defines the I.Q. component of intellectual disability as "about 70 plus or minus five." Dr. Johnson explained that because of this range, "[t]here can be someone whose I.Q. is above 70, but they experience such the bare academic deficits that . . . they would potentially be eligible for a diagnosis of intellectual disability." Conversely, someone with an I.Q. below 70 who does not demonstrate significant adaptive deficits would not be diagnosed as intellectually disabled. Dr. Johnson testified that while the DSM-5 requires significant deficits in only one of three domains of adaptive behavior, she "really wouldn't expect if somebody had significant deficits in one of the domains that the other two would be strong" because some of the behaviors in each domain overlap. Dr. Johnson noted that the DSM-4TR was the "diagnostic bible" in use at the time of the offense in this case and that it required deficits in more than one area of adaptive behavior, which was divided into more narrow categories. Dr. Johnson testified that there was "some disagreement [among experts performing *Atkins* evaluations] about which diagnostic manual to use" when determining if a person was intellectually disabled at the time of the offense. Dr. Johnson agreed that both she and the defense experts relied upon the DSM-5 in this case.

Dr. Johnson testified that "there are a number of different etiologies for intellectual disability" and that, particularly in the mild range, there may be no specifically identifiable cause. Dr. Johnson agreed that people with intellectual disability have "a wide spectrum of disabilities and abilities" and can range from totally dependent on the severe end to nearly independent on the mild end. Dr. Johnson agreed that the majority of people with intellectual disability would be classified as mild. However, even for mild intellectual disability, a person's adaptive deficits must "be significant enough to require some support." Dr. Johnson agreed that the onset of intellectual and adaptive deficits must occur during the developmental period and that some people may develop such deficits as adolescents.

Dr. Johnson agreed that Petitioner received an I.Q. score of 66 when he was sixteen years old and in the Shelby County Jail. Dr. Johnson noted that Dr. Rutledge did not administer "concomitant measures of effort" but indicated that Petitioner "obviously considered the procedure a joke," so Dr. Johnson was not sure that the resulting I.Q. score was "accurate." However, Dr. Johnson testified that if the score was accurate, it indicated that Petitioner "has problems with learning, memory, executive functioning, planning." Dr. Johnson noted that Petitioner was tested by Dr. Craddock in August of 2006 and received an I.Q. score of 68, which Dr. Craddock believed was a fair representation of his intellectual ability. Dr. Johnson testified that an I.Q. test is not designed to specifically look at executive functioning the way neuropsychological testing does. Dr. Johnson testified that neuropsychological tests are useful for determining a person's specific strengths and weaknesses in order to properly tailor the supports a person receives. Dr. Johnson agreed that providing supports is not a factor in an *Atkins* evaluation where the only issue is the person's eligibility for the death penalty.

Dr. Johnson testified that the Test of Memory Malingering is a test of response style and effort, which is designed "as a way to understand what the examinee's approach to the cognitive testing is" and determine if they are malingering or exaggerating their cognitive impairment. Dr. Johnson administered only the first trial of the test to Petitioner, even though the test protocol requires at least two trials, because she believed that "trial two is not going to give me any additional information" after Petitioner received a perfect score on the first trial, indicating that he was "fully cooperating." Dr. Johnson explained that the test does not measure a person's memory or cognitive abilities but instead tests the person's "willingness to show me his memory abilities." Dr. Johnson testified that the Validity Indicator Profile is "the only malingering test that . . . gives you some read [on] cognitive skills, if the person is being compliant." Both tests indicated that Petitioner "did not appear to be malingering."

Dr. Johnson agreed that Petitioner was initially evaluated in this case by Midtown Mental Health, who referred him to MTMHI due to concerns about his competency. While at MTMHI, Petitioner was diagnosed schizophrenia and prescribed medication. Dr.

Johnson testified that in her experience with West Tennessee Forensic Services, a defendant discharged from a psychiatric hospital may have a recommendation for follow-up care in the jail, but she did not know if that occurred in Petitioner's case. Dr. Johnson disagreed with Dr. Dudley's opinion that Petitioner was receiving an excessively high dosage of Risperdal but conceded that she did not know how Petitioner may have responded to that dosage. Dr. Johnson agreed that psychiatric disorders occur at a higher rate in the intellectually disabled population than in the neurotypical population.

Dr. Johnson agreed that the DSM-5 recommends using standardized and culturally appropriate measures of adaptive functioning whenever possible. Dr. Johnson agreed that the ABAS is a standardized test and testified that "if you administer it according to the standardized procedures, then you get some pretty good data relative to the normal sample." However, Dr. Johnson testified that because the ABAS was normed to the general population, it may not necessarily be socioculturally appropriate for the environment in which Petitioner was raised. Dr. Johnson explained that the ABAS included many skills that may not be relevant or required for adaptive functioning in that environment, which would result in the rater giving a lower score on those skills. Dr. Johnson acknowledged that this was an issue with most standardized assessments of adaptive behavior. Dr. Johnson clarified that she did not choose to not administer the ABAS to Petitioner in this case because of "sociocultural issues" but because she prefers to administer standardized assessments to collateral informants.

Dr. Johnson conceded that the adaptive screening she administered to Petitioner is not a standardized test. She explained that the questions were designed to assess similar skills as the ABAS and the Vineland, another standardized test of adaptive behavior. However, rather than asking Petitioner to rate a particular skill on a numerical scale, she asked him information about those skills, such as how to wash clothes, make change, or tell time. Dr. Johnson testified that she had developed the adaptive screening while working at the Department of Intellectual and Developmental Disabilities ("DIDD") and that it was not copyrighted. Dr. Johnson testified that she did not assign any weight to the questions *a priori*; instead, she would focus on questions that showed the person had a significant deficit in a particular area without penalizing the person for having a strength in a different area, which was consistent with the diagnostic criteria. Dr. Johnson acknowledged that, with the exception of a few questions where she asked Petitioner to perform a certain skill, she mostly had to rely on his self-report about what he could do. Dr. Johnson agreed that the majority of the questions discussed in her report focused on the practical domain. Dr. Johnson noted that the DSM-4TR in use at the time of Petitioner's arrest did not require the use of standardized assessments of adaptive behavior.

Dr. Johnson testified that at the time she conducted the adaptive screening, she was still hoping to complete an ABAS rating scale with Alma Rockett. Because Petitioner had lived with Ms. Rockett for a few months prior to the offense in this case, Dr. Johnson

believed that she would be the most familiar with his functioning at home and in the community during that time. Dr. Johnson also wanted to administer at least the work component of the ABAS to Marsha McMillan but had difficulty scheduling with her. Dr. Johnson explained that she also wanted to administer the ABAS to Ms. Rockett in order to compare her results to Dr. Everington's administration, explaining that "it is important that standardized procedures be able to be replicated." However, after reviewing Dr. Everington's raw data, Dr. Johnson realized that such comparison would not be possible.

Dr. Johnson recognized the potential for bias with using Ms. Rockett as an informant. Dr. Johnson noted that Ms. Rockett stated that she had been told by the defense team that her responses could help Petitioner avoid the death penalty. Additionally, Dr. Johnson testified that Ms. Rockett's reasoning for not kicking Petitioner out of her home after learning that he allegedly threatened to rob and murder her was because he was family, which indicated that she "still remains pretty attached" to Petitioner. However, Dr. Johnson also acknowledged that Ms. Rockett could be biased against Petitioner because she had testified for the State at trial and had not been in contact with Petitioner since he went to prison. During one of Dr. Johnson's interviews with Ms. Rockett, she stated that she did not want any involvement with Petitioner because he had "disappointed" her and caused her son to lose his job. Dr. Johnson did not consider using Michael Rockett as an informant even though he had spoken to Dr. Everington.

Dr. Johnson agreed that Petitioner's best school performance was while he attended Larose Elementary, which was located within walking distance of his home, provided "a number of services to try to take care of the children," and acted as a "safe haven" for Petitioner. Dr. Johnson also agreed that Petitioner's school performance and attendance suffered when he entered middle school because he and his friends were often attacked when they walked through a different housing project. Dr. Johnson agreed that Petitioner's grandmother was his primary caregiver because "she was the person there in the home absolutely more than anyone else," but Dr. Johnson did not "know how much caregiving she could provide consistently" with her mental illness. Ms. Rockett reported to Dr. Johnson that Petitioner's mother "was a party type [who] drank heavily" and "would go away for weeks at a time." Dr. Johnson agreed that Petitioner had a long history of arrests as both a juvenile and adult, and there were reports that Petitioner was susceptible to impulsive behavior. Dr. Johnson did not see any medical or school reports that Petitioner was diagnosed with ADHD. Dr. Johnson agreed that Petitioner had a very deprived childhood.

On redirect examination, Dr. Johnson testified that the presence of various ACEs in Petitioner's life did not change her opinion that he is not intellectually disabled. Based on her experience in both the adult and juvenile courts in Memphis, Dr. Johnson testified that it was "rare to find someone in the system who doesn't have [a] significant number of ACEs." Likewise, Dr. Johnson testified that it was "quite common" for the people she

encountered to have many of the risk factors for intellectual disability identified in the AAIDD's manual.

On May 3, 2019, the post-conviction court issued an extensive written order summarizing the testimony presented and reviewing the applicable law with regard to Petitioner's numerous claims. As discussed further below, the post-conviction court determined that trial counsel were deficient with regard to their investigation and presentation of evidence regarding Petitioner's adaptive deficits in support of his intellectual disability claim but that he was not prejudiced by the deficient performance. With regard to Petitioner's other claims, the post-conviction court similarly determined that Petitioner had failed to prove by a preponderance of the evidence either deficient performance or prejudice. Accordingly, the post-conviction court concluded that Petitioner was not entitled to relief and denied his petition. Petitioner filed a timely notice of appeal to this Court.

## Analysis

### I. Recusal of Post-Conviction Judge

Prior to the evidentiary hearing in this case, Petitioner filed a motion seeking recusal of the post-conviction judge. *See* Tenn. Sup. Ct. R. 10B, § 1. According to the motion, the judge provided sworn testimony at an unrelated disciplinary hearing regarding his personal opinion about the reputation and credibility of the Assistant District Attorney ("ADA") who was representing the State in this post-conviction proceeding. Petitioner also asserted that during this same testimony, the judge made a comment contrasting his favorable opinion of the ADA with the actions of an unnamed defense attorney in a capital post-conviction case, which Petitioner asserts was a reference to his attorney in this case reflecting the judge's negative bias. The post-conviction judge denied the recusal motion, stating that "these matters are tried and decided on the facts of the case presented to the judge using the applicable law, and not on the judge's opinion, if any, of the character of the attorneys."

Petitioner sought an accelerated interlocutory appeal in this court pursuant to Tennessee Supreme Court Rule 10B, § 2. This court affirmed the denial of the recusal motion, finding that the judge's statements that the ADA "was honest and ethical would place [the ADA] in no higher standard than any attorney appearing in his courtroom" and that the statement presumably referring to Petitioner's counsel did "not show bias or prejudice to rise to the level of recusal." *Corinio Allen Pruitt v. State*, No. W2017-00960-CCA-T10B-CO (Tenn. Crim. App., at Jackson, July 31, 2017) (order). Petitioner then filed an accelerated application for permission to appeal to the Tennessee Supreme Court. *See* Tenn. Sup. Ct. R. 10B, § 2.07. The majority of the Tennessee Supreme Court concluded that this court "did not err in affirming the trial court's denial of the applicant's motion for

recusal" and denied the application. *Corinio Allen Pruitt v. State*, No. W2017-00960-SC-T10B-CO (Tenn. Oct. 17, 2017) (order); *but see id.* (Lee, J., dissenting).

Petitioner did not file an additional recusal motion or present any additional evidence in the post-conviction court to support his claim of judicial bias. Instead, in his appellate brief, Petitioner attempts to relitigate his claim that the post-conviction judge should have been disqualified due to the appearance of bias created by the judge's disciplinary hearing testimony. Additionally, Petitioner asserts that the post-conviction judge's bias "manifested in the court's skewed view of [t]his case" as reflected in the judge's weighing of certain evidence related to mitigation and intellectual disability. Petitioner requests that this case "be remanded for a new post-conviction hearing should the Court decline to grant the other relief requested herein."

This court's prior conclusion that the post-conviction judge's disciplinary hearing testimony did not create an appearance of bias rising to the level of recusal is binding upon this court under the law of the case doctrine. *See State v. Lesergio Duran Wilson*, No. M2017-01950-CCA-R3-CD, 2019 WL 246249, at *7 (Tenn. Crim. App., at Nashville, Jan. 17, 2019); *State v. Lindsey Brooke Lowe*, No. M2014-00472-CCA-R3-CD, 2016 WL 4909455, at *26 (Tenn. Crim. App., at Nashville, July 12, 2016), *aff'd*, 552 S.W.3d 842 (Tenn. 2018). The law of the case doctrine "typically precludes the reconsideration of issues already decided in prior appeals of the same case." *State v. Hall*, 461 S.W.3d 469, 500 (Tenn. 2015) (citing *State v. Jefferson*, 31 S.W.3d 558, 560 (Tenn. 2000)). "[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Jefferson*, 31 S.W.3d at 560-61 (quoting *Memphis Publg. Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303 (Tenn. 1998)). The law of the case doctrine "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* at 561.

However, courts may reconsider issues that were previously litigated if one of the following limited exceptions applies:

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* Although Petitioner argues that recusal was warranted in this case due to the post-conviction judge's disciplinary hearing testimony, he does not specifically allege that this

court's prior ruling on the issue was clearly erroneous and would result in a manifest injustice if allowed to stand. Additionally, Petitioner has not alleged that there has been a change in the controlling law since this court's prior ruling. Finally, to the extent that Petitioner's claim on appeal is based upon "substantially different" evidence in the form of the judge's allegedly "skewed" factual findings, such evidence does not justify reconsideration of the recusal issue. "Adverse rulings by a trial court are not usually sufficient grounds to establish bias." *Alley v. State*, 882 S.W.2d 810, 821 (Tenn. Crim. App. 1994); *see also Harris v. State*, 947 S.W.2d 156, 173 (Tenn. Crim. App. 1996) (concluding that the judge's remarks at the conclusion of the post-conviction hearing "did not diminish the overall fairness of the proceeding, even applying the heightened standards of due process applicable in a capital case"). It is clear from the record that the judge ensured that Petitioner received a full and fair post-conviction hearing with the opportunity to present all of his witnesses and evidence. This court is able to review the record to determine whether the evidence preponderates against any of the judge's factual findings, *see State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001); thus, remand for a new evidentiary hearing is not necessary. We continue to adhere to this court's prior ruling that recusal was not required in this case, and Petitioner is not entitled to relief on this issue.

## II. Post-Conviction Procedure Act

In *Case v. Nebraska*, 381 U.S. 336 (1965), the United States Supreme Court recommended that the states implement post-conviction procedures to address alleged constitutional errors arising in state convictions in order to divert the burden of habeas corpus ligation in the federal courts. In response, the Tennessee legislature passed the Post-Conviction Procedure Act, whereby a defendant may seek relief "when a conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103; *see Sills v. State*, 884 S.W.2d 139, 142 (Tenn. Crim. App. 1994) ("The Post-Conviction Procedure Act was created to address and remedy constitutional wrongdoing in the convicting or sentencing process which is significant enough to render the conviction or sentence void or voidable.").

### A. Standard of Review

In order to prevail in a claim for post-conviction relief, a petitioner must prove his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). On appeal, a post-conviction court's findings of fact are conclusive unless the evidence preponderates otherwise. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); *Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006). Accordingly, questions concerning witness credibility, the weight

and value to be given to testimony, and the factual issues raised by the evidence are to be resolved by the post-conviction court, and an appellate court may not substitute its own inferences for those drawn by the post-conviction court. *Henley v. State*, 960 S.W.2d 572 (Tenn. 1997). However, the post-conviction court's conclusions of law and application of the law to the facts are reviewed under a purely de novo standard, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Claims of ineffective assistance of counsel present mixed questions of fact and law; thus, our review is de novo, with a presumption of correctness applied only to the post-conviction court's findings of fact. *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011).

## B. Waived or Previously Determined Claims

When a petition for post-conviction relief is filed, the post-conviction court must conduct a preliminary review of the factual allegations contained therein to determine whether they have been waived or previously determined. T.C.A. § 40-30-106(f). Pursuant to Tennessee Code Annotated section 40-30-106(g):

> A ground for relief is waived if a petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless
>
>> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>>
>> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

*See also* Tenn. Sup. Ct. R. 28, § 2(D). "There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." T.C.A. § 40-30-110(f). This presumption "is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief." *Brimmer v. State*, 29 S.W.3d 497, 527 (Tenn. Crim. App. 1998) (quoting *House v. State*, 911 S.W.2d 705, 714 (Tenn. 1995)).

If a claim was raised before a court of competent jurisdiction, it will be considered previously determined if the court "has ruled on the merits after a full and fair hearing." T.C.A. § 40-30-106(h). The statute defines "a full and fair hearing" as one "where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id.*; *see also* Tenn. Sup. Ct. R. 28, § 2(E). "A petitioner may not relitigate a previously determined issue by presenting additional factual allegations." *Cone v. State*, 927 S.W.2d 579, 582 (Tenn.

Crim. App. 1995). Additionally, the Tennessee Supreme Court has held that the plain error rule under Tennessee Rule of Appellate Procedure 36(b), which allows an appellate court to review issues that were not otherwise properly preserved for appeal, "may not be applied in post-conviction proceedings to grounds that would otherwise be deemed either waived or previously determined." *Grindstaff v. State*, 297 S.W.3d 208, 219 (Tenn. 2009) (citing *State v. West*, 19 S.W.3d 753, 756-57 (Tenn. 2000)).

### C. Ineffective Assistance of Counsel

Both the Sixth Amendment to the Constitution of the United States and article I, section 9 of the Tennessee Constitution guarantee the right of an accused to the assistance of counsel. *See Davidson v. State*, 453 S.W.3d 386, 392 (Tenn. 2014). Inherent in this right to counsel is the right to the effective assistance of counsel both at trial and on direct appeal. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Evitts v. Lucey*, 469 U.S. 387, 397 (1985). In order to sustain a claim of ineffective assistance of counsel, a petitioner must prove both that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687; *see also State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel applied in federal cases also applies in Tennessee). Because a petitioner must establish both elements in order to prevail on a claim of ineffective assistance of counsel, "failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. "Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component." *Id.* (citing *Strickland*, 466 U.S. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996)).

The test for deficient performance is whether "counsel's acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'" *Dean v. State*, 59 S.W.3d 663, 667 (quoting *Strickland*, 466 U.S. at 688). "Counsel's performance is not deficient if the advice given or the services rendered 'are within the range of competence demanded of attorneys in criminal cases.'" *Davidson*, 453 S.W.3d at 393 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner bears the burden of overcoming "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions." *Id.* This court will not use hindsight to second-guess a reasonable trial strategy, even if a different procedure or strategy might have produced a different result. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). Indeed, "[t]he fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad*, 938 S.W.2d at 369). "However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate

preparation." *Id*. As the *Strickland* Court explained, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91.

Even if a petitioner shows that counsel's representation was deficient, the petitioner must also satisfy the prejudice prong of the *Strickland* test in order to obtain relief. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The question is "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). A petitioner must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We note that "[a] 'reasonable probability' is a lesser burden of proof than a 'preponderance of the evidence.'" *Davidson*, 453 S.W.3d at 394 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Indeed, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694.

Like claims of ineffective assistance of trial counsel, claims of ineffective assistance of appellate counsel are subject to the *Strickland* standard set forth above. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). In other words, a petitioner must establish both that appellate counsel was deficient for failing to raise an issue on appeal and that there was a reasonable probability that had the issue been properly raised, it "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995). However, an attorney is "not constitutionally required to raise every conceivable issue on appeal." *Carpenter*, 126 S.W.3d at 887; *see Jones v. Barnes*, 463 U.S. 745 (1983). The determination of which issues to raise is a strategic decision "within appellate counsel's sound discretion" and "should be given considerable deference." *Carpenter*, 126 S.W.3d at 887. In evaluating whether the decision to omit a particular issue was an unreasonable one, this court will consider a non-exhaustive list of factors, such as whether the issue was "significant and obvious"; whether it was "clearly stronger" than the issues that were raised; whether there was an objection at trial preserving the issue or whether the issue would be reviewed for plain error; and whether appellate counsel testified regarding appeal strategy and provided a reasonable justification for the omission. *Id*. at 888. Additionally, the petitioner must establish that the omitted issue had some merit; otherwise, counsel's failure to raise it on appeal would not have been deficient and the petitioner would have suffered no prejudice. *Id*. at 887-88.

### III. Petitioner's Claims Related to Intellectual Disability and Mitigating Evidence

#### A. Ineligibility for the Death Penalty

In 1990, the General Assembly enacted Tennessee Code Annotated section 39-13-203, which prohibits the execution of defendants who were intellectually disabled at the time that they committed first degree murder. *See* T.C.A. § 39-13-203(b) (2010). Both the United States and Tennessee Supreme Courts have recognized that the execution of persons with intellectual disability violates the constitutional guarantee against cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Van Tran v. State*, 66 S.W.3d 790 (Tenn. 2001). At the time of Petitioner's direct appeal and post-conviction hearing, "intellectual disability" was defined by the following criteria:

(1) Significantly subaverage general intellectual functioning as evidenced by a functional intelligent quotient (I.Q.) of seventy (70) or below;

(2) Deficits in adaptive behavior; and

(3)The intellectual disability must have manifested during the developmental period, or by eighteen (18) years of age.

T.C.A. § 39-13-203(a) (2010).[12] The defendant bears "[t]he burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence[.]" T.C.A. § 39-13-203(c) (2010).

The post-conviction court found that Petitioner's stand-alone claim that he is ineligible for the death penalty due to intellectual disability was previously determined at trial and on direct appeal. *See Pruitt*, 415 S.W.3d at 203-04. In his appellate brief, Petitioner does not dispute this conclusion but instead argues that "due process concerns overcome the Post-Conviction Procedure Act's bar on previously determined issues." Petitioner further argues that he has satisfied two of the exceptions to the law of the case doctrine, namely that the evidence of his intellectual disability presented at the post-conviction hearing is substantially different from that presented at trial and that the prior ruling that he was not intellectually disabled is clearly erroneous and would result in a manifest injustice if allowed to stand.

Although previous opinions of this court have cited the law of the case doctrine "to support a post-conviction court's refusal to reconsider a previously determined issue, . . .

---

[12] As stated previously, at the time of Petitioner's trial, Tennessee Code Annotated section 39-13-203 used the term "mental retardation" instead of "intellectual disability." In all other respects, the prior version of the statute was identical.

[n]o Tennessee court has yet invoked the law of the case doctrine's exceptions . . . to support reconsideration of a previously determined issue in the post-conviction context." *William G. Allen v. State*, No. M2009-02151-CCA-R3-PC, 2011 WL 1601587, at *8 (Tenn. Crim. App., at Nashville, Apr. 26, 2011); *see also Harold Wayne Nichols v. State*, No. E2018-00626-CCA-R3-PD, 2019 WL 5079357, at *10 (Tenn. Crim. App., at Knoxville, Oct. 10, 2019); *David Lynn Jordan v. State*, No. W2015-00698-CCA-R3-PD, 2016 WL 6078573, at *78 (Tenn. Crim. App., at Jackson, Oct. 14, 2016). While the law of the case doctrine is a discretionary rule of judicial economy and restraint, the Post-Conviction Procedure Act's "bar on reconsideration of previously determined issues is a statutory limitation of the power of a court." *William G. Allen*, 2011 WL 1601587, at *9; *see also Bush v. State*, 428 S.W.3d 1, 15-16 (Tenn. 2014) (citing *Pike v. State*, 164 S.W.3d 257, 262 (Tenn. 2005)) (noting that "post-conviction relief is entirely a creature of statute"). Moreover, it is well-settled that a post-conviction petitioner "may not relitigate a previously determined issue by presenting additional factual allegations." *David Lynn Jordan*, 2016 WL 6078573, at *78 (quoting *Cone*, 927 S.W.2d at 582). Thus, because the statute does not contain any exceptions to the bar on previously determined issues, this court does not have the authority to recognize an exception based on the law of the case doctrine. *William G. Allen*, 2011 WL 1601587, at *9.

Citing cases that applied a due process exception to the post-conviction statute of limitation, previous opinions of this court have also suggested that "due process concerns may overcome the rule of previous determination[.]" *Phedrek T. Davis v. State*, No. M2009-01616-CCA-R3-PC, 2010 WL 1947379, at *2 (Tenn. Crim. App., at Nashville, May 14, 2010) (citing *Sample v. State*, 82 S.W.3d 267 (Tenn. 2002); *Wright v. State*, 987 S.W.2d 26 (Tenn. 1999); *see also William G. Allen*, 2011 WL 1601587, at *7. However, unlike the statute of limitation, which when applied may deprive a petitioner of "an opportunity for the presentation of claims at a meaningful time and in a meaningful manner," *Sample*, 82 S.W.3d at 272, previously determined issues are those that have already been considered on their merits after "a full and fair hearing," T.C.A. § 40-30-106(h). Thus, by their very definition, previously determined issues satisfy "[t]he fundamental requirement of due process," which is "the *opportunity* to be heard 'at a meaningful time and in a meaningful manner.'" *House*, 911 S.W.2d at 711 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)) (emphasis supplied in *House*); *see also Harold Wayne Nichols*, 2019 WL 5079357, at *9.

Petitioner in this case had such an opportunity to present his intellectual disability claim: a post-trial evidentiary hearing was held where Petitioner was able to present evidence and argument, and the trial court did not restrict the scope of the hearing or limit the presentation of evidence. *See House*, 911 S.W.2d at 711. "Nothing more is required to satisfy the 'full and fair hearing' provision of the previously determined definition." *Id.* Additionally, Petitioner has not alleged any improper conduct on the part of the State that prevented him from fully presenting his intellectual disability claim at trial. *See William*

*G. Allen*, 2011 WL 1601587, at *8 ("Most commonly, the due process clause is applied in the context of intentional misconduct on the part of the State to justify relaxation of the Act's limiting provisions."); *Phedrek T. Davis*, 2010 WL 1847379, at *2. Because Petitioner "failed to demonstrate how he otherwise was deprived of 'an opportunity for the presentation of claims at a meaningful time and in a meaningful manner,' he failed to show how due process requires that his case be excepted from the Act's bar on previously determined issues." *William G. Allen*, 2011 WL 1601587, at *9 (citation omitted). However, this conclusion does not bar our consideration of Petitioner's closely related claim that trial counsel were ineffective in their handling of the intellectual disability issue, which will be discussed further below.

### B. Trial Counsel's Failure to Develop and Present Evidence of Intellectual Disability

As stated above, the Tennessee Supreme Court concluded on direct appeal that although Petitioner had established by a preponderance of the evidence that he had significantly subaverage intellectual functioning as evidenced by an I.Q. of 70 or below, he failed to carry his burden of proving that he had deficits in adaptive behavior and that his intellectual disability manifested during the developmental period. *Pruitt*, 415 S.W.3d at 203-04. Petitioner contends that trial counsel were ineffective for failing to adequately investigate and present evidence of his adaptive deficits and manifestation of his intellectual disability before age eighteen. Petitioner argues that because he meets the clinical and statutory definition of intellectual disability, he was prejudiced by counsel's deficient performance. The State argues that Petitioner "failed to meet his burden of demonstrating that he had deficits in adaptive behavior and thus failed to show that trial counsel's alleged deficiency affected the outcome of the proceedings."

The post-conviction court concluded that trial counsel rendered deficient performance in failing to adequately investigate and present evidence regarding Petitioner's adaptive deficits. As stated by the post-conviction court,

> trial counsel conducted some investigation into the Petitioner's background and presented some evidence during trial that counsel could have argued constituted evidence of deficits in adaptive behavior. However, trial counsel could have done more to investigate and present evidence of adaptive deficits to this court at trial. Given Petitioner's background and social history, such actions should have included retaining an expert specifically to investigate and present such evidence, or assigning that task to one of Petitioner's previously-retained experts. The proof presented at this hearing likely would have been available prior to trial. Thus, this court finds that trial counsel's actions . . . constituted deficient performance, in the light of the heightened due process to be applied in capital cases.

The State does not contest this conclusion by the post-conviction court, and it is supported by the evidence in the record. Trial counsel seemed to rely exclusively upon the reports from Dr. Rutledge and MTMHI diagnosing Petitioner with mild mental retardation without seeking a separate assessment of his adaptive functioning, even though lead counsel demonstrated his knowledge of adaptive behavior assessments and their importance in capital cases when he emailed Dr. Rutledge with regard to a separate case. As a result of counsel's failure to obtain such an assessment, "little evidence was presented concerning [Petitioner's] adaptive behavior" in order to support his intellectual disability claim. *Pruitt*, 415 S.W.3d at 204. The lack of evidence also hindered Petitioner's ability to show that any deficits manifested during the developmental period. *Id.* It is professionally unreasonable for trial counsel to present an intellectual disability defense but fail to even attempt to develop evidence supporting two of the three statutory criteria when the statute clearly places "[t]he burden of production and persuasion" upon the defendant. T.C.A. § 39-13-203(c) (2010). Thus, we agree with the post-conviction court that trial counsel rendered constitutionally deficient performance in this regard.

The post-conviction court found that Petitioner failed to establish that he had deficits in adaptive behavior within the meaning of the intellectual disability provisions in Tennessee Code Annotated section 39-13-203 and that, as a result, Petitioner failed to establish that trial counsel's deficient performance resulted in prejudice. Tennessee Code Annotated section 39-13-203 does not define the phrase "deficits in adaptive behavior," but the Tennessee Supreme Court has construed it to mean "the inability of an individual to behave so as to adapt to surrounding circumstances." *Coleman v. State*, 341 S.W.3d 221, 235 (Tenn. 2011) (quoting *State v. Smith*, 893 S.W.2d 908, 918 (Tenn. 1994)). In other words, adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socio-cultural background, and community setting." *Id*. at 236 (quoting *Van Tran*, 66 S.W.3d at 795). Tennessee courts generally "rel[y] upon expert analysis of adaptive behavior or functioning predicated upon definitions advanced within the relevant medical and psychological community and authoritative texts such as the AAIDD Manual and the DSM[ ] in determining whether the second prong has been satisfied." *Id*. at 248. This court has recognized that "[t]he adaptive behavior criteria are exceedingly subjective, and, undoubtedly, experts will be found to offer opinions on both sides of the issue in most cases." *Heck Van Tran v. State*, No. W2005-01334-CCA-R3-PD, 2006 WL 3327828, at *23 (Tenn. Crim. App., at Jackson, Nov. 9, 2006). "In the final analysis, the trial court is not required to follow the opinion of any particular expert, but must give full and fair consideration to all the evidence presented[.]" *Coleman*, 341 S.W.3d at 242 (internal citation omitted).

In its order denying post-conviction relief, the post-conviction court stated that Petitioner presented proof, primarily through Dr. Everington's testimony but also through the testimony of Dr. Auble and lay witnesses, regarding facts "which could be seen as

deficits in adaptive behavior under both the three-domain approach adopted by the AAIDD and the DSM-5 and the eleven-factor test provided in the DSM-IV and cited in most Tennessee appellate opinions addressing this subject." The court found Dr. Everington's testimony to be "credible and informative." The court also found Dr. Johnson's testimony, which rebutted Petitioner's evidence, to be "equally credible and informative." The post-conviction court acknowledged that Dr. Everington testified that the AAIDD placed "little weight" on the self-reporting of adaptive skills and that Petitioner's demonstration of adaptive skills in a prison environment may not accurately reflect his adaptive skills in a real-world environment. However, the court found that the adaptive screening conducted by Dr. Johnson, which included Petitioner's answers to ABAS-related questions, should not be discounted. The court found that Dr. Johnson's testing suggested that Petitioner was capable of performing certain tasks related to adaptive skills and independent living and that, as a result, the "supposed adaptive deficits" identified by Dr. Everington may not be as significant as post-conviction counsel suggested, especially if Petitioner was not under the influence of marijuana or cocaine.

The post-conviction court expressed concerns regarding some of the standardized skills testing administered by the experts. The court noted the "nonstandard" administration of the ABAS by both Dr. Everington and Dr. Johnson and explained that Dr. Everington used the responses of multiple people to produce one ABAS result and that Dr. Johnson did not provide a copy of the ABAS questions to Ms. Rocket in administering the test to her. The court stated that although it considered the results of the testing, "the utility of these results is limited."

The post-conviction court found that "despite the growing trend in death penalty mitigation to incorporate 'cultural competency' into the capital defense case," the ABAS and ILS tests administered in this case were normed to the general population rather than to the environment in which Petitioner lived prior to his incarceration. The court stated that based upon the testimony of Dr. Everington and Dr. Johnson, some tasks referenced in the ABAS and ILS were "not necessarily typical among persons growing up in inner-city Memphis generally and the Fowler Homes development in particular." The court found that if Petitioner grew up in an environment where people commonly did not have a driver's license, did not use a library, and used check-cashing businesses to cash paychecks rather than banks, the inability to perform such tasks should be not considered an adaptive deficit. The court stated that "the experts' testimony suggests Petitioner is far from the only person who has had difficulty navigating the Memphis public transportation system." The court also stated that according to Dr. Johnson's testimony, avoiding potentially difficult or dangerous situations in Fowler Homes would have been problematic because such situations were "apparently prevalent" in that area. The court found that Petitioner's decision to associate with the criminal element at Fowler Homes and Lemoyne Gardens "may have represented an attempt by Petitioner to seek out some sense of protection and/or

comfort in light of his other difficulties rather than an intentionally detrimental choice on Petitioner's part."

The post-conviction court noted that Dr. Everington acknowledged that she did not interview some of the informants referenced in her testimony and report but, instead, relied upon summaries of interviews provided by post-conviction counsel. The court stated that because many of these informants did not testify at the post-conviction hearing, the court was unable to assess the credibility of the informants or to determine whether "the informants had a motive to respond to the Petitioner's legal team as they did (i.e., if they shaped their answers in such a fashion as to improve Petitioner's changes of being declared ineligible for the death penalty)."

The post-conviction court rejected Dr. Everington's testimony in which she maintained that the failure to perform tasks constituted proof of adaptive deficits regardless of whether the person's failure was due an unwillingness rather than an inability to perform. Instead, the court relied upon Dr. Johnson's testimony that several of the purported adaptive deficits identified by post-conviction counsel reflected tasks that the Petitioner may have been able to complete but had not necessarily been required to complete. The court noted Dr. Johnson's testimony that Petitioner might have been capable of washing his clothes, cleaning his home, and shopping for groceries and household items but that others with whom he had lived performed the tasks. The court determined that Petitioner's choice to allow others to perform such tasks or his being ordered not to perform such tasks "should not necessarily be perceived as an adaptive deficit." The court stated that although Petitioner reportedly wore urine-soaked clothes to school while others in the home wore clean clothes, no proof was presented regarding the frequency with which this occurred. The court also noted that no evidence was presented regarding whether Petitioner had other clothes available, whether he was taught how to clean his clothes, or whether he requested that his clothes be cleaned and his requests were denied.

The post-conviction court found that "some of the purported evidence of Petitioner's adaptive deficits was undermined by other evidence introduced at this hearing." The court stated that although Dr. Everington testified that Petitioner did not have any friends other than family members in his youth, her report identified some of the informants as non-family friends, and other non-family friends of Petitioner testified at the post-conviction hearing. The court stated that Dr. Johnson's testimony that when Petitioner called 911 after his mother was stabbed when he was nine years old suggested that Petitioner "knew how to use at least some community resources." The court also stated that "while Petitioner may on at least one occasion been taken advantage of while performing on Beale Street, Petitioner at the very least took the initiative to perform backflips and beg for food on Beale Street to obtain money and food which were not being provided at home."

The post-conviction court noted that Petitioner presented "substantial proof" regarding his poor educational performance and alleged that this poor performance was related to several adaptive deficits, including those in the conceptual domain. The court found that Petitioner did well in school during his younger years and that his poor academic performance during his middle school years coincided with his increased drug use and his involvement with the juvenile justice system. The court described evidence regarding allegations of grade and standardized test score inflation at Petitioner's elementary school as "anecdotal at best" and as "coming from a witness who did not recall [P]etitioner and testified that she did not adjust his grades." The court found that no evidence was presented to allow the court to conclude that Petitioner's grades and tests scores were subject to inflation by any of his teachers or the school system. The court also found that

> Petitioner's coherent interviews during the *Gangland* television episode, his answers to Dr. Johnson's questions during their interview, and his results on certain academic skills testing administered by Dr. Johnson, test results which were generally below normal but which Dr. Johnson stated were above those typically produced by intellectually disabled persons, suggest that if such deficits did exist, they were not nearly as severe as Petitioner suggests.

The post-conviction court found that although Petitioner presented "significant proof of what he deemed to be deficits in adaptive behavior," the State "presented equally significant proof to rebut the Petitioner's proof." The court concluded that "if the evidence produced by the Petitioner at this hearing substantiates adaptive deficits, such deficits would be not significant enough to meet the adaptive deficit prong of the intellectual disability test." The court found that as a result, Petitioner "failed to establish, by a preponderance of the evidence, that he suffers from deficits in adaptive behavior within the meaning of the intellectual disability statute." The court also found that, had Petitioner presented evidence of adaptive deficits during the trial proceedings that resembled the evidence presented during the post-conviction hearing, "there is not a reasonable probability that this proof, in light of the State's rebuttal proof presented both at this post-conviction hearing and at trial, would have led this court to conclude that Petitioner suffered from deficits in adaptive behavior." The court concluded that trial counsel's deficiency in failing to present such evidence at the trial level did not result in prejudice.

Petitioner argues that the post-conviction court failed to consider or give weight to Dr. Auble's testimony; gave insufficient weight to Dr. Everington's testimony based upon her qualifications, which Petitioner claims were greater than those of Dr. Johnson; and failed to credit Dr. Everington's non-standard, retrospective use of standardized tests as acceptable in controlled circumstances. Petitioner maintains that the post-conviction court erred in relying on Dr. Johnson's testimony, arguing that Dr. Johnson improperly discounted certain deficits as caused by mental illness; focused on Petitioner's strengths rather than his deficits; discounted deficits based on whether Petitioner could perform

certain tasks rather than whether he actually did perform the tasks; relied upon Petitioner's self-reporting of strengths and deficits; and relied upon Petitioner's improved behavior while in prison. Petitioner relies upon three opinions from the United States Supreme Court, *Hall v. Florida*, 572 U.S. 701 (2014); *Moore v. Texas*, 137 S.Ct. 1039 (2017) ("*Moore I*"); and *Moore v. Texas*, 139 S.Ct. 666 (2019) ("*Moore II*"), all of which were decided after Petitioner's trial and direct appeal concluded.

Since Petitioner's trial, the Tennessee Supreme Court and the United States Supreme Court have issued opinions developing the law regarding intellectual disability, including adaptive deficits. The Tennessee Supreme Court addressed the issue in *Coleman*, 341 S.W.3d at 248, an opinion released after Petitioner's trial and while Petitioner's direct appeal was pending. In *Coleman*, the petitioner presented testimony from various experts, who concluded that the petitioner was intellectually disabled, and the State presented no witnesses and only briefly cross-examined the petitioner's experts. *Coleman*, 341 S.W.3d at 227. Both the post-conviction court and this court recognized that the petitioner had deficiencies but attributed the cause of the deficiencies to sources other than intellectual limitations, including the petitioner's history of mental illness. *Id.* at 249. In other words, both the post-conviction court and this court had treated the petitioner's mental illness and intellectual disabilities "as separate dichotomous spheres rather than as interwoven causes." *Id.* at 249.

The Tennessee Supreme Court held that a court's application of the intellectual disability statute should "be guided and informed by the clinical standards, criteria, and practices customarily used to assess and diagnose intellectual disability." *Id.* at 240. Our supreme court noted that according to the DSM-4TR, "'[a]daptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with [m]ental [r]etardation.'" *Id.* at 249-50 (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. text rev. 2000)). However, the *Coleman* court also recognized that mental health experts had differing views on whether deficits in adaptive behavior were required to be directly attributable to significantly subaverage intellectual functioning. *Id.* at 250-52. The court stated that it need not decide the appropriate approach to employ and instead held that distinguishing causally between intellectual disability and mental illness was error in the petitioner's case in light of the unrebutted testimony from the petitioner's experts that his intellectual disability and mental illness were interrelated and aggravated each other, combining to limit his adaptive functioning. *Id.* at 252. The court held that in light of the expert testimony, there was not a sufficient basis to support the reasoning of the post-conviction court and this court in separating the impact of mental illness and intellectual disability in assessing the petitioner's deficits in adaptive behavior. *Id.* Rather, "[b]ased on the evidence presented, [the petitioner's] intellectual disability and mental illness are simply too intertwined in cause and effect for such unraveling." *Id.*

In 2014, after Petitioner's direct appeal proceedings had concluded, the United States Supreme Court released its opinion in *Hall v. Florida*, striking down the Florida Supreme Court's interpretation of the "significantly subaverage general intellectual functioning" requirement as excluding those with I.Q. test scores above 70. 572 U.S. at 711-12. The Court stated that even if "the views of medical experts" do not "dictate" a court's determination regarding intellectual disability, the determination must be "informed by the medical community's diagnostic framework." *Id.* at 721. The Court relied on DSM-5 and AAIDD-11, the then-current versions of the leading diagnostic manuals, and concluded that the Florida court had violated the Eighth Amendment by "disregard[ing] established medical practice." *Id.* at 712-14, 722-23. As the Court later recognized, "*Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards." *Moore I*, 137 S.Ct. at 1049.

In *Moore I*, the Court reversed the Texas Court of Criminal Appeals' ("TCCA") holding that the petitioner was not intellectually disabled based, in part, on the TCCA's deviation "from prevailing clinical standards and from the older clinical standards the court claimed to apply" when finding no adaptive deficits. *Id.* at 1050. The TCCA reversed a state habeas court that applied the current medical standards, the DSM-5 and AAIDD-11, in determining that the petitioner was intellectually disabled. *Id.* at 1045-46. The TCCA instead reaffirmed its holding in a prior case, *Ex parte Briseno*, in which the TCCA had adopted the definition and standards for assessing intellectual disability included in the 1992 edition of the American Association on Mental Retardation ("AAMR") manual, the predecessor to the AAIDD-11 manual; incorporated the AAMR's requirement that adaptive deficits be "related" to intellectual functioning deficits; and set forth "seven evidentiary factors" to be considered in determining whether a defendant has satisfied the relatedness requirement. *Id.* at 1046 (citing *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004)).

In *Moore I*, the Supreme Court determined that TCCA acted improperly when it "overemphasized [the petitioner's] perceived adaptive strengths," including the petitioner's living on the streets, mowing lawns, and playing pool for money, and when it concluded that, "in the [T]CCA's view," the petitioner's adaptive strengths overcame "the considerable objective evidence" of the petitioner's adaptive deficits. *Id.* at 1050. The Supreme Court stated that "the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Id.* (citing American Association on Intellectual and Developmental Disabilities, *Intellectual Disability: Definition, Classification, and Systems of Support* (11th ed. 2010);American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013)) (emphasis in original). The majority opinion noted that the dissenting opinion suggested a disagreement in medical authorities about the role of adaptive strengths in the adaptive-functioning inquiry. *Id.* at n.8. The majority

opinion stated that even if clinicians considered adaptive strengths and adaptive weaknesses within the same adaptive-skill domain, Texas and the dissent did not identify "any clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths in which the [T]CCA engaged." *Id.*

The Supreme Court held that the TCCA improperly "stressed" the petitioner's improved behavior in prison when clinicians caution against relying upon adaptive strengths in a controlled setting, such as a prison. *Id.* at 1050 (citing DSM-5, at 38; AAIDD-11 User's Guide, at 20). The Court also held that the TCCA improperly concluded that the petitioner's record of academic failure and childhood abuse "detracted from a determination that his intellectual and adaptive deficits were related" when the medical community considered traumatic experiences to be "'*risk factors*' *for* intellectual disability." *Id.* at 1051 (citing AAIDD-11, at 59-60) (emphasis in original). The Court determined that the TCCA "departed from clinical practice" in requiring the petitioner to establish that his adaptive deficits were not related to a personality disorder when mental health professionals recognized that many who are intellectually disabled also have personality disorders or mental health issues and that the existence of such issues is not evidence that a person is not intellectually disabled. *Id.* (citing DSM-5, at 40; AAIDD-11, at 58-63).

Finally, the Court held that the TCCA erred in relying upon the seven evidentiary factors set forth in *Briseno*, where the court had "advanced lay perceptions of intellectual disability." *Id.* at 1051-52. The Court concluded that "[b]y rejecting the habeas court's application of medical guidance and clinging to the standard it laid out in *Briseno*, including the wholly nonclinical *Briseno* factors, the [T]CCA failed adequately to inform itself of the 'medical community's diagnostic framework.'" *Id.* at 1053 (quoting *Hall*, 572 U.S. at 721). We note that some opinions of this court also cited to the *Briseno* factors in analyzing the adaptive deficits element of intellectual disability. *See Michael Wayne Howell v. State*, No. W2009-02426-CCA-R3-PD, 2011 WL 2420378, at *18 (Tenn. Crim. App., at Jackson, June 14, 2011), *abrogated by Moore I*, 137 S.Ct. at 1052; *Michael Angelo Coleman v. State*, No. W2007-02767-CCA-R3-PD, 2010 WL 118696, at *24 (Tenn. Crim. App., at Jackson, Jan. 13, 2010), *rev'd* 341 S.W.3d 221 (Tenn. 2011); *Heck Van Tran*, 2006 WL 3327828, at *24. However, the Tennessee Supreme Court did not apply the *Briseno* factors in *Coleman* or in its opinion in Petitioner's direct appeal. *See Pruitt*, 415 S.W.3d at 203-04; *Coleman*, 341 S.W.3d at 248-53. Furthermore, this court did not cite to the *Briseno* factors in either our opinion in Petitioner's direct appeal nor subsequent opinions. *See, e.g. Sidney Porterfield v. State*, No. W2012-00753-CCA-R3-PD, 2013 WL 3193420, at *25-27 (Tenn. Crim. App., at Jackson, June 20, 2013); *Corinio Pruitt*, 2011 WL 2417856, at *27-28.

On remand following *Moore I*, the TCCA again determined that the petitioner failed to demonstrate intellectual disability, and the United States Supreme Court again reversed

the TCCA's decision. *Moore II*, 139 S.Ct. at 667. The Court noted too many instances in which the TCCA repeated, with small variances, the same analysis that the Court had determined in *Moore I* to be flawed. *Id.* at 670. The Court stated that the TCCA continued to rely less upon the petitioner's adaptive deficits, which had been cited by the state habeas court, than upon the petitioner's apparent adaptive strengths. *Id.* The TCCA emphasized the petitioner's capacity to communicate, read, and write based in part upon papers that the petitioner filed pro se in court, and the Court stated that while such evidence was relevant, it lacked "convincing strength" absent a determination that petitioner wrote the papers on his own. *Id.* at 671. The Court also stated that the TCCA continued to rely heavily upon the petitioner's adaptive improvements made while in prison and continued to conclude that the petitioner failed to show that the "'cause of [his] deficient social behavior was related to any deficits in general mental abilities' rather than 'emotional problems.'" *Id.* Finally, the Court determined that despite the TCCA's statement that it was abandoning its reliance on the *Briseno* factors, the TCCA seemingly used many of the factors in reaching its conclusion. *Id.*

Although the Tennessee Supreme Court issued its opinion in *Coleman* after Petitioner's trial, this court and the Tennessee Supreme Court applied *Coleman* to Petitioner's intellectual disability claim on direct appeal. *See Pruitt*, 415 S.W.3d at 202-04; *Corino Pruitt*, 2011 WL 2417856, at *25-27. Thus, we will apply *Coleman* in determining whether trial counsel's failure to present evidence related to the adaptive deficits element of the intellectual disability statute resulted in prejudice. Whether this court also should apply the opinions of the United States Supreme Court issued years after Petitioner's trial and direct appeal concluded is not as clear. At the time of Petitioner's trial, the controlling Supreme Court authority was *Atkins v. Virginia*, which gave no comprehensive definition of intellectual disability and left the task of developing appropriate means of enforcing the constitutional restrictions to the states. *See* 536 U.S. at 317. The Supreme Court recently rejected the Sixth Circuit's conclusion that *Moore I*'s holding was "merely an application of what was clearly established by *Atkins*." *Shoop v. Hill*, 139 S.Ct. 504, 508 (2019) (internal quotations omitted). In doing so, the Supreme Court reversed the Sixth Circuit's conclusion that a state court's decision that a defendant failed to establish intellectual disability violated "clearly established law" set forth in *Moore I* even though the state court's decision predated *Moore I* by several years. *Id.* at 506-08. The Supreme Court explained that although "*Atkins* noted that standard definitions of mental retardation included as a necessary element 'significant limitations in adaptive skills . . . that became manifest before age [eighteen],' . . . *Atkins* did not definitively resolve how that element was to be evaluated but instead left its application in the first instance to the States." *Id.* at 508 (quoting *Atkins*, 536 U.S. at 317-18). Because the Supreme Court's opinions issued after Petitioner's trial and direct appeal were not merely an application of law clearly established by *Atkins*, it does not appear that these opinions are applicable to this court's determination regarding the effect of the evidence of adaptive deficits presented at the post-conviction hearing had trial counsel presented similar evidence at trial.

Nevertheless, the overarching principles set forth by the Supreme Court are similar to those expressed by the Tennessee Supreme Court in *Coleman* in that a trial court's findings should be guided by expert testimony and clinical standards and practices customarily used to diagnose intellectual disability.[13]

We conclude that the post-conviction court's findings did not run afoul of *Hall*, *Moore I*, and *Moore II* if these cases apply in the ineffective assistance of counsel context. Unlike the TCCA in *Moore I* and *Moore II*, which rejected expert testimony based upon current medical standards and instead made its own findings based upon outdated standards and factors based upon lay perceptions of intellectual disability, the post-conviction court here relied upon contemporary medical expert testimony, weighed the evidence, made credibility determinations, and concluded that Petitioner failed to establish that he had deficits in adaptive behavior. *See Wright v. State*, 256 So.3d 766, 777 (Fla. 2018) (upholding a trial court's findings regarding adaptive deficits when, unlike the TCCA in *Moore I*, the trial court's findings were based upon expert testimony regarding contemporary medical standards). Although Petitioner asserts that the post-conviction court failed to consider Dr. Auble's testimony, the post-conviction court acknowledged that Dr. Auble testified about adaptive deficits but found the testimony of Dr. Everington and Dr. Johnson to be "credible and informative," thus essentially finding their testimony to be more credible and carry more weight than Dr. Auble's testimony. This finding regarding witness credibility and the weight and value of the testimony was within the exclusive purview of the post-conviction court, and this court is without authority to overturn this finding. *See Henley*, 960 S.W.2d at 578-79. Petitioner also claims that Dr. Everington was more qualified than Dr. Johnson and that the post-conviction court should have given Dr. Everington's testimony greater weight as a result. However, the post-conviction court's decision regarding the weight afforded to the testimony of each expert also was within the court's exclusive purview. *See id.*

Dr. Everington's conclusions regarding all three domains of adaptive functioning relied, in part, upon the results of her administration of the ABAS. However, the post-conviction court found that the results of the test were of limited value because Dr. Everington utilized a nonstandard administration of the ABAS by using the responses of three people to produce one result. The conflicting testimony regarding the reliability of the results of the ABAS administered by Dr. Everington raised a credibility issue, and this court may not second-guess the post-conviction court's credibility determination relating to the competing opinions of mental health experts. *See Carroll v. State*, 300 So.3d 59, 71

---

[13] Although there was a change in the clinical standards for assessing adaptive deficits under the DSM-4TR in use at the time of Petitioner's trial and the DSM-5 in use at the time of the post-conviction hearing, all of the experts testified that they would have reached the same conclusion regarding Petitioner's intellectual disability under either standard. Thus, we agree with the post-conviction court's finding that "[i]t seems unlikely that a person with adaptive deficits would be considered intellectually disabled under the DSM-[4]TR and not intellectually disabled under DSM-5, and vice versa."

(Ala. 2019) (recognizing that competing expert opinions regarding the reliability of a test used to measure adaptive functioning raised a credibility issue and that the appellate court was without authority to second-guess the trial court's credibility determination). The post-conviction court noted that Dr. Everington relied upon some informants whom she did not personally interview and that many of these informants did not testify at the post-conviction hearing. Thus, the post-conviction court was unable to assess the credibility of these informants or to determine whether the informants had a motive to provide specific responses to Petitioner's legal team – "(i.e., if they shaped their answers in such a fashion as to improve Petitioner's chances of being declared ineligible for the death penalty)." The post-conviction court's concern was supported by Dr. Johnson's testimony that Ms. Rockett informed her that Petitioner's defense team told her that the information she provided could help Petitioner avoid the death penalty.

Petitioner has not established that the evidence in the record preponderates against the post-conviction court's finding that he does not have deficits in adaptive behavior within the meaning of Tennessee Code Annotated section 39-13-203(b)(2) (2010). Applying the current diagnostic standards for intellectual disability, Petitioner was required to establish that he had significant limitations in at least one of three domains of adaptive functioning—conceptual, social, and practical. *See* DSM-5 at 37-38; AAIDD-11 at 43-44. The conceptual domain of adaptive functioning includes such skills as functional academics and memory. *See* DSM-5 at 37-38; AAIDD-11 at 43-44. The social domain of adaptive functioning includes such skills as communication, social skills, and understanding of social situations. *See* DSM-5 at 37-38; AAIDD-11 at 43-44. The practical domain of adaptive functioning includes such skills as daily living, personal care, vocational skills, and recreation. *See* DSM-5 at 37-38; AAIDD-11 at 43-44.

Turning to each specific domain, the evidence relating to the conceptual domain reflects that although Petitioner repeated the first grade, he performed well academically throughout the rest of elementary school. While attending Larose Elementary, Petitioner consistently made A's and B's, had standardized tests scores as high as the ninety-eighth percentile, and often made the honor roll and principal's list. Several teachers commented on his report card that Petitioner was "smart" and "a good learner," and there was no evidence that Petitioner was enrolled in special education or resource classes. Although Dr. Everington speculated that Petitioner's grades and standardized test scores may have been inflated, there was no direct evidence to support this supposition.

Petitioner's grades and test scores then declined suddenly in the seventh and eighth grades, and Petitioner dropped out of school. The post-conviction court found that Petitioner's decline in grades coincided with Petitioner's increased drug use and involvement in the juvenile court system. Both *Moore I* and *Coleman* caution a court against faulting a defendant for failing to establish that an adaptive deficit is related to the defendant's deficits in intellectual functioning. *See Moore I*, 137 U.S. at 1050; *Coleman*,

341 S.W.3d at 249-52.  However, the evidence in this case, unlike in *Moore I* and *Coleman*, included testimony from both Dr. Everington and Dr. Johnson that the DSM-5 includes a provision requiring that adaptive deficits be directly related to intellectual impairments. Dr. Everington maintained that the AAIDD Manual, which did not include such a requirement, was the proper standard, while Dr. Johnson maintained that the DSM-5 provided the appropriate standard.  The post-conviction court, through its findings, credited Dr. Johnson's testimony and applied the standard set forth in the DSM-5.  Furthermore, the post-conviction court's findings were supported by Dr. Johnson's conclusion in her report that Petitioner's performance in the classroom and on standardized tests from his second year in the first grade through the fifth grade was "inconsistent" with those who are intellectually disabled and suggested that "some other variable(s)" were related to his lower grades during middle school.  Dr. Johnson, like the post-conviction court, observed that Petitioner's lower academic performance coincided with Petitioner's increased drug use.

The record reflects that Petitioner obtained average or low average scores on achievement tests administered by both Dr. Everington and Dr. Johnson.  Dr. Johnson testified that the Petitioner's test scores were "above what you would expect from someone with an intellectual disability," and Dr. Everington admitted that Petitioner's academic skills were "more advanced than the majority of individuals who have an intellectual disability."  Although Petitioner scored poorly on a test that required him to interpret proverbs administered by Dr. Auble, Dr. Johnson testified that Petitioner's use of an analogy during his *Gangland* interview demonstrated "more complicated thinking" than would be expected of someone with an intellectual disability.  Dr. Johnson stated that although intellectually disabled individuals often have problems recalling their history in a comprehensive manner and "putting together timeframes," Petitioner was able to accurately recall his medical history, childhood, and educational history.  Dr. Johnson did not observe any "striking abnormalities" in Petitioner's ability to recall and provide information relative to the events in his life.  In light of the post-conviction court's factual findings and credibility determinations, we conclude that Petitioner failed to establish that he has significant deficits in the conceptual domain.

With respect to the social domain of adaptive functioning, we note that in addition to the post-conviction court's general findings with respect to Dr. Everington's nonstandard administration of the ABAS and reliance upon summaries of interviews provided by post-conviction counsel, the court found that some of the "purported evidence" of Petitioner's adaptive deficits was "undermined" by other evidence introduced during the evidentiary hearing.  The court found that although Dr. Everington testified that Petitioner's only friends in his youth were family members, her report identified some of the informants as non-family friends, and some of Petitioner's non-family friends testified at the evidentiary hearing.  Dr. Johnson testified that some of her observations of Petitioner conflicted with the ratings obtained by Dr. Everington in her administration of the ABAS. Dr. Johnson said Petitioner displayed good social skills during the interview, such as

pouring water for her and offering food to her when he received his lunch, even though Dr. Everington's report reflected that Petitioner had been rated as "never or almost never" offering food or beverages to guests. Although Petitioner was rated as "sometimes" speaking clearly and distinctly and "never or almost never" listening closely for more than five minutes, Dr. Johnson did not experience any issues with Petitioner in these areas. Petitioner also was rated as "never or almost never" participating in conversations without talking too much or too little, but Dr. Johnson found that while some of Petitioner's answers were "abbreviated," he was able to elaborate when prompted. Dr. Everington testified that Petitioner displayed basic social skills and was friendly, and Dr. Johnson testified that Petitioner listened closely when someone else was speaking, discussed a current event, and waited for others to finish speaking without interrupting. Although Dr. Everington testified that Petitioner had difficulty avoiding social situations that might be dangerous, the post-conviction court credited Dr. Johnson's testimony that avoiding potentially dangerous situations would have been difficult for Petitioner because such situations were prevalent in the neighborhood in which Petitioner was raised.

The Petitioner argues that the post-conviction court and Dr. Johnson improperly focused on his adaptive strengths rather than his adaptive deficits. The Supreme Court in *Moore I* observed that there was no "clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths," but the Court also assumed for the sake of analysis that "clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive skill domain." *Moore I*, 137 S.Ct. at 1050 n.8. Dr. Johnson, whose opinions upon which many of the post-conviction court's findings were based, did not balance unconnected strengths against weaknesses but, instead, weighed evidence of Petitioner's strengths against evidence of his limitations within the same domain to determine whether Petitioner had significant adaptive deficits within that particular domain. *See Sasser v. Payne*, 999 F.3d 609, 619-20 (8th Cir. 2021) (holding that the district court's weighing of evidence of related strengths and weaknesses to determine whether the defendant met his burden of establishing an adaptive deficit in a single skill domain did not run afoul of *Moore I*); *Wright*, 256 So.3d at 777 (holding that unlike the TCCA in *Moore I,* the court "did not arbitrarily offset deficits with unconnected strengths" but, instead, relied upon expert testimony regarding connected adaptive deficits and strengths and credibility determinations made by the lower court).

Although Dr. Johnson agreed that the AAIDD Manual cautioned against relying exclusively on an individual's self-report of adaptive deficits as that individual may attempt to appear more competent than he or she actually is, Dr. Johnson did not believe this concern was necessarily warranted for defendants in the criminal justice system. The record also established that Dr. Johnson did not rely exclusively upon Petitioner's self-report to reach her conclusion that Petitioner had "mild deficits" that did not rise to the level of significant deficits in adaptive functioning. In light of the post-conviction court's factual findings in which the court made credibility determinations and resolved conflicts

in the competing expert testimony, we conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to establish that he has significant deficits in the social domain. As it applies to the practical domain of adaptive functioning, the post-conviction court found that even if Petitioner had some adaptive deficits, such deficits did not amount to significant adaptive deficits such that Petitioner met the adaptive deficits requirement of the intellectual disability statute. The post-conviction court's finding is supported by Dr. Johnson's conclusion in her report that although "some mild deficits in adaptive functioning were noted," these mild deficits "appear[ed] consistent with either deficits displayed by some individuals with [b]orderline intellectual functioning or the behavior exhibited by individuals in similar sociocultural circumstances." Based upon Dr. Johnson's testimony, the post-conviction court found that due to the sociocultural environment in which he was raised, Petitioner should not be faulted for not having a driver's license, not using a library, cashing paychecks at check-cashing businesses rather than a bank, and for having difficulty with the Memphis public transportation system. Additionally, the post-conviction court did not accredit Dr. Everington's testimony that Petitioner's failure to perform some household chores was evidence of an adaptive deficit regardless of whether Petitioner was unable or simply unwilling to perform the tasks. Instead, the court accredited Dr. Johnson's testimony that Petitioner may have been able to perform the tasks but did not do so because someone else completed the tasks for him. Ms. Rockett told Dr. Johnson that when Petitioner lived with her, Petitioner offered to help her around the house and that she knew he was able to perform the chores because he had done so while living with her mother. Ms. Rockett did not want Petitioner to help her because she wanted the chores "done a certain way" and preferred "to do it herself in her home." The post-conviction court also discounted Dr. Everington's testimony about Petitioner's wearing urine-soaked clothes to school, finding that there was no evidence whether the incident was a common or infrequent occurrence and whether Petitioner had other clothes available, was taught how to clean his clothes, or requested to have his clothes cleaned and his request was denied.

The record indicates that in the short amount of time Petitioner lived in the community between periods of incarceration, he found employment through a temporary agency and worked at Patterson Warehouse for several months. Although Ms. McMillan described issues with Petitioner's job performance, Dr. Johnson testified that it was unclear whether Petitioner's poor job performance was the result of issues with intellectual functioning or his drug use. Petitioner lost his job due to abuse of break time or an argument with a supervisor rather than due to poor job performance. In light of the post-conviction court's factual findings and credibility determinations resolving conflicts in the competing expert testimony, we conclude that Petitioner failed to establish that he has significant deficits in the practical domain.

Because we have determined that Petitioner failed to establish that he had deficits in adaptive behavior in accordance with Tennessee Code Annotated section 39-13-

203(b)(2) (2010), we need not determine whether the intellectual disability manifested during the developmental period pursuant to subsection (b)(3). Rather, we conclude that Petitioner has failed to demonstrate a reasonable probability that, but for trial counsel's deficient performance, the result of the proceedings would have been different. Accordingly, Petitioner is not entitled to relief regarding this issue.

### C. Qualification of State's Expert Witness

Petitioner argues that the post-conviction court erred in accepting Dr. Tucker Johnson as an expert witness under Tennessee Rule of Evidence 702 because she lacked specialized knowledge or experience in administering retrospective adaptive behavior assessments in the context of an *Atkins* claim. Additionally, Petitioner argues that Dr. Johnson's opinion should have been excluded under Tennessee Rule of Evidence 703 because her methodology in collecting the underlying facts and data was not reliable. The State responds that "the post-conviction court acted well within its discretion in allowing Dr. Johnson's testimony." Additionally, the State contends that the post-conviction court did not rely solely on Dr. Johnson's conclusion that Petitioner was not intellectually disabled, but instead found that Petitioner had failed to carry his burden of proof of showing that he was prejudiced by trial counsel's failure to present evidence of his adaptive deficits.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court," and a trial court's ruling will not be overturned absent an abuse of discretion. *State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002) (citing *McDaniel v. CSX Transportation, Inc.*, 955 S.W.2d 257, 263-64 (Tenn. 1997); *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)). "[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id*. (quoting *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)).

### 1. Rule of Evidence 702

Pursuant to Rule of Evidence 702, a witness may be qualified as an expert based upon "knowledge, skill, experience, training, or education." Such a witness may then provide testimony "in the form of an opinion or otherwise" "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue." *Id*. The determination of whether a witness is qualified to provide expert opinion testimony "hinges upon whether the proposed expert's qualifications authorize him or her to give an informed opinion upon the fact or issue for which his or her testimony is being proffered." *State v. Scott*, 275 S.W.3d 395, 402 (Tenn. 2009) (citing *Stevens*, 78 S.W.3d at 834).

In this case, Dr. Johnson testified that she is licensed in Tennessee as a psychologist and health services provider. Dr. Johnson obtained her undergraduate degree in psychology from North Carolina State University and her doctorate from the University of Alabama in clinical psychology with a sub-specialization in psychology law. Dr. Johnson completed an internship in clinical forensic psychology at the University of North Carolina at Chapel Hill School of Medicine's Department of Psychiatry and at the mental health division of the Federal Correctional Institution in Buckner, North Carolina. Dr. Johnson's internship focused on conducting pre-trial competency, insanity, and commitability evaluations. Dr. Johnson continued to work for the federal prison system for several years and was eventually promoted to the position of Chief of Psychology Services for the Federal Medical Center in Rochester, Minnesota. Dr. Johnson then took a position as the director of psychology services at the Memphis Mental Health Institute and the State psychiatric hospital.

Dr. Johnson also worked as a consulting psychologist with DIDD, where for the first few years she "did therapy with high functioning people with intellectual disability" and was "the coordinator of the sexual behavior risk reduction committee." Dr. Johnson testified that for two and a half years, she exclusively performed pre-trial competency and insanity evaluations of defendants who were referred to DIDD by West Tennessee Forensic Services because of suspected intellectual disability. Dr. Johnson then worked directly for West Tennessee Forensic Services for eight months, evaluating defendants from multiple counties suspected of having intellectual disability.

Dr. Johnson testified that she presently maintains a private practice conducting forensic evaluations of adults, particularly those seeking eligibility for social security benefits because of intellectual disability. Additionally, Dr. Johnson works on a contract basis for the Shelby County Juvenile Court conducting psychological evaluations of juveniles in relation to transfer hearings. Dr. Johnson testified that many of those juveniles had I.Q. scores in the borderline or mild intellectual disability range and that the vast majority came from impoverished, high crime areas in Shelby County. Dr. Johnson testified that she considers her area of expertise to be "intellectual assessment of offenders and other people, regarding intellectual disability" as well as "forensic psychological assessments," which are "specifically assessments that are related to the legal system and relate to legal questions." Dr. Johnson has previously testified many times in both federal and state courts regarding the results of her evaluations.

During voir dire examination by post-conviction counsel, Dr. Johnson testified that she is not board certified in either psychology or forensic psychology. Dr. Johnson testified that she has not written any peer reviewed publications, explaining that she learned while completing her dissertation that she "wasn't very good at research." Dr. Johnson testified that she is not a neuropsychologist and does not administer a neuropsychological battery during her evaluations. While Dr. Johnson is a member of the American Psychological

Association, she is not a member of the Intellectual and Developmental Disabilities/Autism Spectrum Disorders Subsection. Dr. Johnson is also not a member of the American Association for Intellectual and Developmental Disabilities, though she does use the "green book," the eleventh edition of the AAIDD Manual defining intellectual disability.

Dr. Johnson acknowledged that she had only conducted one prior intellectual disability assessment in the context of a capital post-conviction case, that of Sidney Porterfield.[14] Additionally, Dr. Johnson had consulted for the State during the capital post-conviction hearing for Richard Odom, though she did not directly evaluate the defendant. Dr. Johnson testified that while she has only done two retrospective assessments for intellectual disability, her assessments for DIDD and Memphis Mental Health Institute included both a "current assessment of functioning" as well as a review of the person's history, records, and prior testing. Dr. Johnson explained that intellectual disability is a "life-long disorder, so I'm going to expect to see it now, as well as in the past," and indeed she would "need to see it has arisen during the developmental period." Dr. Johnson explained that her role in conducting those assessments "was not to be an advocate for or against" but to "give the court an objective opinion." Dr. Johnson testified that she attended a training on conducting psychological evaluations in the context of capital cases and had read relevant publications, including the AAIDD's 2015 book on the subject that included a chapter written by Dr. Everington. Dr. Johnson acknowledged that she is "relatively new" to this particular field but that she was able to rely on her "expertise in [intellectual disability] and the psycho-legal arena," which she considered "issues that are directly relevant."

Petitioner objected to Dr. Johnson's qualification as an expert, arguing that she lacked "sufficient knowledge, experience, training, or education to conduct retrospective assessments." Post-conviction counsel stated that it was "our position that assessments in capital cases are different than assessments in non-capital cases that Dr. Johnson has familiarity with." The post-conviction court overruled the objection, finding that Dr. Johnson "does have special training, skill, or experience in this area." The evidence in the record supports the post-conviction court's ruling. Dr. Johnson provided extensive testimony regarding her knowledge, skill, experience, training, and education related to conducting psychological assessments in various legal contexts with a particular emphasis on conducting assessments of defendants suspected of having intellectual disability.

Petitioner makes much of the fact that Dr. Johnson had only conducted one prior intellectual disability assessment in the context of a capital post-conviction case. However, Dr. Johnson was accepted as an expert witness in the *Porterfield* case, despite the fact that it was her first such assessment. *See Sidney Porterfield*, 2013 WL 3193420, at *8. Although Petitioner asserts that intellectual disability assessments conducted in capital

_____

[14] *See Sidney Porterfield*, 2013 WL 3193420, at *8-19.

post-conviction cases are "fundamentally different" from those conducted in other contexts, the only difference he points to is the length of time between the assessment and the criminal offense. However, the standard for diagnosing a person as intellectually disabled is the same in both contexts and takes into account intellectual functioning, adaptive behavior, and manifestation during the developmental period. Thus, Petitioner has not established that Dr. Johnson's experience in conducting pre-trial intellectual disability assessments is completely irrelevant to her ability to give an informed opinion in this case. Accordingly, we conclude that the post-conviction court did not abuse its discretion in accepting Dr. Johnson as an expert witness under Rule 702.

## 2. Rule of Evidence 703

As the Tennessee Supreme Court has recognized, "the court's inquiry into whether expert testimony is sufficiently reliable does not end when a trial court concludes that the witness is, in fact, an expert in the area in which he or she proposes to testify." *Scott*, 275 S.W.3d at 402. Under Rule of Evidence 703, "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness." In *McDaniel*, the Tennessee Supreme Court set forth a "non-exhaustive list of factors" that trial courts may consider in determining the reliability of expert opinion testimony. 955 S.W.2d at 265. While "[r]igid application of the *McDaniel* factors is not required," *State v. Copeland*, 226 S.W.3d 287, 302 (Tenn. 2007), the trial court must still "assure itself that the opinions are based on relevant scientific methods, processes, and data, and not upon an expert's mere speculation." *McDaniel*, 955 S.W.2d at 265. The court must "ensure that the basis for the witness's opinion, i.e., testing, research, studies, or experience-based observations, adequately supports that expert's conclusions." *Stevens*, 78 S.W.3d at 834. "As part of this analysis, the courts should consider how and why the expert was able to extrapolate from certain data to the conclusions that he or she has reached." *Scott*, 275 S.W.3d 395, 402 (Tenn. 2009). There must be a "straightforward connection between the expert's knowledge and the basis for the opinion such that no 'analytical gap' exists between the data and the opinion offered." *Stevens*, 78 S.W.3d at 835. Once this threshold for admissibility has been met, the expert's testimony "will thereafter be tested with the crucible of vigorous cross-examination and countervailing proof," and the weight to be assigned to the testimony is "appropriately entrusted to the trier of fact." *McDaniel*, 955 S.W.2d at 265.

In this case, Petitioner argues that the post-conviction court erred by accrediting Dr. Johnson's testimony without analyzing the reliability of her methods. Relying on the *McDaniel* factors, Petitioner argues that the "screening questions" Dr. Johnson used during her evaluation of Petitioner's adaptive functioning "were not created through any specific methodology, were not subjected to peer review or publication, were not subject to any known rate of error, were not accepted in the scientific community . . . and were created, ad hoc, for purposes of this litigation." However, the post-conviction court was not

required to rigidly apply the *McDaniel* factors in assessing the basis for Dr. Johnson's opinion. Dr. Johnson explained that she did not administer a standardized measure of adaptive behavior to Petitioner because she intended to administer the ABAS rating scale to his aunt, Alma Rockett. Instead, she administered an "adaptive screening" that she had developed while working at the DIDD and used many times when assessing individuals for intellectual disability. Dr. Johnson testified that the questions were based upon some of the subject areas addressed on the ABAS and other standardized adaptive measures. Based on Dr. Johnson's testimony, it is clear that the adaptive screening, like a structured clinical interview, was designed to gather qualitative information about Petitioner's knowledge of and ability to perform certain adaptive behaviors rather than quantitative data about the frequency with which he performed such behaviors. Petitioner faults Dr. Johnson for focusing on the practical domain of adaptive behavior and Petitioner's current level of adaptive functioning. However, any such deficiencies would go to the weight rather than the admissibility of Dr. Johnson's testimony. Moreover, Dr. Johnson's opinion was not based solely upon Petitioner's responses to her screening questions but instead took into account the totality of the information available, including the social history interviews and records provided by Petitioner's post-conviction counsel as well as the results of standardized intelligence and achievement testing. Petitioner has not established that there is any "analytical gap" between Dr. Johnson's screening questions and the ultimate conclusion that she reached regarding Petitioner's adaptive deficits. The post-conviction court did not abuse its discretion in admitting Dr. Johnson's expert testimony under Rule 703.

### D. Trial Counsel's Failure to Investigate and Present Additional Mitigating Evidence

Petitioner argues that trial counsel were deficient because they conducted "a minimal mitigation investigation" consisting of "only a handful" of "cursory" interviews, failed to effectively prepare Vivian and Quiana Pruitt's testimony by refreshing their memories with various records, failed to call additional witnesses to testify regarding Petitioner's social history, and failed to adequately investigate and present evidence of Petitioner's mental health and cognitive impairments. Petitioner argues that he was prejudiced because "if counsel had conducted the constitutionally mandated investigation, they would have discovered compelling mitigation reasonably likely to have persuaded at least one juror to spare [Petitioner's] life."

The State responds that "trial counsel presented significant mitigating evidence about the difficult circumstances of [P]etitioner's childhood and his diagnosis of mental illness." The State argues that trial counsel made reasonable strategic decisions regarding their investigation and presentation of mitigating evidence and that their performance "should not now be deemed incompetent simply because post-conviction counsel were able to build upon it." Additionally, the State argues that Petitioner failed to demonstrate prejudice because the mitigating evidence presented at the post-conviction hearing, though

more detailed, was merely cumulative of the evidence presented at trial and would not have outweighed the strength of the aggravating circumstances.

"Capital defendants possess a constitutionally protected right to provide the jury with mitigation evidence that humanizes the defendant and helps the jury accurately gauge the defendant's moral culpability." *Davidson*, 453 S.W.3d at 402 (citing *Porter v. McCollum* 558 U.S. 30, 41 (2009); *Williams*, 529 U.S. at 393). "[A]lthough there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases." *Id*. at 395 (quoting *Goad*, 938 S.W.2d at 369-70). Accordingly, "counsel should make an effort to discover all reasonably available mitigating evidence and all evidence to rebut any aggravating evidence that the State might introduce." *Id*. at 402 (citing *Wiggins v. Smith*, 539 U.S. 510, 524 (2003)). However, counsel "is not required . . . to run down every conceivable line of potentially mitigating evidence." *Id.* at 395 (citing *Wiggins*, 539 U.S. at 533). Instead, counsel has a duty to "make either a reasonable investigation or a reasonable decision that particular investigations would be unhelpful or unnecessary." *Id*. at 402 (citing *Wiggins*, 539 U.S. at 521). Counsel's performance will be "reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Detrick Cole v. State*, No. W2008-02681-CCA-R3-PD, 2011 WL 1090152, at *36 (Tenn. Crim. App., at Jackson, Mar. 8, 2011) (citing *Wiggins*, 539 U.S. at 523). "To determine whether counsel's actions were reasonable, a reviewing court should 'consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.'" *Davidson*, 453 S.W.3d at 402 (quoting *Wiggins*, 539 U.S. at 527).

If counsel's performance in this regard is found to be deficient, a reviewing court must determine if there is a reasonable probability that the presentation of additional mitigating evidence would have resulted in a different outcome. *See id.* In other words, the petitioner "must show that 'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Nichols v. State*, 90 S.W.3d 576, 598 (Tenn. 2002) (quoting *Strickland*, 466 U.S. at 695). The Tennessee Supreme Court has identified the following factors that should be considered by a reviewing court:

(1) the nature and extent of the mitigating evidence that was available but not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination.

*Id.* (citing *Goad*, 938 S.W.2d at 371); *see also Davidson*, 453 S.W. 3d at 403; *Henley*, 960 S.W.2d at 580.

In this case, the post-conviction court found that Petitioner presented at the post-conviction hearing "potential mitigating evidence about which trial counsel should have known and could have presented during the capital sentencing phase." In particular, the post-conviction court noted the evidence of Petitioner's excessive marijuana use as a teenager and its potential effects on his developing brain, as well as evidence of his mother's drug and alcohol use during pregnancy, which she did not specifically recall at trial. The post-conviction court stated that because this evidence was available before trial and "could have given the jury a better view of Petitioner's potential mental illness and could have placed the low I.Q. scores testified to by Dr. Rutledge in a better context," "it can be said that trial counsel's not presenting it in their presentation of mitigation to the jury may have constituted deficient performance." However, rather than resolve whether trial counsel were indeed deficient, the post-conviction court focused on Petitioner's failure to prove that he was prejudiced. *See Henley*, 960 S.W.2d at 580. The post-conviction court found that "much of the potential mitigation proof presented at the post-conviction hearing was cumulative to the mitigation presented at Petitioner's trial." Moreover, the post-conviction court found that two of the three statutory aggravating factors proved by the State – Petitioner's prior convictions for violent offenses and the victim's age – "appear to have carried significant weight" with the sentencing jury. The post-conviction court concluded:

> While conceivably the extra mitigation evidence identified at the post-conviction hearing but not presented at trial might have further "humanized" Petitioner and offered some sort of potential context for explaining Petitioner's violent tendencies, the number of the aggravating circumstances found by the jury and the strong proof supporting them and the weight the jury would give them, causes this court to find that there is not a reasonable probability that the jury would have returned a sentence other than death had the additional mitigating evidence identified by post-conviction counsel been presented at trial.

Based on our review of the evidence presented at the post-conviction hearing, we conclude that trial counsel conducted a reasonable mitigation investigation and made reasonable strategic decisions regarding the presentation of mitigating evidence during the sentencing phase. Trial counsel and their investigators met with Petitioner and several members of his family on multiple occasions to discuss Petitioner's social history. The defense team obtained Petitioner's school, employment, medical, mental health, and juvenile and adult arrest records. Trial counsel also obtained Vivian Pruitt's arrest records since Petitioner's birth, even though lead counsel did not believe that the jury would necessarily view her frequent arrests as mitigating. After Petitioner was evaluated by

MTMHI, trial counsel obtained an independent psychological evaluation by Dr. Steinberg, although they ultimately concluded that Dr. Steinberg's testimony would not be helpful. Additionally, lead counsel and former lead counsel presented Petitioner's case at a conference specifically designed to brainstorm possible mitigation theories. Based on this investigation and preparation, the defense team developed a mitigation theory related to Petitioner's "bad family situation" and "horrendous childhood," in addition to his diagnosis of schizophrenia and mild mental retardation from MTMHI. There were several indications that Petitioner's family, particularly Alma Rockett, were reluctant to help, and trial counsel relied on Ms. Stanback "to marshal the family" to Petitioner's defense. Trial counsel also made the strategic decision to present Quiana Pruitt as the "family historian." Although trial counsel were deficient in establishing the statutory criteria for intellectual disability, as discussed above, they were able to introduce as mitigating circumstances evidence of Petitioner's low cognitive functioning and mental illness through Dr. Rutledge's testimony. *See* T.C.A. §§ 39-13-203(e); -204(j)(8).

In determining whether trial counsel's investigation was reasonable, this court "must consider the limited time and resources of counsel." *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *48 (Tenn. Crim. App., at Jackson, July 1, 2009). Moreover, this court must "resist the urge to evaluate counsel's performance using '20-20 hindsight.'" *Davidson*, 453 S.W.3d at 393 (quoting *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)). Although Petitioner presented significantly more evidence during the post-conviction hearing regarding his background and mental health, he did not indicate what information in trial counsel's possession would have led a reasonable attorney to investigate further in order to develop such evidence. *See id.* at 402 (quoting *Wiggins*, 539 U.S. at 527). For instance, Petitioner faults trial counsel for failing to obtain an expert to conduct neuropsychological testing to evaluate Petitioner's deficits in executive functioning, but Dr. Steinberg's report specifically stated that such testing was not necessary in this case.[15] Similarly, there is no indication that many of the lay witnesses who testified at the post-conviction hearing were specifically identified by Petitioner, his family members, or in any of the records as potential mitigation witnesses that should have been sought out by trial counsel. Moreover, some of them were deemed "somewhat less credible" by the post-conviction court due to their own criminal records.

Further, as found by the post-conviction court, Petitioner failed to establish that he was prejudiced by any alleged deficiency. The mitigation evidence presented by Petitioner at the post-conviction hearing was largely cumulative of the evidence presented during the

---

[15] Although it is unclear why a copy of Dr. Steinberg's report could not be located in the Public Defender's Office's file prior to the post-conviction hearing, it is clear from the testimony that former lead counsel was familiar with the report and that she discussed her impressions of Dr. Steinberg's opinion with co-counsel when he replaced her on Petitioner's defense team. Additionally, lead counsel testified that he had several conversations with Dr. Steinberg regarding the evaluation of Petitioner; thus, he too would have been familiar with any recommendations as to whether further testing was necessary.

sentencing phase at trial. *See Nichols*, 90 S.W.3d at 601. Through Vivian and Quiana Pruitt, the jury heard about Petitioner's difficult childhood, which included testimony regarding the family's poverty, including periods without electricity; his mother's drug use and frequent arrests, including an aggravated assault for shooting Petitioner's father; the extensive family history of mental illness, including Petitioner's grandmother who was responsible for raising Petitioner while his mother was incarcerated or "in the streets"; the absence of Petitioner's biological father and abandonment by his stepfather; and the trauma experienced by Petitioner when he lost several friends to a violent car crash. The jury also heard about Petitioner's behavioral issues as an adolescent, including the fact that he dropped out of school, used marijuana, and had an extensive juvenile record. Through Dr. Rutledge, the jury heard that Petitioner had low I.Q. scores both as a juvenile and as an adult and that he was diagnosed with mild mental retardation, schizophrenia, and substance abuse disorder. While the evidence presented at the post-conviction hearing added additional detail regarding Petitioner's social history and mental health, it did not paint a significantly different picture. *Cf. Detrick Cole*, 2011 WL 1090152, at *37 (concluding that trial counsel rendered ineffective assistance in presenting mitigation evidence because "the true picture of the Cole family was the antithesis of the loving family presented by trial counsel.").

Finally, to the extent that Petitioner presented evidence that may not have been cumulative of the evidence presented at trial, such as evidence of the violence within both Petitioner's home and community, Petitioner has not established that it would have affected the jury's determination in light of the strength of the aggravating circumstances, particularly his prior conviction for violent felonies[16] and the vulnerability of the victim due to his age. Petitioner argues that this court should "abandon the strength of the aggravating evidence factor," which was first articulated by the Tennessee Supreme Court in *Goad*, 938 S.W.2d at 371, because he asserts that it is inconsistent with more recent United States Supreme Court cases, such as *Wiggins*, 539 U.S. 510, and *Williams*, 529 U.S. 362, which do not include a discussion of the aggravating factors when determining whether counsel was ineffective for failing to present additional mitigating evidence. Petitioner asserts that in *Davidson*, the Tennessee Supreme Court's most recent case on the issue, "the Court only made passing reference to the *Goad* analysis, but effectively applied the correct constitutional standard found in United States Supreme Court jurisprudence."

---

[16] In a footnote in his brief, Petitioner argues that because his prior offenses were committed when he was sixteen and twenty-two years old, trial counsel "should have moved to prohibit use of this conduct as an aggravating circumstance, in violation of the Eighth Amendment in light of *Thompson v. Oklahoma*, 487 U.S. 815, 838 (1988) (plurality opinion) and *Roper v. Simmons*, 543 U.S. 551 (2005)." A conclusory argument presented in a footnote is deemed waived for failure to comply with the briefing requirements of Tennessee Rule of Appellate Procedure 27(a). *See* Tenn. Ct. Crim. App. R. 10(b); *Fisher v. Hargett*, 604 S.W.3d 381, 388 n.6 (Tenn. 2020) (citing *Hodge v. Craig*, 382 S.W.3d 325, 334 (Tenn. 2012)). Even if this issue were not waived, trial counsel would not be deemed deficient for failing to raise an objection that has been found meritless by the Tennessee Supreme Court. *See State v. Cole*, 155 S.W.3d 885, 905 (Tenn. 2005) (citing *State v. Davis*, 141 S.W.3d 600, 618 (Tenn. 2004)).

*See* 453 S.W.3d at 402-03. However, the *Davidson* court not only articulated all three factors as the applicable standard for determining prejudice, *see id.* at 395, they specifically stated that they had considered the strength of the aggravating factors in concluding that the petitioner was prejudiced by trial counsel's deficient performance in presenting mitigating evidence. *Id.* at 406. Accordingly, we cannot conclude that the third *Goad* factor has been implicitly overruled or abrogated. As an intermediate court, we are bound by the decisions of the Tennessee Supreme Court with regard to constitutional questions. *See State v. Pendergrass*, 13 S.W.3d 389, 397 (Tenn. Crim. App. 1999). Moreover, this factor is consistent with the statement in *Strickland* that a petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the *balance of aggravating and mitigating circumstances* did not warrant death" in order to establish prejudice. *Strickland*, 466 U.S. at 695 (emphasis added). The post-conviction court did not err in applying this factor to Petitioner's case, and the evidence in the record does not preponderate against the post-conviction court's conclusion. Because Petitioner failed to establish either that trial counsel rendered deficient performance with regard to their investigation and presentation of mitigating evidence or that he was prejudiced thereby, he is not entitled to relief on this issue.

### E. Trial Counsel's Failure to Investigate and Present Evidence of the Victim's Views on the Death Penalty

Petitioner argues that trial counsel were ineffective for failing to investigate the fact that as a Catholic, the victim was against the death penalty and that his close friends and fellow church members, the Leeches, supported showing Petitioner mercy. However, as found by the post-conviction court, trial counsel were aware of the position of the Catholic Church with regard to the death penalty and the fact that the Leeches and other fellow parishioners indicated they were "not out for blood." Moreover, trial counsel intended to present such evidence as possible mitigation, either through cross-examination of the Leeches or presenting the testimony of a Catholic priest, but the State made a motion in limine to exclude such evidence as irrelevant, which was granted by the trial court. The Tennessee Supreme Court has held that a trial court does not abuse its discretion by excluding evidence of the victim's or the victim's family's views on the death penalty because it is generally "considered to be irrelevant." *State v. Hester*, 324 S.W.3d 1, 59 (Tenn. 2010) (citing cases); *see also State v. Nesbit*, 978 S.W.2d 872, 888 n.8 (Tenn. 1998). Petitioner makes a conclusory assertion that "[d]ue process requires these views [be admitted as mitigating evidence] to rebut and contextualize the State's decision to seek the death penalty" and suggests that trial counsel were deficient because they "were not prepared to make the constitutional arguments" in response to the State's motion in limine.[17] However, Petitioner does not indicate how trial counsel's further investigation

---

[17] By failing to cite any supporting legal authority, Petitioner has waived any due process claim. *See* Tenn. Ct. Crim. App. R. 10(b).

into the religious views of the victim or his close friends might have affected the trial court's ruling or the outcome of his case. Moreover, Petitioner failed to call the Leeches or any other witnesses at the post-conviction hearing to testify regarding the victim's or his close friends' views on the death penalty. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Petitioner has failed to establish either that trial counsel were deficient in this regard or that he was prejudiced.

## IV. Petitioner's Claims Related to Prosecutorial Discretion and Misconduct

### A. Prosecutorial Discretion in Charging Decision

Petitioner argues that the State abused its discretion in continuing to seek the death penalty after receiving notification from the defense that they would present evidence of Petitioner's intellectual disability, including the report from Dr. Rutledge that Petitioner had an I.Q. score of 66. Additionally, Petitioner argues that the State abused its discretion by seeking dual convictions for both felony and premeditated first degree murder, thereby giving the State "two bites at the apple" for a conviction and a death sentence. Petitioner also raises a related claim that trial counsel were ineffective for failing to file a pretrial motion to preclude the imposition of the death penalty and a pretrial motion for the State to make an election of offenses.

The post-conviction court properly determined that the stand-alone claims of abuse of prosecutorial discretion were waived because Petitioner failed to raise them at trial or on direct appeal. *See* T.C.A. § 40-30-106(g). Moreover, the post-conviction court properly determined that because these claims are without merit, Petitioner failed to establish ineffective assistance of counsel. Prosecutorial discretion in charging decisions, including whether to seek the death penalty, is generally not subject to judicial review. *See Pruitt*, 415 S.W.3d at 215 (citing *Bland*, 958 S.W.2d at 666 n.17). Petitioner has cited no authority for the proposition that the prosecutor is precluded from seeking the death penalty upon the mere allegation of the defendant's intellectual disability. Instead, the statute places "[t]he burden of production and persuasion to demonstrate intellectual disability by a preponderance of the evidence [ ] upon the defendant." T.C.A. § 39-13-203(c) (2010). Thus, the State is not required to disprove a claim of intellectual disability prior to seeking the death penalty. Additionally, Petitioner has presented no evidence that the prosecutor would have chosen not to pursue the death penalty had trial counsel filed a pretrial motion to preclude the death penalty rather than simply a notice of intent to present expert testimony. In fact, the post-conviction court concluded that trial counsel made a strategic choice to make a motion for a directed verdict at the close of the sentencing hearing in order to surprise the State and that the timing of the motion "did not waive any of

Petitioner's rights and did not place Petitioner in any disadvantage."[18]  Such strategic choices are "virtually unchallengeable."  *Strickland*, 466 U.S. at 690.

With regard to the prosecutor's decision to charge Petitioner with both felony and premeditated first degree murder, Petitioner relies upon dicta in this court's opinion in *State v. Zirkle*, in which this court affirmed the merger of dual convictions as a "cure[]" for the "double jeopardy problem" but noted that "[p]erhaps the merger procedure would have been prejudicial if the jury had chosen to impose the death penalty."  910 S.W.2d 874, 889 (Tenn. Crim. App. 1995).  However, even in the context of death penalty cases, "our supreme court has held that the State is not required to elect between first degree premeditated murder and felony murder charged in separate counts of the indictment for a single offense, and both theories of first degree murder may be submitted to the jury."  *State v. Joel Richard Schmeiderer*, No. M1999-02546-CCA-R3-CD, 2000 WL 1681030, at *9 (Tenn. Crim. App., at Nashville, Nov. 9, 2000) (citing *State v. Hurley*, 876 S.W.2d 57, 69-70 (Tenn. 1993); *State v. Henley*, 774 S.W.2d 908, 916 (Tenn. 1989)); *see also State v. Cribbs*, 967 S.W.2d 773, 788 (Tenn. 1998).  Additionally, the supreme court has approved of merger as the appropriate remedy "when a jury returns guilty verdicts on two counts representing alternative theories of the same offense."  *State v. Davidson*, 509 S.W.3d 156, 217 (Tenn. 2016) (citing *Cribbs*, 967 S.W.2d at 788).  Thus, Petitioner has not established any deficient performance on the part of trial counsel for failing to file a pretrial motion for the State to elect between felony murder and premeditated first degree murder.  Moreover, the jury ultimately acquitted Petitioner of premeditated first degree murder and, as a result, only considered and imposed the death penalty for one count of first degree murder.  Thus, Petitioner has failed to establish that he was prejudiced.  Petitioner is not entitled to relief on this issue.

### B.  Prosecutor's Use of Peremptory Strikes in Violation of <u>Batson v. Kentucky</u>

Petitioner argues that the State committed prosecutorial misconduct by exercising peremptory challenges against four African American potential jurors in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that trial counsel rendered ineffective assistance by failing to adequately object to the State's discriminatory use of peremptory challenges, resulting in structural defects that require a new trial.  Specifically, Petitioner claims that after raising a *Batson* objection during jury selection, trial counsel failed to argue that the explanation provided by the State with regard to three of the jurors was

---

[18] In his Amended Petition, Petitioner included as part of his claims related to intellectual disability that trial counsel were deficient for failing to raise the issue pretrial because it resulted in his being tried by a "death-qualified" jury.  However, other than quoting the trial court's order denying the motion for new trial, in which the trial court stated that "no defense attorney worth his or her salt would ever wish to try the guilt phase of a Murder First Degree case to a 'death-qualified' jury when he or she had a chance to remove the possibility of death prior to jury selection," Petitioner does not raise the timing of the motion as an issue on appeal other than with regard to its effect on the prosecutor's charging decision.

pretextual and failed to insist upon the State providing a race-neutral explanation with regard to the fourth juror. Petitioner further complains that trial counsel did not raise the *Batson* claims in the motion for new trial and that appellate counsel failed to raise the *Batson* claims on appeal. The post-conviction court found that Petitioner waived any stand-alone *Batson* claim related to the State's use of peremptory challenges by failing to raise the issue on direct appeal. *See* T.C.A. § 40-30-106(g). The post-conviction further found that Petitioner failed to present any proof to establish that trial counsel or appellate counsel rendered ineffective assistance. We agree that the stand-alone prosecutorial misconduct claim is waived and shall analyze the issue only in the context of ineffective assistance of counsel.

In *Batson v. Kentucky*, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race. . . ." 476 U.S. at 89. The following prerequisites must be met to establish a *Batson* violation: (1) the defendant must establish a prima facie case of purposeful discrimination; (2) the State must be given the opportunity to rebut the prima facie case by offering a race-neutral explanation for the exercise of the peremptory challenge; and (3) the trial court must determine whether the defendant has established purposeful discrimination. *State v. Kiser*, 284 S.W.3d 227, 255 (Tenn. 2009). The State's race-neutral explanation must be reasonable and specific but need not be persuasive. *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995); *see State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." *Purkett*, 514 U.S. at 768 (citations omitted); *see Hugueley*, 185 S.W.3d at 368. The trial court, however, must consider the explanation in light of all evidence to ensure that the explanation is not pretextual. *Miller-El v. Dretke*, 545 U.S. 231, 251-52 (2005); *Hugueley*, 185 S.W.3d at 369. "Because the core issue is the prosecutor's discriminatory intent, or lack thereof, the trial court's finding 'largely will turn on evaluation of credibility.'" *State v. Ellison*, 841 S.W. 2d 824, 827 (Tenn. 1992) (quoting *Batson*, 476 U.S. at 98). On appeal, a trial court's findings on the issue of discriminatory intent is accorded great deference and will be sustained unless clearly erroneous. *Hugueley*, 185 S.W.3d at 369.

During jury selection, the State used four peremptory challenges against African American prospective jurors. Trial counsel raised a *Batson* challenge to all four strikes. The trial court noted that the State struck one African American prospective juror in the first round and three in the second round. The trial court then asked the State to provide a race-neutral reason for the three jurors stricken by the State in the second round. The State responded that all three jurors "gave hesitant, reluctant answers on the death penalty question," and additionally that one of the jurors had "bad bod[y] language from the minute he was called up into the jury box" until he was excused. The trial court agreed that all three prospective jurors appeared "hesitant" despite answering that they could vote for the death penalty, noted that one of the jurors appeared "unhappy to be there," and found these

to be race-neutral reasons for striking the prospective jurors. Trial counsel argued against the trial court's consideration of the body language of the prospective jurors but did not dispute the State's reason to strike the jurors because they were "reluctant."

Petitioner complains that trial counsel were deficient for failure to pursue a race-neutral explanation for the State's striking the African American juror in the first round. While the trial court made no explicit finding that trial counsel had made a prima facie showing of discrimination regarding any of the jurors in question, our supreme court in *Woodson* concluded that had the trial court determined that no prima facie showing was made, the court would not have required the State's race neutral explanation for the challenge. *Woodson v. Porter Brown Limestone Co., Inc.*, 916 S.W.2d 896, 905 (Tenn. 1996). Thus, we conclude that the court implicitly found that trial counsel had satisfied the first prong of the *Batson* test with regard to the three jurors stricken in the second round, but not the juror stricken in the first round.

Petitioner further claims that trial counsel were ineffective for failing to challenge the prosecutor's statement that the prospective jurors "all used the word 'reluctantly,'" when the transcript reflected that none of the jurors actually used that word in their responses regarding their willingness to impose the death penalty.[19] However, a single misstatement by the prosecutor does not amount to discriminatory intent. "To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination." *Flowers v. Mississippi*, 139 S.Ct. 2228, 2250 (2019). While the record does not show that any of the prospective jurors in question used the word "reluctant" in their answers about the death penalty, the record does indicate that the trial court found the jurors to be hesitant and not "as vocal as the other jurors." Subjective explanations for a peremptory challenge, such as a prospective juror's demeanor, are permitted but must be "carefully scrutinized" for "facial validity." *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000) (internal citations omitted). The trial court found the State's explanation to be credible in light of the trial court's own observation of the three challenged jurors.

Moreover, Petitioner failed to present any evidence during the post-conviction hearing that contradicts the trial court's findings of a race-neutral reason for the State's peremptory challenges to support his claim that trial counsel were ineffective in failing to further pursue the *Batson* challenge after the trial court's ruling. Likewise, Petitioner failed to present any evidence that if trial counsel were deficient, that alleged deficiency affected the outcome of the proceedings. Petitioner argues that he was not required to present evidence at the post-conviction hearing because the *Batson* issues are all "record based."

_____

[19] One of the prospective jurors did use the word "reluctantly" in her answer regarding being sequestered for the duration of the trial.

However, the United States Supreme Court has cautioned against this approach. *See Massaro v. United States*, 538 U.S. 500, 505 (2003) (noting that the "record may reflect the action taken by counsel but not the reasons for it"). Moreover, Petitioner has the burden of proving the factual basis of his claims for post-conviction relief by clear and convincing evidence. *See* T.C.A. § 40-30-110(f); *Momon*, 18 S.W.3d at 156. Petitioner did not question any of the attorney witnesses – either the prosecutors or trial counsel – about their actions regarding the *Batson* issues, nor did he present any of the stricken jurors as witnesses to refute the trial court's ruling on the issue. Accordingly, Petitioner has failed to establish that trial counsel were deficient in failing to challenge the make-up of the jury and that any deficiency resulted in prejudice. The trial court was in the best position to judge the credibility of both the prospective jurors and the prosecutors because the trial court has the opportunity to observe their demeanor. *Smith*, 893 S.W.2d at 914. The record supports the trial court's acceptance of the State's race-neutral reason for excluding the prospective jurors. Petitioner is not entitled to relief on this issue.

Petitioner further claims that appellate counsel rendered ineffective assistance by failing to raise the *Batson* claims on direct appeal, asserting that there is a reasonable probability that this court would have vacated Petitioner's conviction and remanded the case for a new trial. However, Petitioner offered no proof regarding appellate counsel's decisions with regard to which issues were addressed on appeal and further offered no proof that Petitioner suffered prejudice from appellate counsel's failure to raise the *Batson* issue on direct appeal. Accordingly, we conclude that the record supports the post-conviction court's finding that Petitioner failed to establish deficiency or prejudice as a result of appellate counsel's failure to raise the *Batson* issues on appeal. Petitioner is not entitled to relief on this issue.

### C. *Improper Prosecutorial Statements and Argument*

Petitioner argues that the State committed prosecutorial misconduct by repeatedly making improper arguments and statements during Petitioner's trial and that trial counsel made only limited attempts to stem the misconduct, failing to object during the State's questioning of certain witnesses and closing arguments in both the guilt and sentencing phases of trial. The State argues that the post-conviction court properly concluded that Petitioner failed to prove either deficiency or prejudice. We agree with the post-conviction court that Petitioner's stand-alone allegations of prosecutorial misconduct are waived because they were not raised on direct appeal. *See* T.C.A. § 40-30-106(g). Accordingly, we will address Petitioner's allegations in the context of ineffective assistance of counsel.

Petitioner first argues that trial counsel were deficient for failing to file a motion in limine to prohibit the State from making improper arguments. Co-counsel testified that he did not consider filing a pretrial motion, stating that the prosecutor "was really good at what she did" and that trial counsel "just had to be on our toes to catch her where we could."

Petitioner asserts that had trial counsel filed a pre-trial motion in limine, any improper arguments would have been preserved for appeal even without a specific objection. However, Petitioner fails to cite any authority supporting this position, risking waiver of the issue. *See* Tenn. Ct. Crim. App. R. 10(b). Further, Petitioner failed to offer any evidence to demonstrate that failing to file such a pretrial motion making a general objection to improper argument fell below professional norms or that trial counsel's failure to file such a motion affected the outcome of the trial.

With regard to the prosecutor's allegedly improper statements, Petitioner references three specific incidents during questioning of witnesses at trial: 1) the prosecutor posed a hypothetical question to the forensic pathologist involving a description of the victim being "run over by a tractor"; 2) during cross-examination of defense expert Dr. Smith, the prosecutor posed "inflammatory sarcastic hypotheticals" regarding the victim's cause of death; and 3) during cross-examination of Dr. Rutledge during the sentencing phase, the prosecutor asked if Petitioner could have been "faking stupid." In each instance cited by Petitioner, trial counsel objected and was overruled by the trial court. Petitioner failed to present any proof to support his assertions that trial counsel were ineffective in responding to these alleged improper statements by the prosecutor.

Petitioner also argues that trial counsel were deficient in responding to alleged prosecutorial misconduct during the prosecution's closing arguments at both the guilt and sentencing phases of the trial. The argument of an advocate must be temperate, predicated upon evidence introduced during the trial, and pertinent to the issues that must be resolved by the jurors. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id.* (citing *U.S. v. Young*, 470 U.S. 1, 11-13 (1985)). Indeed, "[a]n improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." *Id.*; *see also Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). The reviewing court should consider the following factors:

> (1) the conduct complained of, viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the [c]ourt and the prosecutor; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Petitioner claims that during closing arguments in the guilt phase of the trial, the prosecutor vouched for the credibility of a State's witness; argued that defense witness Dr. Smith had a "bit of an axe to grind"; mischaracterized the law by referring to the jury instructions as "big fancy legal words" and incorrectly summarizing the lesser included-offenses; repeatedly referred to Petitioner as a "hunter . . . looking for prey"; and argued facts not in evidence. The post-conviction court found that the prosecutor's closing arguments were not unduly improper. Further, the post-conviction court found that at one point, trial counsel objected to the prosecutor's argument, which led to the trial court issuing a "lengthy corrective instruction." In fact, the record reflects that trial counsel objected six times during the State's closing argument, including an objection to the State's mischaracterization of the law, resulting in the trial court's admonishing the prosecutor and the prosecutor's correction of the misstatement. The post-conviction court noted that "after the last of [trial counsel's] objections, the State's argument became more temperate."

At the post-conviction hearing, co-counsel testified that he objected to some of the State's closing arguments but not to others, including the use of the term "hunter," because he had "objected a bunch" already and did not want the jury to hold other objections against him. He also stated that he did not want to risk interrupting the State's argument when it was close to being finished, which could cause the prosecutor to "restart and get her going again." The post-conviction court found trial counsel's strategy to be reasonable, and the evidence does not preponderate against the post-conviction court's findings.

Petitioner also claims that trial counsel were deficient for failing to object to the prosecutor's arguments during the sentencing phase of the trial. The Petitioner asserts that the prosecutor mischaracterized mitigating evidence as "things that make it not so bad," referred to Petitioner as the "hunter" becoming the "hunted," and referenced facts not in evidence. The post-conviction court found that the State's sentencing phase arguments were not so inflammatory as to require the Court to set aside Petitioner's death sentence. The record reflects that trial counsel did object during the State's arguments during the sentencing phase, including an objection to references to facts not in evidence. Further, the trial court properly instructed the jury regarding its consideration of mitigating evidence, and the jury is presumed to follow the instructions of the court. *See State v. Reid*, 164 S.W.3d 286, 346 (Tenn. 2005).

Trial counsel did not object to the State's references to Petitioner as a "hunter" who became "hunted." As set forth above, co-counsel testified that he did not object for tactical reasons, and we do not second-guess tactical decisions. *See Henry Floyd Sanders v. State*, No. M2019-00397-CCA-R3-PC, 2020 WL 2394992, at *11 (Tenn. Crim. App., at Nashville, May 12, 2020). We note that it is improper for a prosecutor to characterize a

defendant as an animal or a beast. *Darden v. Wainwright*, 477 U.S. 168, 180 (1986); *see also State v Thomas*, 158 S.W.3d 361, 413-14 (Tenn. 2005) (holding prosecutor repeatedly referring two co-defendants as "greed and evil" was improper); *State v. Bates*, 804 S.W.2d 868, 881 (Tenn. 1991) (holding prosecutor's reference to defendant as a "rabid dog" was "patently improper"); *State v. Thomas Dee Huskey*, No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *129 (Tenn. Crim. App., at Knoxville, June 28, 2002) (holding prosecutor's reference to defendant as a "human predator" was "derogatory and improper"); *State v. Tyson*, 603 S.W.2d 748, 754 (Tenn. Crim. App. 1980) (holding prosecutor's referring to defendant as a "rat" was improper). However, Petitioner has cited no authority to support his argument that "hunter" has the same animalistic connotation as "predator." The prosecutor used the word "predator" one time in closing argument in reference to the jury as the "ultimate of predators," not in reference to Petitioner.

Even if we agreed with Petitioner that the use of the term "hunter" was improper, we would apply the *Buck* factors to determine whether the use of that term affected the outcome of the trial to Petitioner's prejudice. In reviewing the complained of conduct in light of the context of the facts of the case, we note that the prosecutor's reference to Petitioner as a "hunter" related to Petitioner's trial testimony that he was specifically searching for a car to steal. The prosecutor's use of the term "hunted" refers to the fact that after the death of the victim, the police began searching for Petitioner and the stolen vehicle. Under the second *Buck* factor, we note that no curative instructions were given regarding the terms in question primarily because trial counsel did not object. However, the trial court instructed the jury that statements of counsel are not evidence and are to be disregarded if not supported by the evidence. Again, the jury is presumed to have followed the instructions of the court. *Reid*, 164 S.W.3d at 346. There is nothing from which we can discern the prosecutor's specific intent when using these references other than in the context of the facts of the case. As concluded by the post-conviction court, the State's case was strong in both the guilt and sentencing phases, especially in light of Petitioner's testimony and the strength of the aggravating factors. Thus, while the prosecution's repeated use of "hunter," "hunted," and "prey" could potentially be seen as improper, after application of the *Buck* factors, we conclude that the argument did not undermine the fundamental fairness of the trial. Therefore, we conclude that trial counsel did not render deficient performance by failing to object to these terms. Additionally, Petitioner failed to established any prejudice resulting from these statements.

Petitioner also claims that appellate counsel failed to raise any preserved or unpreserved claims of prosecutorial misconduct on direct appeal, despite trial counsel raising seven separate instances of misconduct in the motion for new trial. Again, Petitioner failed to present any evidence during the post-conviction hearing regarding appellate counsel's strategy in handling the appeal. Appellate counsel did not testify, and Petitioner presented no evidence to overcome the presumption that appellate counsel made

a reasonable strategic decision as to which issues to raise on appeal. *See Carpenter*, 126 S.W.3d at 887-88. Additionally, because Petitioner has not established any prejudice resulting from these statements by the prosecutor, he has not established that he would have been entitled to plain error relief had the issue been raised on direct appeal. *See Jerry Phillips v. State*, No. E2016-01083-CCA-R3-PC, 2017 WL 3475529, at *8 (Tenn. Crim. App., at Knoxville, Aug. 14, 2017).

### D. *Prosecutor's Conflict of Interest*

Petitioner argues that Gen. Weirich, by virtue of her husband's and mother-in-law's connections with the victim and some of the witnesses in this case, operated under a conflict of interest and an appearance of impropriety that violated his constitutional rights. Petitioner argues that "[Gen.] Weirich's enforcement decisions in this case would appear, to a reasonable objective observer, to be motivated at least in part by personal interest arising from a familial fiduciary relationship with the victim and amity with his adopted family." Citing the alleged *Batson* violations and improper argument discussed previously, Petitioner argues that his trial was "tainted" by Gen. Weirich's "personalized zeal to execute" Petitioner. Petitioner asserts that because the prosecutor is a "minister of justice," the need for an impartial prosecutor is comparable to the constitutional right to an impartial judge. Petitioner argues that the participation of a conflicted prosecutor is a structural constitutional error that compromises the integrity of the judicial process and requires that his conviction and sentence be reversed and remanded for a new trial.

The State responds that the post-conviction court properly determined that this issue was waived because Petitioner failed to raise it at trial or on direct appeal. However, as Petitioner correctly points out, the post-conviction court did not actually make any findings of fact or conclusions of law with regard to this specific issue.[20] The confusion seems to arise from the fact that Claim 64 in the Amended Petition refers to both the prosecution's abuse of discretion in seeking the death penalty and conflict of interest. Most of the argument presented in Claim 64 is directed to the abuse of discretion "resulting from a conflict of interest between the prosecution's duties as an advocate and the duties as a minister of justice." However, the last sentence of that section states, "The prosecution labored under a conflict due to professional and personal ties to the Catholic Community, including witnesses and the deceased." The personal conflict of interest issue was clearly

---

[20] Although Petitioner asserts that the issue could not have been raised at trial due to Gen. Weirich's failure to disclose the existence of the relationship, he does not cite or argue Tennessee Code Annotated section 40-30-106(g)(2), which provides an exception to the waiver rule if "[t]he failure to present the ground was the result of state action in violation of the federal or state constitution." Accordingly, we make no findings with regard to the applicability of that statutory exception. We also note that Petitioner does not argue trial or appellate counsel's failure to raise the disqualification issue as a ground for ineffective assistance of counsel. *See Klein Adlei Rawlins v. State*, No. M2010-02105-CCA-R3-PC, 2012 WL 4470650, at *12 (Tenn. Crim. App., at Nashville, Sept. 27, 2012).

litigated by the parties throughout the post-conviction proceedings, including the issue of whether Gen. Weirich's mother-in-law would be subpoenaed from out of state, and the post-conviction court summarized the relevant testimony in its final order. However, the section of the post-conviction court's order addressing Claim 64 only addresses the issue regarding the prosecution's abuse of discretion in seeking the death penalty.

A post-conviction court is required to set forth in its written order "all grounds presented" and "state the findings of fact and conclusions of law with regard to each ground." T.C.A. § 40-30-111(b). While this provision has been construed as mandatory, a post-conviction court's failure to fully comply does not necessitate reversal since the primary intent of the requirement is to facilitate appellate review. *See State v. Swanson*, 680 S.W.2d 487, 489 (Tenn. Crim. App. 1984); *see also John Brent v. State*, No. W2018-01968-CCA-R3-PC, 2020 WL 1972332, at *6 (Tenn. Crim. App., at Jackson, Apr. 24, 2020). Given the testimony presented at the evidentiary hearing and the post-conviction court's general denial of the petition, the record before this court is sufficient for meaningful appellate review of this issue. Because the post-conviction court did not specifically find that this issue was waived by Petitioner's failure to raise it at trial or on direct appeal, we shall proceed to consider it on the merits.

Generally speaking, "a prosecutor in a criminal case could be disqualified where there was an actual conflict of interest that prevented the prosecutor from exercising independent judgment free of 'compromising interests and loyalties.'" *State v. Davis*, 141 S.W.3d 600, 613 (Tenn. 2004) (quoting *State v. Culbreath*, 30 S.W.3d 309, 312 (Tenn. 2000)). "An actual conflict of interest is usually defined in the context of one attorney representing two or more parties with divergent interests." *State v. Tate*, 925 S.W.2d 548, 552 (Tenn. Crim. App. 1995). "Even if there was no actual conflict of interest, disqualification could also be based on an appearance of impropriety." *Davis*, 141 S.W.3d at 613 (citing *Culbreath*, 30 S.W.3d at 313). An appearance of impropriety exists when "an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients." *Clinard v. Blackwood*, 46 S.W.3d 177, 187 (Tenn. 2001) (citation omitted). The Tennessee Supreme Court has emphasized that prosecutors, in particular, have an obligation to avoid even the appearance of impropriety because "an appearance of impropriety on the part of a government attorney will inevitably harm not only the individual attorney, but also the entire system of government that allows such improprieties to take place." *Culbreath*, 30 S.W.3d at 316 (citation omitted).

Regardless of any ethical concerns justifying disqualification of a prosecutor, the question this court must answer in the post-conviction context is whether the involvement of an allegedly conflicted prosecutor violated Petitioner's constitutional rights such that his conviction and sentence are rendered void or voidable. *See* T.C.A. § 40-30-103. The Due Process Clause protects a defendant's right to a fair and impartial tribunal. *See Marshall*

*v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). However, the same degree of impartiality expected of judges does not apply to prosecutors. *Id.* at 248 ("Prosecutors need not be entirely 'neutral and detached.'") (citation omitted); *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987) (noting that "the standards of neutrality for prosecutors are not necessarily as stringent as those applicable to judicial or quasi-judicial officers"). Although "prosecutors are expected to be impartial in the sense that they must seek the truth and not merely obtain convictions," they are still advocates within an adversarial system who "are expected to prosecute criminal offenses with zeal and vigor within the bounds of the law and professional conduct." *Culbreath*, 30 S.W.3d at 314 (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)); *see also Marshall*, 446 U.S. at 248 ("In an adversary system, [prosecutors] are necessarily permitted to be zealous in their enforcement of the law."). However, a defendant's right to due process may be implicated "where enforcement decisions are motivated by personal interest, financial or otherwise," on the part of the prosecutor.[21] *State v. Eldridge*, 951 S.W.2d 775, 782 (Tenn. Crim. App. 1997) (citing *Marshall*, 446 U.S. at 249-250).

Courts of this state have found due process violations when a private prosecutor was compensated by a special interest group and acted with very little oversight from the District Attorney, *Culbreath*, 30 S.W.3d at 318, and when a privately retained prosecutor also represented the victim in a civil suit arising from the same incident as the criminal prosecution, *Eldridge*, 951 S.W.2d at 782.[22] Unlike the special prosecutors in *Culbreath* and *Eldridge*, Gen. Weirich was a public prosecutor employed full-time by the District Attorney's Office, and she did not have a competing duty of loyalty to the victim as a client or a financial interest in the outcome of this case. *See State v. Johnson*, 538 S.W.3d 32, 55 (Tenn. Crim. App. 2017) ("The prosecutor is not an advocate for the victim of a crime or the witnesses for the State but is instead the representative of the sovereign state of Tennessee[.]"). To the extent that her husband's representation of the victim with regard to the victim's will and estate created a conflict of interest that could be imputed to Gen. Weirich, we do not believe that this conflict rose to the level of a due process violation given that the outcome of the criminal prosecution was completely irrelevant to the outcome of the probate case, which had concluded months before Gen. Weirich became involved in the trial of this case. *Cf. State v. Grover L. Parks*, No. E2010-02557-CCA-R3-CD, 2012 WL 525500, at *6 (Tenn. Crim. App., at Knoxville, Feb. 17, 2012) (finding no

---

[21] Other constitutional rights may be implicated when a defendant's former attorney is employed by a district attorney's office, "including his privilege against self-incrimination, his right to the effective assistance of counsel, and his right to a fair and impartial trial and due process of law." *State v. Coulter*, 67 S.W.3d 3, 32 (Tenn. Crim. App. 2001) (citation omitted). However, such a situation is not applicable to the facts of this case.

[22] We note that Tennessee maintains the common law practice of allowing a victim or the victim's family to retain an attorney to assist in the prosecution of a criminal offense, *see* T.C.A. § 8-7-401, and that the statute has been held to be facially constitutional. *See State v. Bennett*, 798 S.W.2d 783, 786 (Tenn. Crim. App. 1990).

conflict of interest or due process violation when "[t]he special prosecutor received the fixed fee from [the victim] prior to the commencement of these criminal proceedings against the [d]efendant, and the fee was not tied to the outcome of the criminal case").

This case does not involve a conflict of interest in the traditional sense of competing loyalties to current or former clients.  Instead, Petitioner complains that Gen. Weirich had a personal interest in the outcome of this case beyond her professional interest as a representative of the State of Tennessee.  As characterized by the Second Circuit Court of Appeals, "the claim is not that the prosecutor had an interest in opposition to [her] proper one in securing an indictment and a conviction; it is rather that [s]he had an additional and impermissible reason in forwarding the prosecution."  *Wright v. United States*, 732 F.2d 1048, 1056 n.7 (2d Cir. 1984).  It would appear that this is an issue of first impression in Tennessee.  From what this court can gather, most jurisdictions that have addressed the issue of prosecutorial disqualification due to a personal relationship with the victim have done so based upon either general ethical concerns or a local statutory rule rather than constitutional due process principles.  *See* Christopher Vaeth, Annotation, *Disqualification or Recusal of Prosecuting Attorney Because of Relationship with Alleged Victim or Victim's Family*, 12 A.L.R.5th 909 (1993).  From those cases that do address the constitutional implications of a prosecutor's personal conflict of interest, it would appear that the burden is on Petitioner to show not merely the appearance of impropriety created by the existence of a relationship, but actual misconduct on the part of the prosecutor that rendered Petitioner's trial unfair.

For example, in *Newman v. Frey*, 873 F.2d 1092, 1093-94 (8th Cir. 1989), the Eighth Circuit Court of Appeals held that the defendant's claim regarding the prosecutor's personal conflict of interest would not warrant federal habeas corpus relief because the defendant did "not suggest the prosecutor's relationship with the murder victim led to any misconduct" and the state court had found that he was not deprived of a fair trial.  The factual allegations in *Newman* are strikingly similar to the case at bar.  On direct appeal of the defendant's conviction, the Missouri Supreme Court noted that the prosecutor's personal and professional relationship with the victim included serving as a pallbearer at the victim's funeral and representing the victim's wife in an estate matter.  *State v. Newman*, 605 S.W.2d 781, 787 (Mo. 1980).  Additionally, the defendant cited the prosecutor's "rather emotional" closing argument as evidence that he had not received a fair trial.  *Id.*  The Missouri Supreme Court concluded that the trial court did not abuse its discretion in denying the defendant's motion to disqualify the prosecutor because the defendant failed "to produce any action on the part of the prosecutor which was unfair or reflected excessive personal concern in the outcome of the case."  *Id.* at 787-88.

In *Wright*, 732 F.2d at 1055, the Second Circuit Court of Appeals examined a collateral attack on an indictment alleging that the prosecutor who presented the defendant's case to the grand jury was married to a political opponent of the defendant who

had actively sought investigation and prosecution of the defendant's alleged corruption. The court stated that the defendant was entitled to a "disinterested" prosecutor, which although "not altogether easy to define," did not include one who "has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged." *Id*. at 1056. However, the court noted that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id*. at 1056 (quoting *United States v. Addonizio*, 442 U.S. 178, 184 (1979)). The court found that the competing interest on the part of the prosecutor's wife "was not a pecuniary interest in utilizing the criminal process to further her position in civil litigation but a public one in the condemnation of a man whom she thought, whether for good reasons or for bad, to have violated the public trust." *Id.* at 1058 (comparing the case to the "manifest impropriety" in *Ganger v. Peyton*, 379 F.2d 709 (4th Cir. 1967), where a prosecutor simultaneously represented the defendant's wife in a divorce proceeding and offered to dismiss an assault charge in exchange for a favorable property settlement). The court concluded that in the absence of any evidence of selective prosecution or specific misconduct, the prosecutor's participation in the defendant's case, though "ill advised," did not deprive the defendant of due process of law. *Id*.

In *People v. Vasquez*, 137 P.3d 199, 203 (Cal. 2006), the Supreme Court of California held that recusal of the District Attorney's office was warranted under a state statute when the parents of one of the defendants were long-time employees of that office and the prosecutor on the case admitted that concern about the appearance of that relationship influenced her discretionary decisions, even though she denied knowing the parents personally. However, the court concluded that "the error was not of constitutional dimension." *Id*. at 206. After noting that "a number of courts have declined to find a due process violation where the prosecutor is alleged merely to have a personal interest that might add to his or her zeal," *id*. at 208 (discussing *Wright*, 732 F.2d at 1055-58), the *Vasquez* court eloquently explained its reasoning as follows:

> That personal influences on a prosecutor are not always regarded as creating so substantial a conflict as to deprive the defendant of fundamental fairness is not surprising. District attorneys, as people, inevitably hold individual personal values and allegiances and feel varying emotions relating to their work. As public officeholders, they may also have political ambitions or apprehensions. But that a public prosecutor might feel unusually strongly about a particular prosecution or, inversely, might hesitate to commit to a prosecution for personal or political reasons does not inevitably indicate an actual conflict of interest, much less a constitutional bar to prosecution. . . .

Even as regards judicial disqualification, the United States Supreme Court has distinguished between "matters of kinship [and] personal bias," which "seem generally to be matters merely of legislative discretion," and a judge's "direct, personal, substantial pecuniary interest in reaching a conclusion against" a defendant, which deprives the defendant of due process. . . .

The Supreme Court's postulate that pecuniary conflicts of interest on a judge's or prosecutor's part pose a constitutionally more significant threat to a fair trial than do personal conflicts of interest may be somewhat counterintuitive, for common experience tells us that personal influences are often the strongest. But according "matters of kinship [and] personal bias" dispositive constitutional importance in this context would import into constitutional law a set of difficult line-drawing problems. As neither judges nor prosecutors can completely avoid personal influences on their decisions, to constitutionalize the myriad distinctions and judgments involved in identifying those personal connections that require a judge's or prosecutor's recusal might be unwise, if not impossible. The high court's approach to judicial conflicts generally leaves that line-drawing process to state disqualification and disciplinary law, with "only the most extreme of cases" being recognized as constitutional violations.

*Id.* at 209-10 (citing *Tumey v. Ohio*, 273 U.S. 510, 523 (1927)) (other internal citations omitted). The court concluded that the prosecutor's conflict of interest in that case did not rise to the level of a due process violation because the prosecutor did not have "a direct, substantial interest in the outcome or conduct of the case separate from [her] proper interest in seeing justice done" and because the defendants did not establish "any specific prosecutorial actions taken as a result of the conflict that deprived them of a fundamentally fair proceeding." *Id*. at 210.

Applying the rationale of these cases to the present case, we hold that Petitioner has not established any personal conflict of interest on the part of Gen. Weirich that rises to the level of a due process violation. There is no evidence that the victim's church family had any kind of personal vendetta or "axe to grind" against Petitioner. *See Wright*, 732 F.2d at 1056. In fact, lead counsel testified that Mr. Leech told him they were "not out for blood," and the defense attempted to present evidence during the sentencing hearing that the Catholic Church is generally opposed to the imposition of the death penalty. Additionally, many of the major enforcement decisions, such as whether to seek the death penalty and whether to offer a plea bargain, were made prior to Gen. Weirich's involvement in Petitioner's case. As discussed more fully above, Petitioner has not established that Gen. Weirich committed any prosecutorial misconduct in either her peremptory challenges or her closing arguments sufficient to render his trial fundamentally unfair. In short,

Petitioner has not shown that Gen. Weirich had "a direct, substantial interest in the outcome or conduct of the case separate from [her] proper interest in seeing justice done." *Vasquez*, 137 P.3d at 210.  Even if this court were to agree that Gen. Weirich's participation in Petitioner's trial was "ill advised" given her family's connections to the victim, Petitioner has not established that he was deprived of a fair trial or his right to due process.  *Wright*, 732 F.2d at 1058.  Accordingly, Petitioner is not entitled to post-conviction relief on this claim.

## V.  Petitioner's Additional Claims of Ineffective Assistance of Counsel

### *A.  Claims Related to Trial Counsel's Handling of Voir Dire*

Petitioner argues that trial counsel rendered ineffective assistance during jury selection.  "The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial."  *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Hugueley*, 185 S.W.3d 356, app. 390 (Tenn. 2006)).  "By posing appropriate questions to prospective jurors, a defense lawyer is able to exercise challenges in a manner that ensures the jury passes constitutional muster."  *William Glenn Rogers v. State*, No. M2010-01987-CCA-R3-PD, 2012 WL 3776675, at *36 (Tenn. Crim. App. , at Nashville, Aug. 30, 2012) (citing *United States v. Blount*, 479 F.2d 650, 651 (6th Cir. 1973)).  However, "there is no requirement that counsel ask any specific questions of potential jurors during the voir dire process[.]"  *Smith*, 357 S.W.3d at 347.  As this court has previously recognized, trial counsel's "actions during voir dire are considered to be matters of trial strategy," which is generally entitled to deference "unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness."  *William Glenn Rogers*, 2012 WL 3776675, at *36 (quoting *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001)).  Even if a petitioner were to establish that counsel's performance during voir dire was objectively unreasonable, he would not be entitled to post-conviction relief unless he establishes that the resulting jury was not impartial.  *Smith*, 357 S.W.3d at 348.

As an initial matter, we agree with the post-conviction court's assessment that Petitioner's "ability to show prejudice is limited" because he failed to present the testimony of any members of the jury pool or any other evidence that the jury that ultimately rendered a verdict in this case was not impartial.  Petitioner presented no proof that any of the jurors were actually biased, nor alleged any of the limited circumstances in which bias may be presumed.  *See id*. (holding that the court had "never presumed bias absent either an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias, and we decline to do so now").  This failure to establish prejudice alone would be a sufficient basis on which to deny this claim for relief.  *See Henley*, 960 S.W.2d at 580.

### 1.  Failing to Question Jurors about Racial Bias

Petitioner claims that trial counsel were deficient for failing to "question[] jurors regarding their attitudes on race" given that he was a black man accused of killing a white victim. The only proof Petitioner submitted in support of this claim was lead counsel's outline of potential voir dire topics that included a section on racial prejudice, but Petitioner failed to ask why lead counsel did not pursue this line of inquiry. Thus, Petitioner failed to overcome the presumption that counsel made a reasonable strategic decision. Moreover, Petitioner failed to present any proof to support his generalized assertions of potential racial bias in the jury pool or to overcome the post-conviction court's finding that "race had nothing to do with the facts of this case." Additionally, the post-conviction court noted that six of the twelve jurors in this case were African American, consistent with the demographic composition of Shelby County. Finally, Petitioner failed to even allege how asking such questions would have affected the outcome of his proceedings so as to establish prejudice.

## 2. Failing to Request Individual Voir Dire

Petitioner claims that trial counsel were deficient for failing to request individual voir dire. However, Petitioner has not established that failing to file a motion requesting individual voir dire was objectively unreasonable under prevailing professional norms. "The prevailing practice in this state is to examine the jurors collectively rather than individually" unless "there is a significant possibility that a prospective juror has been exposed to potentially prejudicial material." *State v. Oody*, 823 S.W.2d 554, 563 (Tenn. Crim. App. 1991). "Indeed, even in a capital case, there is no requirement that death qualification of a capital jury must be conducted by individual, sequestered voir dire." *State v. Austin*, 87 S.W.3d 447, 471 (Tenn. 2002) (appendix) (citing *State v. Stephenson*, 878 S.W.2d 530, 540 (Tenn. 1994)). Other than citing an article suggesting that jurors may be more likely to admit bias in an individual setting and asserting that case law supports conducting individual voir dire "in sensitive cases," Petitioner has not asserted any reason why individual voir dire was necessary in this case[23] or suggested how the outcome of this case would have been different had individual voir dire been requested by counsel.

## 3. Failing to Utilize Jury Questionnaires and a Jury Selection Expert

Petitioner argues that trial counsel were deficient for failing to utilize jury questionnaires and failing to consult a jury selection expert. This court has held that jury questionnaires are "simply preliminary tools to foster appropriate voir dire . . . and [a]re not designed as mechanisms to eliminate potential jurors solely on the basis of answers

---

[23] As discussed further below, Petitioner cites the lack of individual voir dire as a reason why a mistrial was necessary when certain jurors stated that they would not credit Dr. Smith's testimony. However, Petitioner did not argue or establish that any publicity surrounding Dr. Smith's legal issues was a reason that individual voir dire should have been granted in this case.

- 130 -

given without the benefit of legal instruction from a trial judge." *William Glenn Rogers*, 2012 WL 3776675, at *37. Moreover, "the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993). The post-conviction court noted that although it had used questionnaires many times in the past, it did not generally allow the practice unless there was a showing of a "specific need," such as a case involving "a particularly sensitive issue" or "negative publicity[.]" Additionally, a defendant must show a "particularized need" for the appointment of an expert, which requires more than a "conclusory statement that a jury selection expert is necessary for an effective defense in every capital case." *State v. Dellinger*, 79 S.W.3d 458, 469 (Tenn. 2002). Petitioner failed to present any evidence of a specific need for either the use of jury questionnaires or for the appointment of a jury selection consultant. Moreover, Petitioner failed to "demonstrate how a jury questionnaire or an expert in the field of jury selection might have made a difference," so this court is "unable to find prejudice." *Richard Lloyd Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *20 (Tenn. Crim. App., at Jackson, Oct. 20, 2017) (quoting *Prentiss Phillips v. State*, No. W2004-01626-CCA-R3-PC, 2005 WL 1123612, at *6 (Tenn. Crim. App., at Jackson, May 12, 2005)).

### 4. Failing to Life Qualify and Rehabilitate Jurors

Petitioner makes a conclusory assertion that trial counsel were ineffective because they failed to "life qualify" jurors and to rehabilitate potential jurors who expressed reservations about imposing the death penalty. As the Sixth Circuit has recognized, "*Morgan* [*v. Illinois*, 504 U.S. 719 (1992)] does not mandate that life-qualifying questions be asked of potential jurors in every case" and suggests that the decision to ask such questions is "a matter of strategy"; thus, "failure to life-qualify a jury is not per se ineffective assistance of counsel." *Stanford v. Parker*, 266 F.3d 442, 454 (6th Cir. 2001); *see also Tyrone Chalmers v. State*, No. W2006-00424-CCA-R3-PD, 2008 WL 2521224, at *27 (Tenn. Crim. App., at Jackson, June 25, 2008) (citing *Hartman v. State*, 896 S.W.2d 94, 105 (Tenn. 1995)). In fact, trial counsel did ask questions regarding the potential jurors' ability to consider a life sentence and to weigh mitigating evidence. Petitioner failed to present any proof at the post-conviction hearing to overcome the presumption that trial counsel's failure to ask additional questions was a strategic decision or to show that such failure resulted in prejudice. Additionally, Petitioner failed to identify any potential jurors who were excused for cause that could or should have been rehabilitated by trial counsel.

### 5. Failing to Object

Next, Petitioner argues that trial counsel were ineffective for failing to object when the prosecutor extracted pledges from potential jurors that they would impose the death penalty; asked questions that presumed a conviction and sentencing phase; referred to the imposition of the death penalty as "doing the right thing"; and improperly defined and

denigrated mitigating evidence. Like the previously discussed issues, this claim suffers for a lack of proof since Petitioner failed to ask trial counsel any questions regarding this issue. Moreover, Petitioner has not established that any proposed objections would have been sustained. While an attorney may not extract a pledge by asking a prospective juror how they will vote, *State v. King*, 718 S.W.2d 241, 246 (Tenn. 1986), this court has held that it is not improper for the State to ask a prospective juror if they can follow the law and sign their name to a death verdict if the State has met its burden. *Detrick Cole*, 2011 WL 1090152, at *13. Additionally, while the post-conviction court agreed that the prosecutor's characterization of mitigation evidence as "something that makes it not so bad" was an inaccurate statement of the law, the court noted that it was used only once during voir dire and found, as discussed above in the context of the prosecutor's closing argument, that it did not prejudice Petitioner because the proper definition was given in the trial court's instructions. *See Reid*, 164 S.W.3d at 346 ("The jury is presumed to follow instructions."). Petitioner also complains that the prosecutor improperly denigrated the role of mitigation by telling the jurors "we don't judge people, we don't act as jurors, we don't assess your credibility based upon . . . how sorry we might feel for you because of what you might have been through[.]" However, as found by the post-conviction court, this statement was taken out of context and is actually part of a larger statement where the prosecutor was telling the jurors that "[t]here is no room for sympathy nor prejudice in this courtroom," which is consistent with the law. *See Smith*, 893 S.W.2d at 921.

Petitioner briefly asserts that appellate counsel was ineffective for failing to raise this issue on appeal for review under the plain error doctrine. However, appellate counsel did not testify, and Petitioner presented no evidence to overcome the presumption that appellate counsel made a reasonable strategic decision as to which issues to raise on appeal. *See Carpenter*, 126 S.W.3d at 887-88. Additionally, because Petitioner has not established any prejudice resulting from these statements by the prosecutor, he has not established that he would have been entitled to plain error relief had the issue been raised on direct appeal. *See Jerry Phillips*, 2017 WL 3475529, at *8.

### 6. Failing to Move for a Mistrial

Petitioner argues that trial counsel were ineffective for "failing to move for a mistrial when the venire was tainted regarding disgraced pathologist O.C. Smith," who had been retained to testify for the defense.[24] Dr. Smith was the former Medical Examiner for Shelby County who was removed from the position after he was charged with possession of explosives and lying to investigators, a case that ultimately ended in a mistrial. During

---

[24] Petitioner makes a conclusory assertion that the decision to retain "a publicly discredited expert" was "objectively unreasonable." Because Petitioner cites no authority to support this assertion, the issue is waived. Tenn. Ct. Crim. R. 10(b). Moreover, trial counsel's selection of an expert witness is a strategic decision that is generally granted deference under the *Strickland* standard. *See Kendrick v. State*, 454 S.W.3d 450, 475 (Tenn. 2015).

voir dire, trial counsel asked whether any of the potential jurors recognized Dr. Smith's name. After some affirmative responses, trial counsel asked if those jurors would "give his testimony as much credence as you would give anybody else's testimony" or if they would "automatically disbelieve anything he said[.]" One potential juror indicated that she "would try to listen and be impartial" but that she did not know if she could "[j]ust from what I've seen on the news[.]" Later, another potential juror indicated that he knew about Dr. Smith's "situation and what happened, so it might be a little difficult" to assess his credibility. Neither of these potential jurors volunteered any details of what they knew about Dr. Smith, and neither ultimately served on Petitioner's jury.

A mistrial is only appropriate when there is a manifest necessity for such action because an event has occurred that precludes an impartial verdict and a miscarriage of justice would result if the trial were to continue. *See State v. Jones*, 568 S.W.3d 101, 126 (Tenn. 2019) (citations omitted). "Unless there is evidence that the jury which heard the case was prejudiced or biased due to comments made by a prospective juror during voir dire, such comments are not grounds for a mistrial." *State v. Ricky Thompson*, No. E2015-02464-CCA-R3-CD, 2017 WL 1536479 (Tenn. Crim. App., at Knoxville, Apr. 27, 2017) (citing *State v. Brown*, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990)). Petitioner presented no evidence that the jury that heard his case was biased or in any way influenced by these comments about Dr. Smith's credibility. Further, even if the jury was predisposed to not accredit Dr. Smith's testimony, Petitioner has not suggested how he was prejudiced given that he was ultimately acquitted of premeditated first degree murder. Thus, Petitioner has not established either deficient performance or prejudice.

### 7. Failing to Use All Peremptory Challenges

Petitioner argues that trial counsel were ineffective for failing to preserve for appeal any potential jury claims by exercising all of their peremptory challenges. "[O]nly where a defendant exhausts all of his peremptory challenges and is therefore forced to accept an incompetent juror can a complaint about the jury have merit." *Steven Ray Thacker v. State*, No. W2010-01637-CCA-R3-PD, 2012 WL 1020227, at *53 (Tenn. Crim. App., at Jackson, Mar. 23, 2012) (citing *State v. Coury*, 697 S.W.2d 373, 379 (Tenn. Crim. App. 1985)). However, trial counsel is not required to use all of the allocated peremptory challenges but instead must make "a strategic decision . . . in order to ensure the best possible jury for his client." *Michael D. Green v. State*, No. E2012-01875-CCA-R3-PC, 2013 WL 6529310, at *8 (Tenn. Crim. App., at Knoxville, Dec. 11, 2013). Petitioner did not present any evidence to overcome the presumption that trial counsel made a reasonable strategic decision not to exercise any additional challenges. Moreover, as found by the post-conviction court, none of the jury selection issues identified by Petitioner would have entitled him to relief on appeal even if they had been properly preserved. Thus, Petitioner has not established that trial counsel were deficient or that he suffered any prejudice. Petitioner is not entitled to relief on any of these claims.

- 133 -

### B. Claims Related to Petitioner's Anti-Psychotic Medication

Petitioner argues that trial counsel were ineffective for failing to investigate the effects of the prescribed anti-psychotic medication Petitioner was taking before and during trial. Although Petitioner was determined to be competent to stand trial when he was evaluated by MTMHI in 2006, Petitioner asserts that he was rendered incompetent due to the sedative-like effects of his anti-psychotic medication by the time of the February 2008 trial, which affected his ability to consider a plea offer, assist in his defense, and testify coherently. In order to be competent to stand trial, "a defendant must possess the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Wilcoxson v. State*, 22 S.W.3d 289, 305 (Tenn. Crim. App. 1999). In order to determine whether trial counsel was deficient for failing to challenge a defendant's competency, "we must determine whether [trial] counsel had reasonable cause to raise the issue[.]" *Id*. at 306.

Despite the fact that Petitioner presented several witnesses who testified that Petitioner seemed "doped up" and "out of it" in the jail prior to trial, the post-conviction court accredited the testimony of both lead counsel and co-counsel that Petitioner did not seem noticeably impaired and seemed to understand the nature of the proceedings. This court must "defer to the credibility determinations of the [post-conviction] court, which had the opportunity to hear the testimony of" the witnesses. *Arroyo v. State*, 434 S.W.3d 555, 561 (Tenn. 2014). Additionally, trial counsel had access to the report from MTMHI that found Petitioner to be competent to stand trial despite his cognitive limitations and other psychiatric issues, for which he was prescribed medication at the time of the evaluation. As this court has previously held, counsel "is not required to question a diagnosis put forth by a professional expert in the field." *Christa Gail Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *54 (Tenn. Crim. App., at Knoxville, Apr. 25, 2011). The post-conviction court also noted its own observations during trial that Petitioner was "well-behaved" and "often consulted with his attorneys." Although trial counsel both testified that Petitioner's testimony was not helpful, the post-conviction court found that Petitioner presented no evidence that his testimony was incoherent. Petitioner argues that trial counsel should have questioned his competency because many of his decisions were "irrational," including his rejection of an offer to plead to a life sentence and his "unrealistic" belief that at most he should have been charged with manslaughter. However, the post-conviction court accredited trial counsel's testimony that Petitioner understood, but was unwilling to accept, the fact that felony murder was first degree murder and that Petitioner was adamant that he was unwilling to plead guilty. Petitioner did not

produce any proof otherwise.[25]  Petitioner has not established that trial counsel were deficient for failing to request an additional competency evaluation of Petitioner.

Petitioner also argues that trial counsel were ineffective for failing to address potential jurors' attitudes regarding anti-psychotic medication during voir dire, failing to present lay and expert testimony regarding the effects of the medication, and failing to request a jury instruction regarding the effects of the medication as a mitigating circumstance.  Petitioner contends that trial counsel "should have contextualized [Petitioner's] testimony by informing the jury he was under the influence of drugs that affected his ability to express himself and display appropriate emotion."  However, as found by the post-conviction court, trial counsel made a strategic decision not to inform the jury that Petitioner was taking anti-psychotic medication because of their concern that such proof might cause the jurors to fear Petitioner.  Petitioner asserts on appeal that this was simply a "post-hoc rationalization" and that "there was not a sufficient basis to make a strategic decision" given trial counsel's lack of investigation into the precise dosages and resulting effects of the medication.  However, even if Petitioner's assertion is true, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91.  As discussed above, both trial counsel testified that Petitioner was not noticeably impaired such that they should have been prompted to investigate further, and Petitioner has produced no evidence that further investigation would have led counsel to make a different decision.  Moreover, as found by the post-conviction court, Petitioner presented no evidence that trial counsel's alleged deficiency in failing to inform the jury that he was taking anti-psychotic medication affected the outcome of the proceedings.  Because the Petitioner failed to establish either deficient performance or prejudice, he is not entitled to relief on this claim.

### C.  Claims Related to the Conduct of Trial

#### 1.  Exclusion of Petitioner's Mother During Guilt Phase

Petitioner argues that trial counsel were ineffective for incorrectly advising Petitioner that his mother could not be present during the guilt phase of trial because they intended to present her testimony during the sentencing phase.  Tennessee Rule of Evidence 615 states that when a party invokes the rule, the trial court shall exclude the witnesses from the trial or hearing.  In *State v. Jordan*, the Tennessee Supreme Court held, as an issue of first impression, that a trial court should not "automatically or mechanically

---

[25] We note that Petitioner did not testify at the post-conviction hearing, even though Tennessee Code Annotated section 40-30-110(a) requires a post-conviction petitioner to "give testimony at the evidentiary hearing if the petition raises substantial questions of fact as to events in which petitioner participated." *See Keough v. State*, 356 S.W.3d 366, 370 (Tenn. 2011) ("The Act contemplates that the petitioner's testimony will be necessary to satisfy th[e] burden of proof.").

rely on Tennessee Rule of Evidence 615 to exclude mitigation proof from a capital sentencing trial on the basis that the witness was present during the guilt/innocence phase of the trial." 325 S.W.3d 1, 48 (Tenn. 2010). The State asserts that because *Jordan* had not been decided at the time of Petitioner's trial, trial counsel's advice that Petitioner's mother could not be in the courtroom during the guilt phase without risking her testimony being excluded from the sentencing phase was reasonable. In addition to relying on *Jordan*, Petitioner also relies on the actual practice of the trial judge in this case. During the sentencing phase, when overruling trial counsel's objection to Marie Leech's testimony on the basis that she had been present in the courtroom during the guilt phase, the trial judge stated, "I have never prohibited a Defense mitigation witness like a mother or someone else from being in the guilt phase of the trial, either." In the order denying post-conviction relief, the post-conviction court found that "had trial counsel moved to allow Vivian Pruitt to remain in the courtroom during the guilt/innocence phase, the Court would have permitted her to stay[.]"

Even if we were to agree that trial counsel were deficient in their misunderstanding of the application of Rule 615 to mitigation witnesses, Petitioner has failed to establish that he was prejudiced by his mother's absence during the guilt phase of trial. The post-conviction court found that "[a]lthough Petitioner may have gained an emotional benefit from having his mother present throughout the entire trial (even though it was Petitioner's theory that she was a large part of the problem)," Petitioner failed to provide any legal authority supporting his assertion that he was denied the right to a fair trial because of her absence. In his appellate brief, Petitioner contends that the post-conviction court's finding "is a fundamental misunderstanding of the closeness and emotional reliance a severely abused and neglected person can receive from a parent[.]" Petitioner asserts that "the presence of his mother might have provided [Petitioner] emotional support" and served as "visual evidence that someone cared about him." However, Petitioner failed to produce any evidence at the post-conviction hearing to support these assertions or any evidence that the outcome of the proceedings would have been different if his mother had been present in the courtroom during the guilt phase. Accordingly, Petitioner is not entitled to relief on this issue.

### 2. Failure to Request that Petitioner be Seated at Counsel Table

Petitioner argues that trial counsel were ineffective for failing to request that Petitioner be allowed to sit at counsel table during the trial. Rule 8.05 of the Rules of Practice and Procedure for Shelby County Criminal Court provides that "[w]here space is available and with permission of the Court, the defendant may sit at counsel table with his or her attorney." In *State v. Rice*, the Tennessee Supreme Court rejected a constitutional challenge to this local rule, which "leaves to the discretion of the trial judge whether the defendant may sit at the table with counsel." 184 S.W.3d 646, 674 (Tenn. 2006). The *Rice* court found that "[r]equiring the defendant to sit directly behind his attorneys is not the

same as making the defendant wear prison attire or shackles in the courtroom, which would suggest to the jury that he is a danger," nor did it "impair the defendant's presumption of innocence . . . [or] impact the defendant's ability to communicate with counsel." *Id.* at 675. Petitioner relies on the supreme court's more recent opinion in *State v. Smith*, which emphasized the "statement in *Rice* that 'it is the better practice to allow a defendant to sit at counsel table.'" *State v. Smith*, 492 S.W.3d 224, 243 (Tenn. 2016) (quoting *Rice*, 184 S.W.3d at 675). However, even if a trial court abuses its discretion in denying a defendant's request to sit at counsel table, the defendant has the burden of showing that he was prejudiced by the non-constitutional error. *Id.* at 244; *see also Rice*, 184 S.W.3d at 675 (holding that "a showing of prejudice is necessary in order to obtain relief").

Given that the seating arrangement is discretionary with the trial court and may be dependent upon the space available in the courtroom, Petitioner has produced no evidence that trial counsel's failure to make the request that he be allowed to sit at counsel table was unreasonable under prevailing professional norms. Moreover, even if we were to agree that trial counsel were deficient, Petitioner has failed to produce any evidence that he was prejudiced. As found by the post-conviction court, Petitioner presented no proof that the seating arrangement inhibited his ability to communicate with counsel. Petitioner's conclusory assertion that the practice of having a defendant sit in the row behind trial counsel "visually reinforces racial stereotypes" is speculative at best. *See State v. Antonio Benson*, No. W2017-01119-CCA-R3-CD, 2018 WL 5810004, at *12 (Tenn. Crim. App., at Jackson, Nov. 5, 2018), *rev'd on other grounds*, 600 S.W.3d 896 (Tenn. 2020). Because Petitioner failed to establish either deficient performance or prejudice, he is not entitled to relief on this issue.

### 3. Cross-Examination of the State's Witnesses

Petitioner argues that trial counsel were deficient in their cross-examination of two of the State's witnesses, Dr. Chancellor and Taka Pruitt. As an initial matter, Petitioner failed to question trial counsel on this issue or offer any evidence to overcome the presumption that trial counsel made reasonable strategic decisions with regard to their cross-examination of the witnesses. This court has held that "cross-examination is a strategic and tactical decision of trial counsel, which is not to be measured by hindsight." *State v. Kerley*, 820 S.W.2d 753, 756 (Tenn. Crim. App. 1991). Further, Petitioner did not call either witness to testify as to what the substance of their trial testimony would have been had they been asked different questions. *See Johnson v. State*, 145 S.W.3d 97, 120 (Tenn. Crim. App. 2004) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).

With regard to the cross-examination of Dr. Chancellor, Petitioner argues that trial counsel "caused the introduction of prejudicial testimony supporting the State's allegation that [Petitioner] 'intentionally' beat the victim." On cross-examination, counsel asked Dr.

Chancellor whether she could tell if bruises on the victim's chest "were sustained by blows from a hand or produced by some instrument," and Dr. Chancellor responded that "the pattern is suggestive of knuckles of a hand but I can't tell you that for sure." Petitioner insists that this "was the first time such testimony came into evidence." However, during direct examination, Dr. Chancellor agreed that the victim's injuries were consistent with having been beaten, and trial counsel's objection to such testimony was overruled by the trial court.

Petitioner further complains that after this reference to the victim's injuries being caused by a hand, "[c]ounsel continued to evoke violent imagery and repeatedly asked the witness how these various bruises were caused, heightening inferences of brutality and invoking sympathy from jurors." However, the full context of counsel's questioning shows that he emphasized that Dr. Chancellor could not tell what caused the bruises and that they could have been caused by a fall onto a hard surface, which was consistent with the defense's theory. Dr. Chancellor responded that in her opinion, "these were intentional injuries" because the victim had "three separate skull fractures." Petitioner suggests that trial counsel should have "move[d] to strike such testimony as beyond the scope of the evidence or speculative," but he fails to cite any legal authority that such an objection would have been sustained. Petitioner argues that he was prejudiced because trial counsel's questions "appear[ed] to concede the intentional nature of Mr. Guidroz's injuries." However, Petitioner was clearly not prejudiced in that manner since the jury acquitted him of premeditated first degree murder. As found by the post-conviction court, "the defense did an effective job of creating a possibility in the mind of the jurors that Petitioner didn't intend the victim's death[.]" Petitioner has not established either deficient performance or resulting prejudice with regard to counsel's cross-examination of Dr. Chancellor.

With regard to the cross-examination of Taka Pruitt, Petitioner complains that trial counsel "needlessly and prejudicially referred to the incident as an 'attack.'" Petitioner incorrectly states that trial counsel "introduced use of this term into the testimony" when in fact the prosecutor had earlier referred to the victim "being attacked" during direct examination. Moreover, Petitioner has not shown that this was an incorrect or inappropriate characterization of what happened to the victim based on Taka Pruitt's description. Finally, Petitioner does not even suggest how he was prejudiced by trial counsel's use of this word during cross-examination.

Petitioner further argues that trial counsel failed to impeach Taka Pruitt's testimony that she saw blood on the ground by calling Officer LaSheka Mays to testify regarding her police report that indicated that there was no blood. However, Officer Mays did not testify at the post-conviction hearing and her report was not introduced as an exhibit. As the courts of this State have repeatedly made clear:

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing. "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner."

*Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting *Black*, 794 S.W.2d at 757); *see also Cauthern v. State*, 145 S.W.3d 571, 616 (Tenn. Crim. App. 2004). This court will not speculate as to what Officer Mays' testimony would have been or how Taka Pruitt would have responded if questioned on this issue. *See Thompson v. State*, 958 S.W.2d 156, 164 (Tenn. Crim. App. 1997). Moreover, Petitioner has not suggested how impeaching Taka Pruitt regarding the presence or absence of blood on the ground would have resulted in a different outcome at trial. Accordingly, Petitioner has failed to prove either deficient performance or prejudice.

### 4. Petitioner's Testimony

Petitioner argues that trial counsel were ineffective for allowing Petitioner to testify during the guilt phase and for failing to adequately prepare him to do so. Although Petitioner acknowledges that the decision whether to testify ultimately rests with the defendant rather than with counsel, *see Momon*, 18 S.W.3d at 161 (citing *Vermilye v. State*, 754 S.W.2d 82, 88 (Tenn. Crim. App. 1987)), he contends that counsel may be deemed ineffective for providing poor advice regarding the decision. However, both lead counsel and co-counsel testified that they repeatedly advised Petitioner to testify during the sentencing phase, not the guilt phase, and that they were surprised when Petitioner chose to do the opposite at trial. As this court has previously recognized, "counsel's performance cannot be deemed deficient simply because Petitioner did not follow counsel's advice against testifying." *Dennis Wade Suttles v. State*, No. E2008-02146-CCA-R3-PD, 2011 WL 1642640, at *25 (Tenn. Crim. App., at Knoxville, Apr. 29, 2011). Petitioner has not alleged how trial counsel should have better prepared him to testify, especially given the fact that they did not know that he would do so prior to trial. Although Petitioner contends that his decision to testify after being advised that his prior convictions would be admissible as impeachment evidence did not make "rational sense," he does not contend that he was not properly advised of his rights during the *Momon* hearing. Moreover, Petitioner did not testify at the post-conviction hearing to establish what his trial testimony would have been had he been better prepared. Even if Petitioner had not testified during the guilt phase, the evidence of his guilt of felony murder was overwhelming. Accordingly, Petitioner has not established either that trial counsel were deficient or that he was prejudiced.

### 5. Reference to the Victim's Lack of Family in Closing Argument

Petitioner argues that trial counsel rendered deficient performance by referring to the victim's lack of family during the guilt phase closing argument, which prejudiced Petitioner because "the State focused on this commentary in rebuttal closing at both the guilt/innocence and sentencing trials, to [Petitioner's] detriment." During closing argument of the guilt phase, while summarizing the testimony, lead counsel stated, "The first witness, Mr. Leech, testified Mr. Guidroz was a devout Catholic, and he principally went to St. Paul's Church, had no family here, plenty of friends." Later in his argument, lead counsel stated:

> What went on out there at [the victim's] car? Was he beaten and body-slammed or just pushed and his keys taken away from him? What really happened to Lawrence Guidroz in this case? *No family here. Did nobody care about Mr. Guidroz?*

(Emphasis added). The State responded directly to this statement multiple times during its rebuttal closing argument in both the guilt and sentencing phases. The prosecutor stated, "[lead counsel] told you all that nobody cared about Lawrence Guidroz. As a citizen of this community, I take offense to that. As a representative of the State of Tennessee, I take deeper offense to that."[26] The prosecutor further argued that Petitioner did not "get a half-off coupon . . . because you happened to kill a nice old man that never married and had kids." Later in her argument, the prosecutor stated, "You heard that from T.J. Leech, who was like a son to Mr. Guidroz, the same Mr. Guidroz that [lead counsel] wants you to think nobody cared about. You've seen them there all week, the rows full of people." Then, during rebuttal closing argument for the sentencing phase, the prosecutor responded to lead counsel's argument about closure by stating, "How ironic today -- this is from the same individual who said yesterday nobody cared about Mr. Guidroz. Now, all of a sudden, let's worry about Mr. Guidroz's loved ones."

As explained by the United States Supreme Court, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003); *see also Torrez Talley v. State*, No. W2009-02036-CCA-R3-PC, 2011 WL 1770485, at *4 (Tenn. Crim. App., at Jackson, May 9, 2011). Although lead counsel was asked if he recalled making the statement that "nobody care[d]" for the victim, he was not asked about his reasoning for making such a statement. However, when lead counsel's statement is read in its full context, it is clear that lead counsel was not trying to disparage the victim but

---

[26] This statement by the prosecutor, as well as the later statement, "I hope it offends you," drew objections from trial counsel and warnings from the trial court "to leave yourself out of this" and not argue about "personally what offends you." Trial counsel's objections to some of the other statements discussed in this section were overruled by the trial court. However, Petitioner did not include these statements by the prosecutor in his claim regarding improper prosecutorial argument addressed above.

was trying to emphasize the lack of investigation in this case. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *See Goad*, 938 S.W.2d at 369.

However, even if we were to agree with the post-conviction court that "making that statement may be said to be deficient performance" because it "opened the door to damaging rebuttal argument by the State," Petitioner has failed to establish prejudice. The brief statement by lead counsel, and even the responses by the State that drew several objections, cannot be said to have affected Petitioner's convictions given the strength of the State's case with regard to the elements of felony murder, including Petitioner's testimony admitting that he intended to steal the car. Further, the post-conviction court found that "the comment had no effect on the sentencing decision of the jury, due to the strength of the State's case and the rest of the proof and argument in the trial." The evidence presented during the post-conviction hearing does not preponderate against this finding, and Petitioner has not established that there is a reasonable probability that the outcome of his trial would have been different but for this statement by lead counsel. Accordingly, Petitioner is not entitled to post-conviction relief on this claim.

### D. Claims Related to Jury Instructions and the Verdict Form

Petitioner argues that trial counsel were ineffective for failing to challenge or request certain jury instructions and that appellate counsel was ineffective for failing to raise the issues on appeal. As an initial matter, the post-conviction court noted that its ability to review this issue was "limited" because Petitioner did not ask trial counsel any questions about their reasons for not objecting to the challenged instructions. In his brief, Petitioner asserts that he was not required to ask questions regarding counsel's strategy, relying upon this court's statement in *Marlon Duane Kiser v. State* that "there is no requirement that trial counsel's strategy be proven." No. E2016-01644-CCA-R3-PD, 2017 WL 6549893, at *14 (Tenn. Crim. App., at Knoxville, Dec. 21, 2017). However, as the *Kiser* court explained, while "[n]either party must prove strategy or tactics[,] . . . the burden of proof for an ineffective assistance of counsel claim remains on the [p]etitioner." *Id.* This includes overcoming the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at *13 (quoting *Strickland*, 466 U.S. at 688-89); *see also Burt v. Titlow*, 571 U.S. 12, 23 (2013) ("It should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.") (internal quotation omitted). Accordingly, the post-conviction court did not misstate the law by noting the limited proof presented at the evidentiary hearing regarding these claims. Moreover, regardless of any strategic rationale, neither trial nor appellate counsel will be deemed deficient for failing to raise an issue that is without merit. *See Carpenter*, 126 S.W.3d at 887; *Joe L. Utley v. State*, No. M1999-00560-CCA-MR3-PC, 2000 WL 374916,

at *3 (Tenn. Crim. App., at Nashville, Apr. 7, 2000) (holding that trial counsel was not deficient for failing to make a meritless objection to a jury instruction).

### 1 Anti-Sympathy Instruction

Petitioner argues that the so-called "anti-sympathy" instruction,[27] combined with the instruction that the jury could consider victim impact evidence during the sentencing phase, "effectively told [the jury that] they could consider sympathy for the victim's survivors but not for [Petitioner] . . . [and] precluded the jurors' consideration of mitigation." The Tennessee Supreme Court has consistently held that "[a] trial judge does not err in instructing a jury not to allow mere sympathy or prejudice to influence them in reaching their verdict." *Smith*, 893 S.W.2d at 921; *see also State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994) (noting that the court had "on numerous occasions upheld the 'no-sympathy' instruction against constitutional attack"). Petitioner notes that those cases were decided prior to the Tennessee Supreme Court's decision in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), which promulgated an instruction regarding the jury's consideration of victim impact evidence, and asserts that there is a "tension" between the two instructions. However, neither *Smith* nor *Bigbee* have been overruled with regard to this issue in the years since *Nesbit* and are still the controlling law. Accordingly, trial counsel were not deficient for failing to raise an objection to the "anti-sympathy" instruction.

### 2. Order of Instructions

Petitioner argues that trial counsel were ineffective in failing to object to the order of the instructions, which listed the charged offenses of first degree murder before the lesser-included offenses. However, the Tennessee Supreme Court has upheld the constitutionality of such "acquittal-first" instructions. *See State v. Davis*, 266 S.W.3d 896 (Tenn. 2008). Petitioner asserts that *Davis* was wrongly decided and that "acquittal-first" instructions are "inherently coercive." *See id.* at 912 (Wade, J., concurring in result only). Because this court is an intermediate appellate court, we are bound by the decisions of the Tennessee Supreme Court. *See Pendergrass*, 13 S.W.3d at 397. Petitioner has not shown a reasonable probability that *Davis* would have been overruled had the issue been raised in his direct appeal.

### 3. Unanimity Instruction and the Consequences of the Jury's Failure to Agree

Petitioner argues that trial counsel were ineffective for failing to object to the "confusing nature" of the unanimity instruction during the sentencing phase and for failing

---

[27] "The jury in no case should have any sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict. They should render their verdict with absolute fairness and impartiality as they think truth and justice dictate. Every fact and circumstance in the case you may consider in arriving at your verdict."

to request "an instruction concerning the consequences of the [jury's] failure to agree at sentencing" that would inform the jurors "that guilt/innocence trial verdicts would not be affected." Tennessee Code Annotated section 39-13-204(h) specifically prohibits the trial court from instructing the jury as to the effect of the jury's failure to agree on a punishment. Both this statute and the requirement that the jury unanimously agree on a sentence have been upheld by the Tennessee Supreme Court. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) (citing *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994). Trial counsel cannot be deemed deficient for failing to request an instruction that is prohibited by law.

### 4. Instructions on Mitigating Circumstances

Petitioner argues that trial counsel were ineffective for requesting instructions on mitigating circumstances that were not supported by the evidence presented during the sentencing phase, including that Petitioner had "significant deficits in his ad[a]ptive behavior," that he experienced "neglect and abandonment" during his childhood, and that he was "possibly [ ] prenatally exposed to drugs and alcohol." Petitioner argues that these instructions served to "highlight the absence of mitigation." The Tennessee Supreme Court has "suggested . . . that trial courts instruct [capital sentencing] juries only on those mitigating circumstances raised by the proof." *State v. Cazes*, 875 S.W.2d 253, 267 (Tenn. 1994). "In the absence of a showing of prejudice, however, any such error does not require reversal because the error generally benefits the defendant." *Id*. at 267-68. Petitioner asserts that *Cazes* was wrongly decided, but again we are bound by the decisions of the Tennessee Supreme Court. *Pendergrass*, 13 S.W.3d at 397. The post-conviction court found that all of the mitigating circumstances requested by counsel and charged to the jury were supported by circumstantial evidence. Even assuming that trial counsel's performance was deficient, Petitioner has failed to establish any prejudice resulting therefrom.

### 5. Moral Certainty

Petitioner argues that trial counsel were ineffective for failing to object to the reference to "moral certainty" in the reasonable doubt instruction.[28] Petitioner asserts that the phrase could have confused the jury into thinking that "personal religious beliefs could be used to augment any deficiencies of proof," thereby "lower[ing] the prosecution's burden of proof" in violation of *Cage v. Louisiana*, 498 U.S. 39 (1990). However, the Tennessee Supreme Court has consistently rejected such challenges to the reasonable doubt instruction. *See Carter v. State*, 958 S.W.2d 620, 626 (Tenn. 1997) (quoting *State v. Nichols*, 877 S.W.2d 722, 734 (Tenn. 1994)); *see also State v. Hall*, 976 S.W.2d 121, 159

---

[28] "Reasonable doubt is that doubt created by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof needed to constitute the offense."

(Tenn. 1998) (appendix) (citing *Victor v. Nebraska*, 511 U.S. 1 (1994)) (explaining that while the United States Supreme Court "expressed criticism of the continued use of the 'moral certainty' phrase, the Court did not actually hold that it was constitutionally invalid," and instead looked to the jury charge as a whole). Petitioner has not suggested that the reasonable doubt instruction, when read as whole, failed to convey the necessary level of evidentiary certainty required to comport with due process. *See Nichols*, 877 S.W.2d at 734.

### 6. Verdict Forms

Petitioner argues that counsel were ineffective for failing to challenge the language of the verdict forms used during the sentencing phase, which stated, "We, the Jury, unanimously find that the [S]tate has proven beyond a reasonable doubt that the statutory aggravating circumstance or circumstances so listed above outweigh *any* mitigating circumstance or circumstances" (emphasis supplied by Petitioner). Petitioner asserts that this language prevented the jury from giving full effect to all mitigating evidence because it implied that "the death penalty is appropriate when an aggravating circumstance outweighs a mitigating circumstance, regardless of whether it outweighs another mitigating circumstance or the group of mitigating circumstances as a whole." However, this language on the verdict form is consistent with the statutory language of Tennessee Code Annotated section 39-13-204(g). Petitioner has not cited any authority supporting his proposition that this statutory language is constitutionally problematic.

Because Petitioner has failed to establish that any of these claims would have been meritorious if raised at trial or on direct appeal, he has failed to establish that either trial or appellate counsel were ineffective. Accordingly, Petitioner is not entitled to post-conviction relief on this issue.

### VI. Petitioner's Claims Related to the Death Penalty

#### A. Disproportionality of Death Penalty

Petitioner argues that the death penalty is a disproportionate sentence in this case. Petitioner argues that the post-conviction court, in determining that this claim was previously determined on direct appeal, "failed to consider that this claim is based on additional evidence which could have been discovered and presented, but for the deficient performance of trial counsel," specifically evidence of Petitioner's "intellectual disability, his mitigated life circumstances, pervasive childhood trauma, and his cognitive impairments." To the extent that Petitioner is raising a stand-alone claim that the death penalty is disproportionate, the post-conviction court correctly found that it was previously determined on direct appeal. *See Pruitt*, 415 S.W.3d at 223. Petitioner cannot relitigate this issue simply by presenting additional mitigating evidence. *See David Lynn Jordan*,

- 144 -

2016 WL 6078573, at *86; *Robert Faulkner v. State*, No. W2012-00612-CCA-R3-PD, 2014 WL 4267460, at *85 (Tenn. Crim. App., at Jackson, Aug. 29, 2014). To the extent that Petitioner is arguing ineffective assistance of trial counsel for failing to "develop and present available evidence of disproportionality," this claim appears to just be a restatement of his claim that trial counsel were ineffective for failing to develop and present evidence of his intellectual disability and other mitigating circumstances discussed above. To the extent that Petitioner is arguing ineffective assistance of appellate counsel, Petitioner fails to suggest any way in which appellate counsel was deficient in arguing the proportionality issue on direct appeal or how any such deficiency prejudiced the outcome of his case. Petitioner is not entitled to relief on this claim.

### B. Constitutionality of the Death Penalty

Petitioner argues that the death penalty is unconstitutional because it is imposed in an "arbitrary" manner that is "geographically and racially skewed," because it violates international law and treaties, and because the method of execution is unconstitutional. Petitioner only makes a brief argument that either trial or appellate counsel were ineffective for failing to argue "these rights under international law." Otherwise, to the extent that Petitioner is raising these claims as stand-alone issues, they are waived. *See* T.C.A. §§ 40-30-106(g); -110(f). Moreover, the post-conviction court properly concluded that each claim has been specifically rejected by the Tennessee Supreme Court. *See State v. Freeland*, 451 S.W.3d 791, 826 (Tenn. 2014) (rejecting argument that death penalty is unconstitutional because it is imposed in an arbitrary manner based on race and geography); *Abdur'Rahman v. Parker*, 558 S.W. 3d 606, 625 (Tenn. 2018) (rejecting constitutional challenge to current lethal injection protocol); *West v. Schofield*, 468 S.W.3d 482, 492 (Tenn. 2015) (finding constitutional challenge to electrocution was not ripe for determination); *State v. Odom*, 137 S.W. 3d 572, 600 (Tenn. 2004) (rejecting argument that death penalty violates international law). Because these claims are without merit, Petitioner failed to establish either deficiency or prejudice resulting from counsel's failure to raise these issues at trial or on direct appeal.

### VII. Cumulative Error

Finally, Petitioner argues that the cumulative effect of all of the asserted errors violated his constitutional rights and entitle him to a new trial and/or a new sentencing hearing. "The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Consideration should be given to the nature and number of the errors, their interrelationship, any remedial measures by the trial court, and the strength of the State's case. *Id*. (quoting *United States v. Sepulveda*, 15 F.3d 1161, 1196

(1st Cir. 1993)). In the context of claims of ineffective assistance of counsel, multiple instances of deficient performance by counsel may be considered together in assessing whether the petitioner suffered prejudice. *Tommy Dale Adams v. State*, No. M2018-00470-CCA-R3-PC, 2019 WL 6999719, at *31 (Tenn. Crim. App. at Nashville, Dec. 20, 2019); *Sylvester Smith v. State*, No. 02C01-9801-CR-00018, 1998 WL 899362, at *24 (Tenn. Crim. App., at Jackson, Dec. 28, 1998).

As an initial matter, Petitioner cannot use the cumulative error doctrine to relitigate those claims that are waived or previously determined. *See Bruce Turner v. State*, No. W2014-01426-CCA-R3-PC, 2015 WL 13306156, at *9 (Tenn. Crim. App., at Jackson, Oct. 22, 2015); *Brian Le Hurst v. State*, No. M2014-02083-CCA-R3-PC, 2015 WL 9581575, at *26 (Tenn. Crim. App., at Nashville, Dec. 30, 2015). Additionally, none of Petitioner's allegations with regard to the guilt phase, even if this court had found that he established either deficient performance by trial counsel or prosecutorial misconduct, call into question the reliability of his conviction for first degree felony murder given the evidence presented at trial. *Cf. State v. Sexton*, 368 S.W.3d 371, 431 (Tenn. 2012). With regard to the sentencing phase, we agreed with the post-conviction court that trial counsel were deficient for failing to investigate and present evidence in support of Petitioner's intellectual disability claim, but we concluded that trial counsel were not deficient with regard to the additional mitigating evidence. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *Hester*, 324 S.W.3d at 77. Accordingly, Petitioner is not entitled to relief under the cumulative error doctrine.

## Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court that Petitioner is not entitled to post-conviction relief from his felony murder conviction or his death sentence.

_____
JILL BARTEE AYERS, JUDGE